## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | |
|---|---|
| MICAH BAILEY,<br>　　　　　　Plaintiff, | Civ. No._____ |
| v. | JURY TRIAL DEMANDED |
| NEXSTAR BROADCASTING, INC.,<br>　　　　　　Defendant. | MAY 3, 2019 |

## COMPLAINT

Plaintiff Micah Bailey (hereinafter "Plaintiff") by and through his attorney Kirsten M. Schneider, of Law Office of Kirsten Schneider, LLC, files this Complaint against the Defendant Nexstar Broadcasting, Inc. (hereinafter "Defendant"). Plaintiff alleges as follows:

## I.    PRELIMINARY STATEMENT

This is Plaintiff's complaint asserts claims for: (1) gender discrimination (Title VII), (2) gender discrimination (CFEPA), (3) retaliation, (4) hostile work environment, (5) breach of contract, (6) breach of covenant of good faith and fair dealing, (7) defamation – slander per se, (8) defamation – libel per se, (9) invasion of privacy – false light, (10) wrongful discharge in violation of public policy, (11) negligent infliction of emotional distress, and (12) intentional infliction of emotional distress.

## II.    JURISDICTION, VENUE & PARTIES

1.    Plaintiff is a resident of the State of Connecticut, having his principal residence at Hamden, CT. Plaintiff is currently 26 years old.

2.  Defendant, Nexstar Broadcasting, Inc., is headquartered at 545 E. John Carpenter Freeway, Suite 700, Irving, Texas 75062. Defendant acquires, develops, and operates television stations in the United States.

3.  Nexstar Broadcasting, Inc. owns and operates WTNH-TV. WTNH-TV is a television station located at 8 Elm Street, New Haven, Connecticut 06510. Plaintiff was employed with Nexstar Broadcasting, Inc. and worked for WTNH-TV when he was unlawfully terminated.

4.  This action is authorized and instituted pursuant to 29 U.S.C. § 621, et.seq., and pursuant to 28 U.S.C. Sec. 451, 1331 and 1343(3) and (4). This Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367.

5.  All of the allegations made herein occurred within the territorial jurisdiction of the United States District Court for the District of Connecticut.

## III.   PROCEDURAL PREREQUISITES

6.  On December 13, 2018, Plaintiff filed his charge discrimination against Defendant with the Boston Area Office of the Equal Employment Opportunity Commission (EEOC). On December 14, 2018, Plaintiff filed his charge of discrimination with Connecticut Commission on Human Rights and Opportunities (CHRO). A copy of the dual charge was sent to the Defendant on the same dates.

7.  On February 11, 2019, Plaintiff received his Notice of Right to Sue letter from the EEOC regarding Nexstar Broadcasting, Inc., charge number 523-2019-00465. (Exhibit A).

8.  On April 3 2019, Plaintiff received his Release of Jurisdiction from the CHRO regarding Nexstar Broadcasting, Inc., charge number 1930331. (Exhibit B).

9.  All administrative prerequisites to the institution of this action have been satisfied.

## IV.   STATEMENT OF FACTS

10.   In February 2014, 4 months before Plaintiff graduated from Quinnipiac, he was employed with WTNH-TV, News 8 in New Haven, Connecticut as its Assignment Editor. Over the next year Plaintiff worked tirelessly and was promoted to News Producer in January 2015. As a News Producer, his job duties included:

    i.   Produce consistently or filled-in on nearly all shows under the WTNH News 8 franchise, including: 5 am, 6 am, 9 am, Noon, 5 pm, 6 pm, 10 pm & 11 pm.

    ii.   Research all local and national news that should be shared with the public each day.

    iii.   Plan special segments, interviews, and stories that will appeal to the audience.

    iv.   Work with broadcasters to develop stories and determine the order of the news.

    v.   Write scripts for newscasters and prepare them for clips and images being shown.

    vi.   Coordinate the visual aspect of news stories, including decisions of what video and pictures for editors to generate for broadcasts.

    vii.   Study demographics and marketing to determine the best target audience and content for the broadcast.

    viii.   Schedule special guests for certain stories and segments.

    ix.   Assist on-location broadcasters in plans for live broadcast, such as determining location, interviews, clips to be shown, etc.

    x.   Write news stories/produce daily news briefs for mass digital distribution through WTNH.com website, Twitter, Facebook and radio updates.

11.   Plaintiff has always been qualified for his position. In the last several years, he has always received excellent performance reviews. His creative work has earned acclaim and his colleagues have always applauded his work ethic and performance.  Plaintiff was

never disciplined for his work performance or placed on a performance improvement plan.

12. At work, Plaintiff was part of the weekdays nightside news team. The team consisted of Darren Kramer, Ann Nyberg, and Anne Craig, all longtime television personalities and news anchors. They were all peers and reported to Chuck Carter, Assistant News Director. Every day since June 2016, he would work closely with this team to produce and broadcast the 10 pm nightly newscast to the state of Connecticut. Also, a part of this team were various editors, reporters and photographers.

13. In December 2017, Amy Hudak was hired as a Reporter. Amy was nice and Plaintiff and she worked well together. She was quite flirtatious with Plaintiff. She would flirt with Plaintiff by referring to him being a producer (not on camera), and how he should be on-camera because he "has the look." She was insinuating that Plaintiff is good looking enough to be in front of the camera. She would also comment about how she liked his hair. She would also spend extra time at Plaintiff's desk talking to him and it was noticeable to others that she was trying to flirt with Plaintiff and send signals showing her romantic interest in him. On one occasion, on or about January/February 2018, Plaintiff's co-worker, Darren Kramer, said to Plaintiff something like, "What do you think about Amy, she's into you." Amy Hudak and Plaintiff are approximately the same age and Plaintiff was single. Amy had a boyfriend at the time that was a long-distance relationship. She and her boyfriend were co-workers at previous news station. The flirtatious relationship between them was obvious to their co-workers, but Plaintiff kept an arm's length from her because she had a boyfriend. Plaintiff considered her a good friend.

14. On about February 14, 2018, as Plaintiff was leaving News 8 for his dinner break and Amy was leaving for the day, she offered Plaintiff a ride to the Elm City Market, to which he accepted. At first, Plaintiff rejected the offer because the market is so close, only down the block, and he normally would walk. But she said "No come on, I insist." As Amy dropped Plaintiff off in front of the market, just before getting out of the passenger seat, Plaintiff gave a friendly, meaningless and quick one-armed half-hug and cheek-to-cheek gesture as simply appreciation for the ride and "goodbye." Simultaneously, Plaintiff said "thank you" and they both said goodbye. Amy showed no negative change in energy or reaction as that happened. Then, immediately afterward, Amy initiated a text message exchange, engaging in a friendly, somewhat flirty conversation. There was no objection or unwanted physical contact as she would later claim. Plaintiff was just saying good bye to his friend, thanking her for a ride to the market.

15. On Saturday, February 17, 2018, Amy asked Plaintiff out on a date, for which he accepted. For weeks, Amy and Plaintiff had been talking about getting together for a drink sometime. When they were working, she would always hint out loud, even within the newsroom, that she never really had any big plans on her weekends. While texting back and forth that Saturday morning, Plaintiff suggested they do something together because Amy said 'she's around.' To which Amy responded with "Do you want to grab a drink?" Plaintiff said, "Yes [he]'d love to grab a drink. What time works for you?" Her answer, "Anytime any place." She initiated the idea to go out for a drink. Their plans never included going out with a group of co-workers, as she would later claim. They solidified plans over text to go to a wine bar near Plaintiff's apartment that night.

16. They continued to text a little throughout the day, all in good spirit, including Amy sending a picture of her and her cat snuggling.

17. Despite a snowstorm making driving conditions challenging, Amy was willing to drive herself from Hamden to New Haven to meet up with Plaintiff. She parked in the parking lot outside his apartment and they walked together to the wine bar. Amy and Plaintiff sat by the front door and ordered a bottle of wine. Many others were at this wine bar, they were not secluded in any way. They spent 2-3 hours talking about everything from News 8 to her transition to the new job, life, family, goals, etc. At one point while conversing, they even held hands for a few minutes, without any resistance, force, or signs of discomfort. Their interactions were mutual. Her right hand and Plaintiff's left hand, as snow fell outside the window behind them.

18. The wine bar began closing up at 11 pm, and they were one of the last customers there. There was no rush to leave, both of them enjoying their time. They walked out of the bar, while the snow was still falling, and Plaintiff asked Amy if she would like to see his apartment as they approached the parking lot. She gladly said, "Yes."

19. Before Plaintiff left his apartment for the evening, Plaintiff intentionally left his lights on because he likes to come home to a lighted apartment. Plaintiff's apartment was well-lit on arrival.

20. They spent no more than five minutes in his apartment. Quick, small tour... Amy said she liked the apartment. They didn't even sit down. Plaintiff didn't even offer her water or a drink, which would have indicated her staying at his apartment longer. Plaintiff was being cautious because this was a new relationship. As a gentleman, Plaintiff offered to

walk her back to her car because it is still snowing outside. She said that was sweet of Plaintiff.

21.   They arrived back to Amy's car in the well-lit public parking lot. They stood beside her car, with snow-falling creating quite the 'Winter Wonderland' scene, they wrapped up their goodbye conversation looking right in each other's eyes, and then they kissed. They met halfway and consensually kissed for about 10-15 seconds. After they kissed, Amy then word-for-word says, "I can't do this to Jim." (Jim is her long-distance boyfriend, who she had repeatedly verbally berated over the past months, not only to Plaintiff but to other coworkers.) She would say things to Plaintiff like "I don't plan on visiting him," "he never visits me," and that the relationship was likely ending sooner or later. Amy even said she had plans to turn down his marriage proposal. The relationship was failing and essentially already over, according to Amy.

22.   After they kissed and she said, "I can't do this to Jim", Plaintiff immediately took half a step backwards, looked off to the side reflecting on what she said, and he responded, "I totally understand. I've been on the other side… I know what that's like. It's not easy." Plaintiff's response confirmed to her that he heard her loud and clear. Her natural, instinctual choice of words "I can't do this to Jim," is centered around her own actions with the choice of the word "I." She did not say, "We can't do this," nor did she say anything along the lines of it being inappropriate because they worked together professionally. It simply revolved around her personal decision and willingness to become mutually involved with Plaintiff, and its possible impact on her relationship with her boyfriend.

23. After the comment about Jim, they said goodbye to each other, without tension or any negative energy, they hugged and kissed each other again for about five-ten seconds (shorter than the first kiss, but still by definition a full, mutual kiss and hug). As Amy got in her car Plaintiff said, "Hey text me when you get home safely so I know you're okay", because roads were covered in snow and he was concerned about her driving. Amy replied, "I will!" New Haven to Hamden are adjacent, the drive should only take 15 minutes or so. So, Plaintiff waited about an hour before texting her hoping she got home safely, and thanking her for coming out and for the great time. She never answered the text.

24. On February 18, 2018, Monday, back at work, Plaintiff walked past with a simple wave to Amy and the photographer she was speaking to in the parking lot. In the newsroom, Amy did not interact with Plaintiff, so he gauged his interaction with her based on her behavior, which was honestly surprising to see. The only communication that day was when Plaintiff mentioned a "Report-It" email the station received that Plaintiff thought Amy might find funny, which she did laugh at and had a light-hearted response to. Plaintiff read it out loud to her with others around in the newsroom. (The email had to do with competitive swimming. Amy used to be a competitive swimmer.)

25. On Wednesday, February 20, 2018, Plaintiff learned that Amy made two false claims against him to Human Resources. The first false claim Amy made to Human Resources was, "In January 2018, Micah Bailey walked me out to my car. At her car Micah kissed her on the cheek. She said that she brushed off his advances and he said that in Miami, where he grew up, that's how they act towards all of their friends." This was a false statement. This was made with malicious intent. This event did not happen.

26.  The second false claim Amy made to HR about Plaintiff is, there was "an unwelcome kiss on the mouth after we met for drinks on February 17, 2018 date." She stated, "On February 17, 2018, after an evening out with what was supposed to be a group of co-workers, Micah made another unwanted advance towards her by kissing her on the mouth. She was very surprised by the nature of the kiss and it was very unwelcome. She told him no but she said that he kissed her again." This was a false statement. These statements were made with malicious intent. The date was never supposed to be with a group of friends and the kiss and romantic interaction were mutual and consensual. Amy never said "no." She consensually kissed him.

27.  Plaintiff learned that Amy made these false claims against him when, on February 20, 2018, Keith Connors called him into a meeting with Lisa Newell, HR, and Ricky Santiago (Union Representative) and told Plaintiff that a female has made two claims of unwanted physical contact. Plaintiff was shocked that a co-worker had complained about him. At first, Plaintiff was not told who made the complaint, nor was he told the details of the complaint.

28.  During this meeting with HR, not knowing any details of the allegations against him, Plaintiff provided HR with an honest response to the accusations. Plaintiff responded that the first false allegation never even happened, and a detailed account of the timeline refuting the second false allegation. Plaintiff respectfully denied any wrongdoing on his part. Zero intent, zero threat, zero harassment.

29.  Plaintiff did not know Amy completely fabricated an alleged January 2018 incident. Plaintiff did not know Amy lied to HR about their date being "what was supposed to be a group of co-workers", before giving his account of the story. Plaintiff did not know Amy

lied about him making "another unwanted advance". Plaintiff did not know Amy lied about her being "very surprised… and it was very unwelcome". Plaintiff did not know Amy lied, saying "she told him no but she said that he kissed her again". Details of the written complaint against Plaintiff were not provided to him until eight weeks after his firing, once he was finally given his personnel file by NABET Local 14 President Joe D'addesse. Even then, the report was vague, calling Amy "a female" and not using her name, and it was littered with false statements. When Plaintiff was asked to tell HR his side of the story, Plaintiff did not know what he was responding to. Nonetheless, Plaintiff provided the truth.

30. After briefly explaining his side of the story to HR, Lisa Newell cut him off and said, to him, "It sounds like you took advantage of a woman who is going through a lot, who was just looking for a friend in a time of need." Plaintiff was stunned by Lisa's comment. This was a hostile statement. Lisa asked Plaintiff very few questions. Lisa was clearly not interested in listening to Plaintiff's account of what happened and had already judged him. She was treating him differently than she treated Amy. Lisa discriminated against him because he is male. Then, Lisa and Keith both suggest that Plaintiff take full responsibility and apologize to Amy. Again, shock. Why was Plaintiff being forced to apologize for something that did not happen? They demanded an apology and disregarded the facts presented in Plaintiff's side of the story. They did not consider that perhaps Plaintiff was telling the truth and that Amy's accusations were false or unfounded. They are calling this their "investigation," but in light of the #MeToo movement and being the male involved, they were quick to judge, quick to demand Plaintiff accept the blame, and quick to disregard his honest and truthful response to the

accusations. Lisa and Keith did not treat Amy in this same disrespectful manner. She was listened to and believed without question. Plaintiff was treated differently because he is male.

31. In this meeting Plaintiff suggested that he had all the text messages that lead up to their February 17, 2018 date. He offered to show them to Lisa and Keith. However, Lisa and Keith were not interested in hearing his side of the story and ignored the offer of evidence.

32. WTNH/News 8 failed to investigate fully, by failing to acquire any text messages or communications related to the claims. In the written documentation of the complaint, management admits to not retrieving any text messages.

33. On February 22, 2018, Plaintiff was required to report back to HR and join a meeting with Amy, Lisa Newell, and Keith Connors. Plaintiff was told that he was required to apologize to Amy, even though he told HR the claims were false. Plaintiff's union representative, Ricky Santiago, was not present at the meeting. Plaintiff expected union representation, but no one was present to represent him. Lisa and Keith initiated the meeting, without Amy in the room, by sharing that they made the decision to issue him a verbal warning. They give Plaintiff another stern reminder regarding his apology that "shorter is better," (despite having numerous unanswered questions, and having denied her accusations), and that Plaintiff should, "just apologize and take responsibility." Lisa then told Plaintiff that this incident does not go on his record, nor does it get shared with corporate (Nexstar Media Group, Inc.). Plaintiff was shocked that Lisa and Keith discouraged him from asking questions. Plaintiff would have asked questions, but he could tell from their tone of voice that he should not. They coerced Plaintiff to make an

apology to Amy for something he did not do, and enticed him to do so by assuring him that WTNH would not tell corporate.

34.    Amy entered the room and the meeting lasted for about 10 minutes. Plaintiff apologized like he was instructed and made the promise to her and everyone to remain entirely professional and have complete focus on the job they were there to do. Amy then gave her well-crafted, quite theatrical response, over-acting with dramatic delivery. She pretended to be quite upset saying things like, "I drove home crying hysterically to my boyfriend on the phone. He was heartbroken." etc. Plaintiff believes that she was acting and these emotions were not real because later that same day, she was seen laughing and carrying on like nothing was wrong. Previously and frequently, she had also complained that her relationship with her boyfriend was virtually over. Now all of the sudden she is acting upset. Something was not right.

35.    Apparently, Amy quickly recovered from any upset she felt because of the interactions that she claimed were unwanted. Shortly after filing her false complaint against Plaintiff, she accepted a new role at WTNH/News8, working nights (week nights) as a reporter on the show Plaintiff produced. This was a promotion. This promotion was given to her by News Director, Keith Connors. Previously she worked weekend nights. Working weekday nights is certainly a preferred schedule versus working weekend nights. This was a promotion as a Reporter because of the increased exposure of reporting on the weeknight newscasts rather than the weekend nights. More people watch News 8 during the weeknights. If she was so distraught by their interactions, why would she accept this role, and why would WTNH/News 8 place her in this position? On March 6, 2018, shortly after Amy began working nights with Plaintiff, she emailed him complimenting

his producing of the show that night. Her email sated, "Really solid with a great sense of urgency. Live teases and extra 10:30 live element were great! (Bob also can do no wrong in my eyes.) Amy." This was totally unnecessary (no one does this, not even Plaintiff's bosses would), but even more so given their very fresh history (just three weeks prior, she had accused Plaintiff of sexual harassment). Plaintiff remained professional, and responded to her email, "Thank you very much. Always with urgency is the goal! Nice job tonight. Welcome to nightside."

36.  Keith Connors' hostile act, by placing Amy Hudak, on the same shift as him and placing her in a role that made them work more closely together, shortly after she accused Plaintiff of sexual harassment, was outrageous. Keith intentionally placed Amy in this position to cause him undue stress and anxiety. It was as if Keith was taunting Plaintiff and purposely making his work life more stressful. This hostile act altered the terms and conditions of Plaintiff's employment by creating a more hostile environment, making it more difficult to do his job. This was an adverse employment action.

37.  Thereafter, work went as usual. Plaintiff continued to do good work and interacted with Amy only at work, and refused to respond to her flirtatious behaviors toward others around. Plaintiff remained professional towards her at all times. Weeks later, Assistant News Director Chuck Carter even vouched to HR on Plaintiff's behalf, that his professionalism working with Amy Hudak following the matter was quote, "Exemplary." Amy however, continued to flirt with co-workers. Her behavior promoted a sexually charged hostile work environment. Amy was not disciplined for her behaviors.

38.  Plaintiff was Amy's equal at work. Plaintiff was her peer, not her supervisor and he had no managerial authority over her at work.

39. On information and belief, a few months later, Amy broke up with her boyfriend and she promptly continued dating other men.

40. The verbal warning Plaintiff received because of Amy's false statements caused him damage to his exceptional reputation at work and later caused him damage because he was terminated, in part, because of Amy's false statements. People whispered about Amy's accusations, and her false statements caused a hostile work environment. WTNH/News 8 did not consider Plaintiff's side of the story or consider that his rendition of the events was the truth. Amy was immediately believed because she is female and Plaintiff was not believed because he is male. Plaintiff was treated differently because he is male.

41. On Friday night, April 6, 2018, a group of four work friends went out for drinks in downtown New Haven. (Plaintiff, Matt Buynak, Producer, Ron Kauffman, Photographer, and Alexandra "Alex" Conroy, Editor.) They first went to The Regal Beagle, then to Geronimo, then eventually picked up pizza at Aladdin Crown Pizza and ate it altogether while walking back to the station.

42. While at Geronimo, Alex Conroy (female) snapped some videos of the group hanging out together having a good time, and she even posted an individual video of Plaintiff, and tagged him in it, on her 'Instagram Story'… Something all of her friends and followers can see. One would not post anything about somebody they don't care for or don't like. Posting a video of someone you like is pretty common practice across social media. This posted video was an immediate sign of admiration towards Plaintiff.

43.     That night while they were hanging out together, Alex was acting towards Plaintiff as she normally did at work. She was giving Plaintiff "the eyes" suggesting that she found him attractive, she was nervous laughing, acting flirtatious and joked with Plaintiff.

44.     After getting back to the station, everyone hung out for a little bit before getting in their cars to leave. Alex got in her car, and Plaintiff got in his car. Plaintiff sent Alex a message on Instagram and suggested she not leave yet and asking if he could come say bye, to which she said, "Sure? Haha." So, Plaintiff walked from his car over to her car and he sat in the passenger seat. Alex and he chatted for about a minute or two, and in that short conversation came up the fact that they "matched" on the social dating app Tinder. The discussion about them both "swiping right" is what led them to start kissing. Alex and Plaintiff matched (both swiped right) on Tinder, approximately two months prior to this night. The first message Plaintiff received from Tinder about Alex was, "You matched with Alexandra on 2/10/18." The first message came from Alex... although in the initial messages she said that Ron Kauffman (another WTNH employee and friend of Alex's) took her phone and messaged Plaintiff on her behalf, from her account. Plaintiff asked if it actually was Ron, then he jokingly replied, "Maybe it was, but who was it that swiped right? I think we need a News 8 investigation." Alex responded to his question and said, "I swiped right." Swiping right means that you like that person and it allows users to chat if both users swiped right.

45.     Alex and Plaintiff began kissing in her car. The kissing lasted about 5 minutes before — for lack of better words — coming up for air. They both giggled and smiled in a blushing type of way, the way people do when they have a new crush. In the time that they paused, Alex NEVER said or showed that she felt uncomfortable. She NEVER said "No." She

NEVER said, "Stop." Everything she was doing, behavior and body language, represented that of someone giving full consent to the mutual actions.

46. They soon started kissing again, even more enthusiastically. At that point they are holding hands, too. Plaintiff then placed her hand near his private area, as a gesture inviting her touch. This was done completely without force on his part, and without resistance on her part. She did not pull her hand away. Plaintiff did not hold his hand there forcing her to touch him, he simply placed her hand gently and took his hand away. On her own will, she took that invitation and proceeded to touch Plaintiff on her own. Plaintiff took that as a clear sign that she was still consenting to everything happening. Plaintiff then touched her the same way she was touching him. In response to Plaintiff's touching she began moaning from pleasure. This pleasurable moan told Plaintiff that everything was mutual and it is something she is enjoying. Once again, there was no resistance or negative change in body language, and the words "Stop" and "No" were NEVER SPOKEN. (In the claims she made to HR, she outright lied by saying "She became uncomfortable with the nature of the physical contact and told him to stop".)

47. All of the actions described happened entirely over their clothing. All articles of clothing were on and remained on.

48. As the kissing and touching came to an end after about another 5 minutes, they again sat back and smiled, light-heartedly reflecting on the situation. Plaintiff then asked her if she would like to come over to his place, to which she responded, "I would, but not tonight." Plaintiff then asked if she felt okay to drive home, to which she said she did. They said goodbye, Plaintiff got out of her car and he walked back to his car, got in, and drove home.

49. Plaintiff wanted to make sure Alex arrived home safely. He was excited about a possible new relationship with her. Plaintiff messaged Alex when he arrived home asking if what happened was okay with her given the fact that they are co-workers. Plaintiff woke up in the morning and she had not responded. Typically, she is always quick to respond to messages. So, Plaintiff messaged her later in the morning, and said that what happened didn't have to happen again if she didn't want, or that it can, but that Plaintiff just wanted to know that everything was okay. Plaintiff was simply making an effort to gauge her feelings moving forward. Plaintiff hoped there would be no tension at work, or confusion about the situation. All of his messages were from a place of concern and hopefulness, with pure intentions, and were in no way a threat or harassment.

50. Alex Conroy and Amy Hudak worked the same shift at News 8. On information and belief, Amy and Alex are friends, and are friends with the same group of co-workers.

51. Plaintiff was Alex's equal at work. Plaintiff was her peer, not her supervisor and he had no managerial authority over her at work.

52. On April 12, 2018, Plaintiff was brought into Chuck Carter's office and notified that "Another female has made complaints against me." Plaintiff was told to report to HR.

53. Before reporting to HR, Plaintiff tracked down the closest Union Representatives, Ricky Santiago and JP Coleman, to accompany Plaintiff in the meeting. In the meeting are: Plaintiff, Ricky Santiago, JP Coleman, Chuck Carter (then Assistant News Director), and Lisa Newell.

54. During this meeting, Plaintiff learned of Alex's claim against him. Lisa Newell shares that Alex made one claim of "unwanted physical contact" that happened on April 6, 2018. But Lisa did not share any details regarding Alex's claim before Plaintiff was

required to tell Lisa what truthfully happened. For a second time, Plaintiff was required to respond to unknown allegations.

55. Plaintiff provided Lisa with an honest response to the false claim of "unwanted physical contact," a detailed account of the timeline of the interaction, and respectfully denied the accusation that physical contact was not welcome. Zero threat, zero harassment, no one said, "No," or "Stop." Those words were NEVER spoken and Alex was clearly participating equally in the physical contact. She was touching Plaintiff as well. Her body language/actions reflected that of two adults consensual in the moment.

56. At this meeting, Plaintiff told Lisa that the consensual incident occurred after work hours, in the News 8 parking lot, between two mutually-interested adults. Plaintiff told her that he had Tinder and Instagram messages to prove the mutual interest. Plaintiff also offered to show her these messages, but Lisa was not interested in hearing his side of the story, or seeing any proof that the alleged "unwanted physical contact" was actually mutual and consensual. Plaintiff was treated differently than Alexandra Conroy.

57. Plaintiff's response to the brief, vague claim against him took about 5 minutes, and Lisa Newell had no response. They sat there speechless for several seconds as Plaintiff assumed Lisa would ask follow-up questions or share with everyone what Alex accused him of. Lisa did not share that information. Lisa did not ask a single follow-up question, implying she heard everything she needed to hear already. On information and belief, when Alex complained, Lisa took time to ask her questions and listen to her. Plaintiff was treated differently because he is male.

58. Lisa failed to thoroughly investigate this situation by not asking Plaintiff follow-up questions. Her lack of concern about his recollection of the events told Plaintiff that she

had a preconceived judgement of the case and him, and once again, discriminated against Plaintiff because he is male. Plaintiff remembered Lisa's previous discriminatory and hostile comment to him in February that he "took advantage of [Amy]." He was worried that she would discriminate against him again. Plaintiff offered Lisa a second chance to view the text messages between Alex and him, and again was ignored. Lisa did not want to hear his side of the story or consider that Alex made a false statement against him. WTNH/News 8 also failed to investigate fully by failing to gather witness accounts, and acquire all messages and evidence related to the case. Alex's story was taken as the truth and Plaintiff's narrative was disregarded.

59.   At this same meeting, Chuck Carter shared with everyone in the room that Plaintiff was exemplary moving forward working with Amy Hudak after that situation. Carter shared that she and he have had to work closely every night as producer-reporter, and that she has even been comfortable enough to often come to Plaintiff's desk to discuss matters regarding her story/the show.

60.   Lisa ended the meeting by informing Plaintiff that all of the information will be shared with corporate, and that corporate's HR will make the final decision, which will be shared with Plaintiff on Monday, April 16, 2018. At this point Plaintiff was scared for his job. Lisa was not listening to him or considering his side of the story. It was clear that she believed Alex. It was clear that she had already decided that Plaintiff should lose his job because of these false accusations. She was using "corporate" as a shield and not taking ownership for her failure to investigate the truth of the matter.

61.   Because of the overwhelming fear Plaintiff had that the truth was being ignored by HR again, Plaintiff asked Lisa if he would be given the opportunity to resign instead of being

potentially fired. Plaintiff explained to Lisa, and the others in the room, that if his employment was going to end, Plaintiff was hoping to leave without his reputation being tarnished further and to keep the terms of his departure confidential. Lisa told Plaintiff that resigning would be an option.

62. Once this meeting ended, Plaintiff went for a walk with Union Representatives Ricky Santiago and JP Coleman, to gather his emotions and talk about what is next to come. They reminded Plaintiff everything he shared with them would be "always confidential." Plaintiff was very emotional with them and confused. The fact that Plaintiff's conversations with Ricky and JP remained confidential was comforting, but Plaintiff was still very upset. Plaintiff told them that Alex's accusations were false. He told them that Amy's accusations were false. Plaintiff said this to them several times. He told them that he felt that he was not being treated fairly and that Amy and Alex were being treated better than he was. Plaintiff told them that his side of the story was not being considered, while Amy and Alex were believed instantly. Plaintiff told them that he felt that he was not believed because he was male. Plaintiff tried returning to his desk to get back to work, but then Chuck Carter asked to chat with him and suggested he go home. Carter later called Plaintiff that night and left a message asking that Plaintiff stay home from work the next day (Friday).

63. On information and belief, after Plaintiff's walk with Ricky and JP, they reported back to Lisa and Keith Connors and told them what he had shared, that he felt he was not being treated as fairly as Amy and Alex.

64. On Monday April 16, 2018, Plaintiff came to work at his usual time of 3:00 pm, with instructions to meet in Keith Connors' office and that he should have a Union

Representative in there with him. Plaintiff spent 15-20 minutes looking around the station and waiting for Ricky Santiago, the Union Representative. Plaintiff spoke to two employees in near proximity to where he would usually be, and both said they had not seen him yet. Plaintiff could not find him anywhere, which was odd because Ricky was usually easy to find. While on the phone with Keith Connors, Chuck Carter saw Plaintiff sitting waiting in Keith's office after trying to find Ricky. Keith then told Chuck over the phone the meeting would be up in HR, not in his office like Plaintiff was originally told. Chuck Carter said he would track down Ricky. Plaintiff went upstairs and waited outside the HR office for another 5 minutes thinking Ricky would arrive any minute... he did not. The meeting was already 20-25 minutes late. Keith asked if he wanted to wait for Ricky, and Plaintiff replied that he already had been waiting the entire time and looking for him. On information and belief, Ricky was avoiding Plaintiff and the meeting. So, Plaintiff entered the HR room and the began the meeting. (Legally, the Union is obligated to have a representative in all disciplinary meetings. Ricky was a no-show. Plaintiff never did get a reason why he did not show. Instead, Ricky became overly-involved and detrimental to Plaintiff's firing and defamation in the following days.)

65. This April 16, 2018 meeting included Plaintiff, Lisa Newell, Keith Connors and no Union Representative. Keith provided a speech expressing his "extreme disappointment" in Plaintiff. Keith accused Plaintiff of, then tells him for the first time that Alex's complaint was about, an "unwelcome sexual advance," that he kissed and touched her. Keith said Plaintiff should "feel lucky that so many people came to bat for me/fought for me" in the discussion about all this. He said the discussion included Richard Graziano (WTNH General Manager/Vice President) and Chuck Carter. Keith insinuated that Graziano and

Carter did not want Plaintiff disciplined. Keith said the decision had been made to issue him a 2-week suspension without pay. Lisa Newell handed Plaintiff copy of "Anti-Harassment Policy" and EAP (Employee Assistance Program) information. Lisa was very quiet the entire meeting. Plaintiff responded and said that he was grateful for those who fought for him. In cooperation, Plaintiff said he would seek out guidance with the EAP. Despite having so much more to say and so many questions, the meeting abruptly ended and he was not allowed to ask his follow up questions. Plaintiff then left initiating his two-week suspension. This was an adverse employment action.

66.     Plaintiff's two-week suspension was retaliatory for complaining that he was being treated differently than Amy and Alex. On information and belief, had Plaintiff not complained for gender discrimination, he would have been given a written warning and not suspended without pay.

67.     On April 17, 2018 at 2:52 PM, merely 23 hours after they issued Plaintiff the suspension, Keith Connors called him and fired him. Plaintiff was terminated over a 2-minute phone call. On the phone Keith, extremely briefly says, "We found new evidence, and based on that new evidence we are deciding to terminate you." About 15 seconds of complete silence followed. Plaintiff waited for an explanation as to the content of this "new evidence." There was no explanation, no elaboration from Keith on "new evidence." No information on the allegations. No documentation. No indication of an investigation. Plaintiff responded utterly shocked, and said, "I cannot for the life of me imagine what possible new evidence you could have come across that would lead you to making this decision. Nothing new could incriminate me to termination. Everything has already been shared and laid out on the table." Keith responded with "Lisa Newell will be sending you

your benefits information," and ended the phone call. Plaintiff was humiliated and shocked.

68.    The termination phone call completely negated Plaintiff's ability to resign, which he had requested as a potential option and Lisa promised it would be an option. Resigning would have saved him his second job, which he lost too, resulting in thousands of dollars in lost income.

69.    Plaintiff was never even informed of what Alex told HR, not before or after he responded to the claim. It wasn't until after he was fired, and weeks later, that he received his incomplete personnel file including the documentation of Amy's and Alex's claims. Until then, Plaintiff did not know they lied, or what they lied about. Plaintiff could not properly respond to allegations against him when he did not know the content of the allegations. Every time Plaintiff began to ask questions, he was interrupted by Lisa or Keith.

70.    On or about April 18, 2018, News Director Keith Connors sent out a mass e-mail announcing Plaintiff's termination to everyone at News 8, reading in part: "Micah Bailey is no longer an employee at WTNH. His termination is effective immediately." After the email was sent, the Assistant News Director Chuck Carter and Human Resources Lisa Newell both scurried to Keith's office, to address their concern about the immediacy of the mass e-mail and its potential repercussions. This email sent immediate shockwaves through the station and got everyone talking about Plaintiff and the false allegations against him.

71.    On April 19, 2018, Anne Craig, the (former) 5pm and 11pm News 8 Anchor, called Plaintiff and left him a sincere voicemail message. In this message she expressed how talented Plaintiff is and how sorry she was to hear of his situation. Notably in her

voicemail, she referred to the #metoo movement and WTNH/News 8's knee jerk reaction to terminate Plaintiff. In her voicemail she stated, "The culture of everything now is just so sensitive and I know you're such a good guy." She went on to say how sorry she was. It was clear from the message that she realized that WTNH/News 8 fired Plaintiff, not because his acts were inappropriate, but because WTNH/News 8 quickly overreacted, afraid that it would be the next #metoo headline related to Amy and Alex.

72. On or about April 20, 2018, during the weekly "Stand-Up Meeting" (gathering of all news staff in the newsroom for weekly update), Keith Connors led the meeting by verbally announcing Plaintiff's firing and using his name as a launching pad for their stance against sexual harassment, reviewing their "no tolerance policy," in turn slandering Plaintiff's name, framing him as an example and stating as much that it was certain that Plaintiff sexually harassed Alex and Amy. Dozens of employees heard this statement. Keith knew that Plaintiff had adamantly opposed and disagreed with Amy and Alex's false allegations. He knew Plaintiff offered evidence to Lisa that could prove his interactions with them were welcomed and consensual. To add to the defamation, Keith sent out a mass email of the points/updates discussed during the meeting, so those who did not attend in person were made aware of all updates. His points and updates email after this Stand-Up Meeting, included Plaintiff's firing and stated or at least inferred that the reason for Plaintiff's firing was sexual harassment. This was a hostile act. This was defamation. This put Plaintiff's character in a false light. This was a major misrepresentation of Plaintiff's character that most reasonable people would find objectionable.

73. Keith's defamatory comments were made while at work, in the scope of his employment.

74.   Right after Keith finished the newsroom "stand-up meeting", a female employee marched

into Chuck Carter's office expressing disappointment/concern about Keith's handling of

Plaintiff's termination announcement. WTNH/News 8 did not retract its defamatory

remarks or correct its false statements. WTNH/News 8 knew of the defamatory

statements and promoted the defamation by failing to correct the false statements.

75.   On April 26, 2018, 9 days after Plaintiff was terminated, he finally met with NABET

Local 14 Union President Joe D'addesse (veteran News 8 photographer). This was, and

to this day still, their one and only in-person meeting. JP Coleman accompanied

D'addesse. D'addesse provided Plaintiff with his personnel file containing his incomplete

employee records, the termination letter, and written accounts of the accusations from the

first two accusers. In Keith Connors' words, the "new evidence" — an alleged complaint

of a third accuser — was not included. Nor was Plaintiff's most recent stellar

performance review for the year 2017.  Plaintiff received this review in February 2018.

By his own admission, D'addesse has never handled a case of this level before.

D'addesse and the NABET Local 14 Union deprived Plaintiff of fair representation and

breached its duty of loyalty to Plaintiff.

76.   The Alexandra Conroy report in Plaintiff's personnel file is vague, calling Alex "a

female" and not using her name, and it contained numerous false accusations.  The

written account of Alex's claims provides: "on Friday, April 6, 2018, after an evening out

with a group of co-workers, which included Micah and the female complainant, the group

returned to the station to retrieve their cars. Everyone headed to their own vehicles;

Micha texted the female from his car asking if he could jump in her car to say "bye". She

agreed. Once in her car he proceeded to kiss her on the mouth and touch her. She became

uncomfortable with the nature of the physical contact and told him to stop. She said that she felt his advances became unwelcome. The next day Micah texted the female co-worker regarding the incident. Management didn't review the texts, but the woman said that she was uncomfortable with the nature of those texts." This was a false statement.

77.    After Plaintiff received his personnel file, he still did not know what "new evidence" caused his termination. It was not included in Plaintiff's personnel file. Plaintiff does not know the reason for his termination, on what grounds, and still had no idea what "new evidence" evolved the suspension to a termination. Plaintiff was totally in the dark, in complete turmoil. On information and belief, all female employees involved in Plaintiff's termination were fully informed and their questions answered. Plaintiff was discriminated against and terminated because he is male. Plaintiff was treated differently than similarly situated employees who are female.

78.    Joe D'addesse failed to explain this "new evidence" to Plaintiff that caused his work status to go from a two-week suspension to terminated. What Joe did tell Plaintiff was that on April 17, 2018, "a current union member went forward to HR on their own, addressing their own discontent with the decision to only issue [Plaintiff] a suspension." This was newly hurtful and surprising to Plaintiff because he had no enemies at WTNH/News 8 that he knew of. Plaintiff was highly respected by all and treated everyone equally. At the time, Plaintiff had no idea why someone would make him a target. D'addesse said, this "current union member" also took it upon themselves to share allegations about former WTNH/News 8 producer Marissa Nobile and Plaintiff, less than 24 hours after Plaintiff's suspension. According to D'addesse, that person alleged that there are questionable text messages between Nobile and Plaintiff. This was a completely

false and ridiculous accusation because Plaintiff has zero history with Nobile outside of a

co-worker relationship/friendship. This "new evidence" was entirely fabricated.

79.     The single, only written message Plaintiff had with Marissa Nobile includes one

Facebook message back and forth. On November 4, 2017, the first and only messages

were, Plaintiff: "I mean it when I say you're not alone with this. I went through it alone

and it sucks. Text whenever Marissa (305) XXX-XXXX" (3:04 AM), and Marissa Nobile

response, "Thank you!! I sincerely appreciate it!" (5:41 AM). The context of this

communications was that Marissa Nobile was producing overnights at the time,

specifically the weekend morning show, the same show Plaintiff produced as an early-on

producer. When Plaintiff returned to the station to use the restroom following a night out

after work, Marissa was there preparing for the morning show. They chatted for a little

catching up and she shared with Plaintiff that she just broke up with her long-term

boyfriend and that things were really hard juggling that stress along with working

overnights. Plaintiff shared with her that he went through the exact same thing — a

sudden break up from a long-term relationship while Plaintiff worked weekend

overnights — and that Plaintiff went through it all alone without family or many friends

nearby. Being a good friend, Plaintiff shared comforting words along the lines that he had

been in her shoes and could relate, and "time heals", 'this too shall pass", etc. Plaintiff

sent her that single Facebook message when he arrived home, letting her know she's not

alone in her challenging times. Simply, being a friend.

80.     Thereafter, in search for answers as to what the "new evidence" was, Plaintiff learned

from several people, including D'addesse, that this third person (a false accuser), Marissa

Noble, somehow "entered the picture" with unknown claims. Marissa was not even an

employee of News 8 at the time the other complaints were filed. Marissa's employment with WTNH/News 8 ended in December 2017. Plaintiff still does not officially know why or how or what Marissa allegedly complained about, or how she was even brought into the picture less than 24 hours after his suspension, triggering his termination.

81.    As a former Producer, Marissa had to interact and work side-by-side with Amy Hudak and Alex Conroy just as Plaintiff did in his Producer role. Amy was hired the same month that Marissa left. Marissa worked weekends for a while with Alex Conroy. A much smaller staff is assigned to work weekends, which given that fact, affords people working weekends more opportunity to become close. Marissa was very talkative and friendly with everyone, but especially with her weekend crew, including Alex Conroy. On information and belief, Marissa and Alex kept in touch after Marissa ended her employment at News 8 station.

82.    Apparently, hearing the new (unproven, un-investigated) accusations against Plaintiff was enough for WTNH to call the lies "new evidence" and terminate him. False accusations once again gone un-investigated by WTNH. D'addesse said Keith shared the "new evidence" with corporate and they too were in-line with the decision to terminate Plaintiff's employment. This all happened only 23 hours after they made the decision to suspend his employment. And, Plaintiff was never asked about his relationship (or lack thereof) with Marissa. When WTNH/News 8 heard "new accusations" and pulled the trigger, it completely skipped an investigation and completely skipped the obligation to inform Plaintiff of what he was being falsely accused of, as well as skipped affording him the chance to refute the accusations. WTNH/News 8 completely deprived Plaintiff of his

due process rights. WTNH/News 8 discriminated against Plaintiff because he is male. Plaintiff was treated differently than similarly situated female employees.

83. Due to WTNH/News 8's failure to complete a proper and accurate investigation, their decision to terminate was based off of unconfirmed, fake information.

84. Plaintiff still does not know the entire contexts of the "accusations", but based on it involving Marissa Noble, WTNH/News 8 clearly believed the false, misleading accusations, and out of fear of repercussions of these women jumping on the #metoo band wagon and having a public claim against the news station, WTNH/News 8 fired Plaintiff without doing a proper and complete investigation. Plaintiff was treated differently because he is male.

85. Since Plaintiff's April 26, 2018 meeting with D'addesse, he has asked the union several times to retrieve this documentation from HR. To this day, Plaintiff still has not been given in writing an official account of the claims/accusations made consisting of this "new evidence." On information and belief, no documentation exists, proving further the accusations were maliciously fabricated. Plaintiff is still in the dark about why he was fired. He does not know what information transformed his suspension — with promise that he would return to work two weeks later— into a termination the very next day.

86. The defamatory statements of Amy Hudak, Alex Conroy, Ricky Santiago, and Keith Connors have carried over to news stations and industry affiliates in the region, preventing Plaintiff from obtaining gainful employment. Plaintiff 's reputation has been damaged to the extent that many former co-workers, superiors and mentors will no longer speak to Plaintiff. Plaintiff's networking capabilities have been damaged by WTNH/News 8's unlawful acts against him.

87. Amy Hudak's defamatory comments were made while at work, in the scope of her employment.

88. Alex Conroy's defamatory comments were made while at work, in the scope of her employment.

89. As a result of WTNH/News 8 discriminatory conduct towards Plaintiff and the defamatory statements of its employees, Plaintiff lost his second job with Full Send Productions, as a result of the "sexual harassment" label… a decision made based on Plaintiff being a "business risk." Plaintiff had recently, before his termination, brought in the biggest project ever for Full Send Productions, which would have earned him at least $7,000, or more. When Full Send learned that Plaintiff was terminated under the false pretext of sexual harassment accusations, it terminated its relationship with Plaintiff and he lost this income. Along with this income, Plaintiff had numerous other projects he was part of producing. Dan Fish, Full Send's President, sent him a text the day after Plaintiff was fired from News 8 stating: "Was thinking about this more and I feel terrible but I think it's in the business's best interest to not have you on any shoots until you get this all sorted out. I really hope you understand where I'm coming from but I can't risk losing any clients. I'm sorry man." Instead, Fish received this $7,000.00 and more. This major project Plaintiff captured also had sentimental value to Plaintiff. Full Send and Plaintiff had just been hired to produce the new admissions video and various video content for Quinnipiac University, Plaintiff's alma mater, and the project was near and dear to his heart. This project alone would have provided Plaintiff with at least 8 months of steady work.

90. Plaintiff lost his partnership with Full Send, a fast-growing business with significant professional growth prospects for Plaintiff. Plaintiff also lost the intellectual property he created with Full Send. Plaintiff was looking forward to a prosperous relationship with Full Send and this relationship was destroyed by Amy Hudak's and Alex Conroy's defamatory statements.

91. According to the online Nexstar Sexual Harassment Course all employees are required to take, it says quote, "If sexual contact is mutually desired it is not harassment". In the incidents with Amy and Alex, the "sexual contact" was mutually desired. The online course also goes on to say "A single isolated incident is unlikely to constitute a hostile work environment". Plaintiff did not once harass or threaten Amy or Alex.

92. The Nexstar Employee Guidebook states regarding sexual harassment the conduct must be "unwelcomed". Plaintiff did not violate the policy because his behavior with Amy and Alex was welcomed in the moment. It was not until afterwards that these women decided they would falsely accuse Plaintiff for reasons unknown. Plaintiff's conduct with Amy and Alex was welcomed and consensual. For actions to be "unwelcome" means that it must be known that the actions are not welcome. No one said, "No." No one said, "Stop." Both accusers lied to HR about saying "no" and "stop". There was no resistance, no force, no threat, no aggression. Only mutual actions. There were two consenting adults, each time. There was mutual interest, overall involvement and participation. Plaintiff tried his best to explain this to Lisa and HR, but he was not given the appropriate opportunity and WTNH/News 8 did not fully investigate his side of the story.

93.  Rather, WTNH/News 8 violated the Nexstar Employee Guidebook by failing to promptly and thoroughly investigate, and by failing to keep the matter confidential. Nexstar Employee Guidebook states that:

> "A PROMPT AND THOROUGH INVESTIGATION OF THE COMPLAINT WILL BE CONDUCTED WHILE MAINTAINING CONFIDENTIALITY TO THE EXTENT PRACTICAL. EVERY EFFORT WILL BE MADE TO SAFEGUARD THE EMPLOYEE'S PRIVACY INTERESTS AND TO KEEP THE MATTER CONFIDENTIAL TO THE EXTENT PERMITTED BY LAW."

94.  Plaintiff's union failed to fairly represent his interests.

95.  Plaintiff's union also failed to keep this matter confidential, influencing the termination and adding further to the defamation by union representative, Ricky Santiago. Ricky purposefully defamed Plaintiff by gossiping and telling others outside of News 8 about his termination.

96.  Ricky Santiago and Plaintiff's union owed Plaintiff a duty of fair representation.

97.  Plaintiff's union, NABET Local 14, owed Plaintiff a duty of fair representation.

98.  Ricky Santiago, the union and Plaintiff's employer owed him a duty act in good faith.

99.  Plaintiff's employer and union had a covenant of good faith and fair dealing to represent his interests.

100.  Plaintiff's employer and union breached its covenant of good faith and fair dealing by failing to investigate his claims that the accusations against him were false.

101.  Plaintiff's employer breached the collective bargaining agreement (or "Agreement") by failing to give him the reason for his termination and for discriminating against him because he is male.

102.  Ricky Santiago was in the meetings where Plaintiff learned of the accusations against him, but later on did not show up at the meeting where Plaintiff learned of his suspension.

After the meetings where Plaintiff learned of the accusations, he was overrun with emotions and confided in Ricky as the experienced "representative" supposed to have Plaintiff's back and guide him through this. After both meetings, Ricky reminded Plaintiff that no matter what, he and the Union keep everything confidential and whatever Plaintiff said to him stayed between them. That gave Plaintiff comfort, knowing he could express his true emotions and be completely truthful, just as Plaintiff had been with Human Resources. After the first meeting, Ricky helped calm Plaintiff down and Plaintiff returned to work. After the second meeting, Plaintiff was distraught to the point of tears, realizing he very well could lose his job and Plaintiff had been wronged and falsely accused once again. JP Coleman, Ricky and Plaintiff went for a walk down the block so that he could contain himself before going back to work. JP and Ricky shared somewhat comforting words, talking altogether about the "#MeToo Movement", and how these women were abusing the #MeToo movement. Plaintiff told them the accusations were false. Plaintiff shared with them how entirely truthful he had been about everything, shed more tears and they walked back to the station.

103. Ricky Santiago defamed Plaintiff by making false statements about him to another. Ricky's defamatory acts were within the scope of his employment. On Tuesday, April 17, 2018 at 8:06 pm, just hours after receiving the termination phone call, Plaintiff texted one of his best friends, Jarryd, who used to work at WTNH but now works at NBC Boston. Purely out of career panic, Plaintiff asked if there are any producer position openings at his station. He said, "I don't think so. And we gotta talk man, RJ told me what happened kind of". Plaintiff asked "When did he talk to you?". Jarryd: "Earlier today". Plaintiff: Yeah I can't believe what's happening. How would RJ know?" Jarryd: "Yeah, I want to

talk to you about it. And I assume either Ricky or Kels told him. Plaintiff: "That spread fast... And I don't know what you know but you know me... And I would never do something I felt wasn't welcome or wanted. Never". Jarryd: "No I know that. That's why I want to talk to you".

104. On Thursday, April 19, 2018 at 8:30 pm: Plaintiff spoke with Jarryd on the phone and he confirmed what he had texted, being that through word of mouth of "either Ricky or Kels", he heard what happened to Plaintiff merely hours after Plaintiff was fired. (RJ and Jarryd work together in Boston. RJ, Jarryd, Ricky and Kels are all good friends, some of them former roommates. Ricky and RJ are best friends. Plaintiff has zero reason to believe Kels is the one who shared what happened. He has no connection to it and is an extremely soft-spoken, mild-mannered person, and is friends with Plaintiff. Ricky on the other hand has been very connected to it, heard all the accusations, and was involved from the very beginning.) On information and belief, Ricky was either texting RJ while all this was happening, keeping him updated throughout, or Ricky immediately texted RJ once Plaintiff was fired, sharing the news within a matter of hours.

105. Later in this April 19, 2018 phone conversation, Jarryd informed Plaintiff that he also heard from their friend, Allison, a producer at NBC Connecticut at the time. They all used to work together at WTNH/News 8. Allison texted Jarryd asking what happened to Plaintiff and said that she heard the news. Allison said she found out from Samantha Plourde and Sarah Paduano, other producers at NBC Connecticut; all are friends with Plaintiff. Plaintiff was shocked and humiliated that someone had spread these lies to a competitor station and friends within a matter of two days. On information and belief, Ricky was the person spreading these lies about Plaintiff. He communicated the news and

false reason about Plaintiff's firing with these NBC Connecticut employees. Plaintiff believes this because Ricky is good friends with Sarah Paduano, who also used to work at News 8. Ricky and Sarah Paduano are known to keep in touch. Plaintiff even saw the two of them hanging out together, within the past couple years, through social media. So, they are good friends and keep in touch.

106. Plaintiff learned of all this from Jarryd, meanwhile already knowing what he had learned from friends at News 8. Plaintiff was told that a day or so after he was fired, a female WTNH/News 8 employee, Sashi Hamilton, shared her refusal to believe what the accusers were alleging, with Plaintiff's friend Alexandra Ceneviva. Sashi said she and Alexandra Ceneviva had a tense conversation with Ricky Santiago, in the middle of a News 8 hallway. On information and belief, this conversation was overheard by many employees. Sashi Hamilton shared that she and Alexandra Ceneviva were negating what Ricky was saying about Plaintiff "being like that." Then Ricky said, "you should believe it, there were other accusers too." Ricky, Plaintiff's union representative, was encouraging female employees at WTNH to believe that Plaintiff had sexually harassed Alex Conroy and Amy Hudak and that "there were others too." Ricky continued to defame Plaintiff to his former co-workers and to persons in the industry outside of News 8. WTNH/News 8 knew of the defamatory statements and promoted the defamation by failing to correct the false statements. WTNH/News 8 was reckless in not preventing the malicious defamatory acts of its employees.

107. Ricky's defamatory comments were made while at work, in the scope of his employment. Ricky's comments were recklessly indifferent to Plaintiff's professional reputation. Ricky's comments were intentional and wanton.

108. Ricky's false statements injured Plaintiff's reputation in the industry and has prevented him from finding other employment. For example, Plaintiff applied to a Producer position opening at NBC Connecticut, an equal position which Plaintiff was more than qualified for. A recruiter from NBC Universal contacted Plaintiff for a phone interview. Plaintiff had the phone interview and it went exceptionally well. The recruiter said NBC Connecticut themselves would contact Plaintiff if he was to move forward in the hiring process. Instead, Plaintiff received a rejection email about two weeks later on 9/20/18 stating, "unfortunately, the team at NBC Connecticut decided to go with somebody else for the open Producer position. Feel free to reach out if you come across any other roles that you think might be a fit and I'll keep you in mind for opportunities moving forward." Plaintiff responded, "I do appreciate you following up with me despite NBC Connecticut's decision. Throughout my job search, I have in fact had my eyes on some other opportunities with NBC Universal and I am curious about what your territory is for recruiting. If it isn't too much to ask, I would love to hear what you know about the following positions; whether they are still open positions and if you feel I would be a solid candidate. Here are a few throughout the Northeast area that I have interest in." Plaintiff then listed several open positions throughout Connecticut, Boston and New York. Plaintiff never heard back from the recruiter. On information and belief, multiple people at NBC Connecticut found out about Plaintiff's firing and the false allegations around it. This prevented his opportunity to obtain new employment. These false statements were shared by Ricky Santiago, Plaintiff's union representative. Ricky defamed Plaintiff and caused him damages.

109. On information and belief, Ricky Santiago, after Plaintiff was terminated, continued to make false statements against Plaintiff. A WTNH/News 8 employee and friend of Plaintiff's, Ben Brunson, asked Plaintiff's friend "How's he doing?" Ben Brunson shared that he had a conversation with Ricky, in which Ricky made more false defamatory statements about Plaintiff, stating that when some of the employees used to go out after work together, Plaintiff would "Grab Marissa's butt." Plaintiff was horrified to hear such blatant lies. This was an absolute false statement about him. This was made with malicious intent to harm Plaintiff's reputation. Not only would Plaintiff never do that to a co-worker or anyone in public, but it is so fabricated it is preposterous. Once again, Ricky was intentionally making things up and spreading lies about Plaintiff to others. WTNH/News 8 knew of the defamatory statements and promoted the defamation by failing to correct the false statements.

110. Plaintiff suffered a hostile work environment because he was discriminated against because of his gender. The WTNH/News 8 work environment is permeated with a flirtatious atmosphere. This created a sexually-charged atmosphere. Plaintiff was the target of teasing and innuendo frequently because of his gender and because of his looks. Plaintiff would shrug it off, but it was always embarrassing and always made him feel uncomfortable. This was unwelcomed behaviors by WTNH/News 8 employees, but because several of them were Plaintiff's superiors he didn't want to complain about it. On numerous occasions, consistently, Plaintiff was the "poster boy" vis-à-vis the sexually-charged atmosphere and teased because of his physical appearance, especially his hair. Plaintiff's counterparts and co-workers such as Amy Hudak, Alex Conroy, Keith Connors, Adam Darsky, Darren Kramer, Anne Craig, Ann Nyberg, Nancy Lynch, Nicole

Warren, Mia Bechak and Noelle Gardner made comments, routinely like, " You could be a reporter you know, you have 'the look," "With that hair, you should be in front of the camera," "Have you seen Micah? His hair was just here," "Man, if I had that hair/if I looked like you…," "Check out the 'wave' today! I keep telling my husband to do his hair like that, but I don't think he can," "This is Micah Bailey… is he gorgeous or what? Really young, single… and I get to work with him every day," "This guy's hair needs its' own TV show," "The hair is lookin' extra good today. It always looks good, but today its extra 'flowy'," "You're young, you're stealth, you're all that," "Everybody talks about your hair… you have a ton of hair," "He's got the thickest, curliest, waviest hair ever! That's what makes you really handsome." Plaintiff was also given nicknames like "GQ" and "Smooth." Plaintiff was embarrassed by these comments but was afraid to say anything because on many occasions, the comments were made by his superiors. These comments were made during work hours to Plaintiff and within the ear shot of numerous co-workers. These comments were made publicly during Facebook live feeds and on a "Fireside Chat" segment with Ann Nyberg. These persons would not continuously comment to female employees about their hair, how attractive they were or other physical characteristics. Plaintiff was treated differently than his female co-workers. Plaintiff was discriminated against because he is male. Plaintiff suffered a hostile work environment because he is male. WTNH/News 8 has a pattern and practice of discriminating against their employees based on gender. These discriminatory comments were outrageous.

111. On June 19, 2018, Rich Graziano reached out to Plaintiff via text, just over one month to the date of his termination letter, signed by him. Graziano's text was to initiate a phone call later that day regarding "someone that might be able to use your service" —

Plaintiff's "service" being video production. Plaintiff and Graziano spoke on the phone later that day and Graziano shared a brief sentiment about how things ended up for Plaintiff at News 8. Graziano then introduced a show idea he claimed he is personally invested in outside of News 8, called "That Life". He proposes that he could use Plaintiff as a producer, in teaming up with supposed Executive Producer "French Montana", an A-list rapper he knows Plaintiff is a fan of. They agree to discuss this further over lunch with the president of the Connecticut NAACP, Scot Esdaile, an Executive Producer supposedly also invested in this show idea. Graziano then emailed his WTNH secretary to schedule a lunch meeting with Esdaile and Plaintiff. On June 26, the three of them met at Portofino's in New Haven and discussed this show idea further. At this point Plaintiff heard out what they had to say, but was mainly gauging the authenticity of the ideas and strategy they were proposing to Plaintiff. Graziano name-dropping and talking about the budget "I think you'll like", certainly added flare. Graziano acted as though he wanted to hire Plaintiff as a producer on this project. After lunch, Graziano and Plaintiff stood outside the restaurant and chatted for about two minutes. Conversation shifted from the show idea to more of Graziano's sentiment about what unfolded against Plaintiff at News 8. Graziano then made memorable statements to Plaintiff. Graziano stated, "I can't believe Amy Hudak would do that" and "I tried to fight for you, but once it went up to corporate it was out of my hands". A few days later, June 29th, 2018, Plaintiff emailed Graziano and Esdaile following up on their meeting. Graziano responded, Esdaile did not. Supposedly, the next task at hand was for Graziano and Esdaile to begin to pitch this to their local connections. Nothing has since moved forward that Plaintiff is aware of, and Plaintiff has not heard directly from Graziano since.

112.   On April 27, 2018, Plaintiff filed a union grievance related to his working conditions.

113.   The President of Local 14, D'addesse has failed to adequately manage Plaintiff's union grievance. Every time there has been an update or information he needed, Plaintiff had to chase him down and seek it out, texting and calling like he's been hiding from Plaintiff. Plaintiff was very cognizant of the fact that Union grievances "take a long time", as D'addesse has repeatedly shared. Plaintiff was very respectful with his communication but D'addesse's communication was always curt. D'addesse even admitted to Plaintiff that he had never handled a case this size. At one point when Plaintiff asked him "What is the latest", Joe said, "Not much [go]ing over info in dc I will be there next week for meetings on other issues as well." Plaintiff waited for weeks to hear an update from Joe, as has been the case with most of the updates.

114.   July 23, 2018 Plaintiff received an email from Joe: "Hi Micah, attached please find ruling on case. Thanks Joe. The attachment read:

> Micah Baily
>
> Dear Micah, after a very long investigation of the facts the local E-Board along with the Nabet/Cwa Sector President and General Council have decided not to arbitrate your case.
> This was not an easy decision. If you disagree with the decision of the Nabet/Cwa Sector President, you have the right to appeal this decision to CWA President Christopher Sheldon in accordance with the Internal Appeals Procedures as stated in the CWA Constitution.
>
> Sincerely Joseph A D'Addese
> President Local 14
> New Have Connecticut

115.   On August 26, 2018, Plaintiff filed his appeal to challenge the Union's decision not to arbitrate. The Union never told Plaintiff they even had an option to not go through arbitration. Plaintiff understood that it is Plaintiff's right to have the Union run the course

of the grievance, including arbitration. Joe did not explain the process to Plaintiff thoroughly or his options moving forward.

116. On November 13, 2018, Plaintiff learned from NABET Sector President Charles Braico, that WTNH had changed its story again about Marissa Nobile's "complaint." At first, Plaintiff was told he sent "inappropriate texts messages" to Marissa, and now Plaintiff has learned that he allegedly made "inappropriate comments" to Marissa. This too is false. Plaintiff never made inappropriate comments to Marissa. Marissa Nobile's employment at WTNH/News 8 ended in December 2017, so this alleged conduct must have happened prior to December 2017. Allegedly, "She [Marissa] complained that you would return to the station in the evenings after drinking, and made comments that made her feel very uncomfortable." This is a false, fabricated, undocumented, un-investigated and malicious statement.

117. November 13, 2018, was the final adverse employment action against Plaintiff when WTNH-TV changed its story about why Plaintiff was terminated and his appeal to arbitrate his claims was denied by the Union and by WTNH/News 8.

118. Moreover, the Union's original decision not to arbitrate, did not include this false detail about Marissa Nobile. The Union and News 8 revealed contradictory reasons for Plaintiff's termination. The Union in its letter stated, "Please be advised that the SEC did not consider this claim [by Marissa Nobile] in making its decision. Its position is based on your admitted conduct towards Conroy, after being warned about sexual harassment in February." However, this statement directly contradicts WTNH/News 8's statement that it terminated Plaintiff because of the "new evidence" tied to Marissa, not the Conroy encounter or anything before, which led to his suspension. On information and belief, the

scathing tone of this union letter, the denial of due process from the Union, and the late revelation of yet another false allegation against Plaintiff confirmed that the Union was in collusion with WTNH/News 8.

119. Plaintiff has suffered extreme and severe emotional distress because of the discriminatory acts of WTNH/News 8 and because of the defamatory acts of its employees. Plaintiff has suffered from sleeplessness, depression, mood swings, aggression, anxiety, panic attacks, nervous breakdowns, post-traumatic stress and suicidal thoughts. Plaintiff has sought counseling from William Mecca, LCSW and continues to see him on a regular basis. Plaintiff has been prescribed Sertraline, an antidepressant medication, prescribed to help treat the effects of his severe emotional distress.

120. Plaintiff was discriminated against because he is male. Plaintiff was treated differently than similarly situated female employees. Plaintiff suffered a hostile work environment and has suffered emotional distress. Plaintiff has been defamed by his co-workers and placed in a false light. Plaintiff has suffered and continues to suffer damages as a result of WTNH/News 8's unlawful acts towards him.

## V. COUNT ONE: GENDER DISCRIMINATION PURSUANT TO TITLE VII OF THE CIVIL RIGHTS ACT

121. Paragraphs 1-120 are hereby incorporated by reference the same as if fully pleaded in Count One.

122. Plaintiff, on the date of termination, and at all relevant times in question, was a highly qualified and respected employee of the Defendant, pursuant to Title VII of the Civil Rights Act).

123. On information and belief, Defendant exhibited a continuous pattern of gender discrimination. There was not one singular incident, but consistent and constant discriminatory acts by Defendant over a period of years.

124. Plaintiff was subjected to a series of continuous adverse employment actions as described herein, including but not limited to unequal treatment on account of his gender, denial of union representation, and denial of dues process related to his suspension and termination, all taken because of his gender.

125. Circumstances surrounding the adverse employment actions give rise to the inference of gender discrimination. Plaintiff was disciplined for consensually touching two female coworkers, outside of work and working hours, while the female employees were not disciplined for touching Plaintiff. The female employees who complained about Micah were fully informed of all facts and given the opportunity to be heard and explain their concerns. Plaintiff was not given all of the facts related to these female employees' complaints and was not given the opportunity for his side of the story to be heard.

126. Circumstances surrounding the adverse employment actions give rise to the inference of gender discrimination. During work hours, female and male employees made sexist comments to and about Plaintiff related to his looks and physical appearance, while similarly situated female employees did not suffer similar sexist comments.

127. Circumstances surrounding the adverse employment actions give rise to the inference of gender discrimination. On information and belief, female employees received adequate union representation and Plaintiff did not.

128. Circumstances surrounding the adverse employment actions give rise to the inference of gender discrimination. Plaintiff's union representative, Ricky Santiago, defamed Plaintiff

by making false statements about him to third parties. On information and belief, Ricky Santiago did not make false statements about the female employees involved in the complaints against Plaintiff.

129. When Plaintiff was terminated, Defendant never stated a reason for the termination other than there was "new evidence." On information and belief, when female employees are terminated from Defendant's employ, they are given the reason for their terminations. Any reason Defendant now gives is factually baseless and without merit. Defendant's reasons for the adverse actions are clearly pretextual and false.

130. Plaintiff's gender was a the reason for Defendant's denial of his equal treatment in the terms, conditions and privileges of his employment.

131. On information and belief, Defendant exhibited a continuous pattern of gender discrimination. There was not one singular incident, but consistent and constant discriminatory acts by Defendant over a period of years.

132. Plaintiff was treated differently than similarly situated female employees. Plaintiff was discriminated against because of his gender.

133. Defendant should be held liable for discriminating against Plaintiff because of his gender, in violation of Title VII of the Civil Rights Act.

**VI.**    **COUNT TWO:**    **GENDER DISCRIMINATION PURSUANT TO CONNECTICUT'S FAIR EMPLOYMENT PRACTICES ACT (CFEPA).**

134. Paragraphs 1-133 are hereby incorporated by reference the same as if fully pleaded in Count Two.

135. Plaintiff, on the date of termination, and at all relevant times in question, was a highly qualified and respected employee of the Defendant, pursuant to Connecticut's Fair Employment Practices Act (CFEPA).

136. On information and belief, Defendant exhibited a continuous pattern of gender discrimination. There was not one singular incident, but consistent and constant discriminatory acts by Defendant over a period of years.

137. Plaintiff was subjected to a series of continuous adverse employment actions as described herein, including but not limited to unequal treatment on account of his gender. Circumstances surrounding the adverse employment actions give rise to the inference of gender discrimination. Plaintiff was disciplined for consensually touching two female coworkers, outside of work and working hours, while the female employees were not disciplined for touching Plaintiff. The female employees who complained about Micah were fully informed of all facts and given the opportunity to be heard and explain their concerns. Plaintiff was not given all of the facts related to these female employees complaints and was not given the opportunity to provide his side of the story.

138. Circumstances surrounding the adverse employment actions give rise to the inference of gender discrimination. During work hours, female and male employees made sexist comments to and about Plaintiff related to his looks and physical appearance, while female employees did not suffer similar sexist comments.

139. Circumstances surrounding the adverse employment actions give rise to the inference of gender discrimination. On information and belief, female employees received adequate union representation and Plaintiff did not.

140. Circumstances surrounding the adverse employment actions give rise to the inference of gender discrimination. Plaintiff's union representative, Ricky Santiago, defamed Plaintiff by making false statements about him to third parties. On information and belief, Ricky Santiago did not make false statements about the female employees involved in the complaints against Plaintiff.

141. Plaintiff's gender was a substantial motivating factor for denial of his equal treatment in the terms, conditions and privileges of his employment.

142. Plaintiff was treated differently than similarly situated female employees. Plaintiff was discriminated against substantially in part because of his gender.

143. Defendant's actions caused Plaintiff damages.

Defendant's should be held liable for discriminating against Plaintiff substantially in part because of his gender, in violation of CFEPA.

## VII.   COUNT THREE:    RETALIATION BASED ON GENDER

144. Paragraphs 1-143 are hereby incorporated by reference the same as if fully pleaded in Count Three.

145. Plaintiff participated in protected activity when he complained to Defendant that he was treated differently because of his gender related to the failure of Defendant to fully investigate the false allegations against him related to Amy Hudak and Alex Conroy. Plaintiff complained to Defendant on several different occasions.

146. After Plaintiff complained to Defendant about his unlawful treatment, he suffered two adverse employment actions when he was first placed on a suspension and then less than 24 hours after, his employment was terminated.

147. Defendant's actions caused Plaintiff damages.

148. Defendant's should be held liable on this count and Plaintiff should be awarded all appropriate relief.

## VIII. COUNT FOUR:    HOSTILE WORK ENVIRONMENT

149. Paragraphs 1-148 are hereby incorporated by reference the same as if fully pleaded in Count Four.

150. Defendant's conduct and sexist statements toward Plaintiff regarding his hair, physical appearance, marital status and age had the purpose of unreasonably interfering with Plaintiff's work performance and created a hostile and offensive work environment. Defendant's conduct was continuous over several years.

151. Plaintiff's workplace was permeated with discriminatory intimidation and ridicule that was sufficiently severe that it altered the conditions of his employment.

152. Defendant's actions caused Plaintiff damages.

153. Defendant should be held liable on this count and Plaintiff should be awarded all appropriate relief.

## IX. COUNT FIVE:    DEFAMATION SLANDER PER SE

154. Paragraphs 1-153 are hereby incorporated by reference the same as if fully pleaded in Count Five.

155. Defendant's employees orally published a false statement to a third person.

156. Defendant's employee, Amy Hudak, made false oral statements to Defendant, including human resources representatives and other management employees, with the malicious intent to harm Plaintiff.

157. Defendant's employee, Amy Hudak, made false oral statements to other employees of Defendant, with the malicious intent to harm Plaintiff.

158. Defendant's employee, Alexandra Conroy, made false oral statements to Defendant, including human resources representatives and other management employees, with the malicious intent to harm Plaintiff.

159. Defendant's employee, Alexandra Conroy, made false oral statements to other employees of Defendant, with the malicious intent to harm Plaintiff.

160. Defendant's employee, Ricardo Santiago, made false oral statements to Defendant, including human resources representatives and other management employees, with the malicious intent to harm Plaintiff.

161. Defendant's employee, Ricardo Santiago, made false oral statements to other employees of Defendant, with the malicious intent to harm Plaintiff.

162. Defendant's employee, Keith Connors, made false oral statements to Defendant, including human resources representatives and other management employees, with the malicious intent to harm Plaintiff.

163. Defendant's employee, Keith Connors, made false oral statements to other employees of Defendant, with the malicious intent to harm Plaintiff.

164. Plaintiff's reputation suffered injury as a result of the false oral statements.

165. The false oral statements involved allegations that question Plaintiff's moral turpitude.

166. The false oral statements were made within the course and scope of their employment.

167. The false oral statements were made in furtherance of the employer's business.

168. The false oral statements were made with malicious intent.

169. The Defendant ratified and adopted the slanderous publications made by its employees.

170. The Defendant failed to prevent the slanderous and malicious acts of its employees.

171. Plaintiff was defamed by Defendant's employees. Defendant should be held liable on this count and Plaintiff should be awarded all appropriate relief.

## X. COUNT SIX: DEFAMATION LIBEL PER SE

172. Paragraphs 1-171 are hereby incorporated by reference the same as if fully pleaded in Count Six.

173. Defendant's employee, Keith Connors, published a false written statement to a third person.

174. Defendant's employee, Keith Connors, made false written statements to Defendant, including human resources representatives and other management employees, with the malicious intent to harm Plaintiff.

175. Defendant's employee, Keith Connors, made false written statements to other employees of Defendant, with the malicious intent to harm Plaintiff.

176. Plaintiff's reputation suffered injury as a result of the false written statements.

177. The false written statements involved allegations that question Plaintiff's moral turpitude.

178. The false written statements were made within the course and scope of Keith Connor's employment.

179. The false written statements were made in furtherance of the employer's business.

180. The false written statements were made with malicious intent.

181. The Defendant ratified and adopted the libelous publications made by its employees.

182. The Defendant's employer failed to prevent the libelous and malicious acts of its employees.

183. Plaintiff was defamed by Defendant's employees. Defendant should be held liable on this count and Plaintiff should be awarded all appropriate relief.

## XI.  COUNT SEVEN:  INVASION OF PRIVACY – FALSE LIGHT

184. Paragraphs 1-183 are hereby incorporated by reference the same as if fully pleaded in Count Seven.

185. Plaintiff was placed in a false light by Defendant when Defendant publicized and represented that Plaintiff was terminated for sexual harassment and other details related to his termination.

186. Plaintiff was placed in a false light by Defendant's employee, Keith Connors, when the employee publicized and represented that Plaintiff was terminated for sexual harassment and other details related to his termination.

187. Plaintiff was placed in a false light by Defendant's employee, Ricardo Santiago, when the employee publicized and represented that Plaintiff was terminated for sexual harassment and other details related to his termination.

188. Plaintiff was placed in a false light by Defendant's employee, Amy Hudak, when she publicized and represented to Defendant that Plaintiff unwantedly and inappropriately touched her, amongst other false details.

189. Plaintiff was placed in a false light by Defendant's employee, Alexandra Conroy, when she publicized and represented to Defendant that Plaintiff unwantedly and inappropriately touched her, amongst other false details.

190. This false light placed Plaintiff in a position that is highly offensive to a reasonable person.

191. These false light publications were false.

192. These false light publications were a major misrepresentation of Plaintiff's character.

193. Defendant knew or acted with reckless disregard as to the falsity of the publicized matter and the false light in which Plaintiff was placed.

194. Defendant's employees were acting in the course of their employment and for the benefit of their employer with the false light publication occurred.

195. Defendant should be held liable on this count and Plaintiff should be awarded all appropriate relief.

## XII. COUNT EIGHT:     BREACH OF CONTRACT

196. Paragraphs 1-195 are hereby incorporated by reference the same as if fully pleaded in Count Eight.

197. Defendant breached the collective bargaining agreement (hereinafter "contract") with NABET-CWA Local 14.

198. Plaintiff was an employee of Defendant.

199. Plaintiff was a member of the NABET-CWA Local 14 union and paid union dues.

200. NABET-CWA Local 14 represented Plaintiff's interests in negotiating the contract with Defendant and therefore Plaintiff is a party to the contract.

201. The parties, with mutual assent, agreed to form this contract and reasonable consideration was exchanged.

202. Plaintiff was promised and had an expectation to receive the benefits of the contract in exchange for the union dues he paid.

203. Defendant breached the contract when it violated section 4.2 and 16 of the contract, amongst other sections.

204. Defendant breached the contract when it violated section 4.2 of the contract by failing to give Plaintiff reason for his discharge.

205. Defendant breached the contract when it violated section 16 of the contract by discriminating against Plaintiff because of his gender.

206. Defendant's breach caused, and continues to cause, Plaintiff damages.

207. Defendant should be held liable on this count and Plaintiff should be awarded all appropriate relief.

**XIII. COUNT NINE:        CLAIM FOR BREACH OF IMPLIED
                          COVENANT OF GOOD FAITH AND FAIR DEALING**

208. Paragraphs 1-208 are hereby incorporated by reference the same as if fully pleaded in Count Nine.

209. No similarly situated reasonable employee would expect their employer to intentionally, willfully, and with dishonest purpose, discriminate against him because of his gender and breach their contract by failing to give him a reason for his termination.

210. Defendant's breach injured Plaintiff's rights to receive the benefit of the contract.

211. Defendant should be held liable on this count and Plaintiff should be awarded all appropriate relief.

**XIV. COUNT TEN:         WRONGFUL DISCHARGE IN VIOLATION OF PUBLIC
                          POLICY**

212. Paragraphs 1-211 are hereby incorporated by reference the same as if fully pleaded in Count Ten.

213. Plaintiff was employed with Defendant as an at will employee.

214. Plaintiff was terminated for an improper reason in violation of public policy.

215. Defendant's improper motive for terminating Plaintiff's employment was derived from its fear of being the next #Metoo headline and because of the societal and litigious pressures of the #Metoo movement.

216. Defendant failed to fairly investigate Plaintiff's account of Amy Hudak and Alexandra Conroy's false allegations against him and terminated him without discovering the truth of the matter.

217. Defendant' accepted Amy Hudak and Alexandra Conroy's false allegations as truth because they are female.

218. Defendant terminated Plaintiff's employment without a fair investigation because he is male.

219. Defendant's violation of public policy promotes discrimination in the workplace against its male employees.

220. Plaintiff suffered damages because of Defendant's violation of public policy and its wrongful termination of Plaintiff's employment.

221. Defendant should be held liable on this count and Plaintiff should be awarded all appropriate relief.

## XV. COUNT ELEVEN: NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS

222. Paragraphs 1-221 are hereby incorporated by reference the same as if fully pleaded in Count Eleven.

223. The unlawful employment actions alleged herein were the direct result of the Defendant's actions to negligently inflict emotional distress, or that Defendant knew or should have known that such distress was a likely result of its conduct.

224. Defendant negligently inflicted emotional distress on Plaintiff by humiliating him during the suspension and termination process.

225. During Plaintiff's suspension and termination process, Defendant's employee, and the person in charge of the investigation, Lisa Newell, made sexist remarks to Plaintiff

stating that he was "obviously taking advantage of a friend in need," and did not allow Plaintiff to participate fully in his own investigation. Defendant's employee, Lisa Newell, did not collect evidence offered by Plaintiff to support his defense to the false allegations.

226. During Plaintiff's suspension and termination process, Defendant's employee, Ricardo Santiago, made false statements about Plaintiff to other employees regarding the false sexual harassment allegations against Plaintiff. Santiago was Plaintiff's union representative and failed to show up to critical disciplinary meetings to support Plaintiff.

227. Defendant, during the suspension and termination process, knew how distraught and upset Plaintiff was because of the false allegations against him. Defendant witnessed Plaintiff emotional response, including tears, to Defendant's negligent acts against him.

228. Defendant's conduct involved an unreasonable risk of causing distress to Plaintiff.

229. Defendant's employees knew that the emotional distress they caused might result in Plaintiff's illness.

230. As a result of the Defendant's negligent infliction of emotional distress, Plaintiff became physically ill and also sought professional counseling and medication to help manage his emotional distress.

231. Defendant's conduct caused emotional distress to Plaintiff.

232. This emotional distress and humiliation caused Plaintiff damages.

## XVI.  COUNT TWELVE: INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

233. Paragraphs 1-232 are hereby incorporated by reference the same as if fully pleaded in Count Twelve.

234. The unlawful employment actions alleged herein were the direct result of the Defendant's actions to intentionally inflict emotional distress, or that Defendant knew or should have known that such distress was a likely result of its conduct.

235. Defendant's acts of employment discrimination, defamation and wrongful termination towards Plaintiff were so extreme and outrageous as to offend the common decency of any similarly situated individual in his position. No employee should be subjected to a material change in their terms, conditions and privileges of employment based on his gender, as alleged herein.

236. The Defendant possessed knowledge that the employment discrimination alleged herein directly violated the Defendant's own employment policies, but did nothing to remedy each and every violation.

237. Plaintiff has experienced severe emotional and psychological injuries as a direct and proximate cause of the Defendant's actions. He has trouble sleeping, eating, experiences stress, depression and anxiety.

238. As a result of Defendant's conduct, Plaintiff has suffered and will continue to suffer past and future economic, physical and emotional harm.

## XVII. PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff respectfully requests that this Court:

a. Award Plaintiff compensatory damages for gender discrimination in violation of CFEPA, in an amount to be determined at trial;

b. Award Plaintiff compensatory damages for gender discrimination in violation of Title VII Civil Rights Act, gender discrimination, in an amount to be determine at trial;

c.     Award Plaintiff compensatory and punitive damages for Defendant's violations of Connecticut common law (wrongful termination, hostile work environment, defamation, breach of contract, breach of implied covenant of good faith and fair dealing);

d.     Award Plaintiff compensatory and punitive damages for Defendant's intentional infliction of emotional distress, in an amount to be determined at trial;

e.     Award Plaintiff compensatory and punitive damages for Defendant's negligent infliction of emotional distress, in an amount to be determined at trial;

f.     Award Plaintiff compensatory damages for retaliation in an amount to be determined at trial;

g.     Award of punitive damages;

h.     Award of prejudgment interest and costs;

i.     Award attorneys' fees and costs.

j.     Award such other relief in law or equity as this Court deems appropriate.

**<u>JURY TRIAL DEMANDED</u>**

Plaintiff respectfully requests a jury trial on all questions of fact raised by his Complaint.


PLAINTIFF,

MICAH BAILEY


By: _____ /s/ _____

Kirsten M. Schneider (ct29703)
Law Office of Kirsten Schneider, LLC
P.O. Box 339
Fairfield, CT 06824
(475) 999-8061 tel.
kschneider@kschneiderlaw.com
His Attorney

EXHIBIT A

## U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

## DISMISSAL AND NOTICE OF RIGHTS

| To: Micah Bailey<br>36 Cental Ave. # 2<br>Hamden, CT 06517 | From: Boston Area Office<br>John F. Kennedy Fed Bldg<br>Government Ctr, Room 475<br>Boston, MA 02203 |
|---|---|

|  | On behalf of person(s) aggrieved whose identity is *CONFIDENTIAL (29 CFR §1601.7(a))* | |
|---|---|---|

| EEOC Charge No.<br><br>**523-2019-00465** | EEOC Representative<br>**Anthony M. Pino, Jr.,**<br>**Enforcement Supervisor** | Telephone No.<br><br>**(617) 565-3192** |
|---|---|---|

### THE EEOC IS CLOSING ITS FILE ON THIS CHARGE FOR THE FOLLOWING REASON:

| | |
|---|---|
| [ ] | The facts alleged in the charge fail to state a claim under any of the statutes enforced by the EEOC. |
| [ ] | Your allegations did not involve a disability as defined by the Americans With Disabilities Act. |
| [ ] | The Respondent employs less than the required number of employees or is not otherwise covered by the statutes. |
| [ ] | Your charge was not timely filed with EEOC; in other words, you waited too long after the date(s) of the alleged discrimination to file your charge |
| [X] | The EEOC issues the following determination: Based upon its investigation, the EEOC is unable to conclude that the information obtained establishes violations of the statutes. This does not certify that the respondent is in compliance with the statutes. No finding is made as to any other issues that might be construed as having been raised by this charge. |
| [ ] | The EEOC has adopted the findings of the state or local fair employment practices agency that investigated this charge. |
| [ ] | Other (briefly state) |

### - NOTICE OF SUIT RIGHTS -

*(See the additional information attached to this form.)*

**Title VII, the Americans with Disabilities Act, the Genetic Information Nondiscrimination Act, or the Age Discrimination in Employment Act:** This will be the only notice of dismissal and of your right to sue that we will send you. You may file a lawsuit against the respondent(s) under federal law based on this charge in federal or state court. Your lawsuit **must be filed WITHIN 90 DAYS of your receipt of this notice;** or your right to sue based on this charge will be lost. (The time limit for filing suit based on a claim under state law may be different.)

**Equal Pay Act (EPA):** EPA suits must be filed in federal or state court within 2 years (3 years for willful violations) of the alleged EPA underpayment. This means that **backpay due for any violations that occurred more than 2 years (3 years) before you file suit may not be collectible.**

On behalf of the Commission

*Feng K. An,*
**Area Office Director**

FEB 1 1 2019
*(Date Mailed)*

Enclosures(s)

cc:

**NEXSTAR MEDIA GROUP INC.**
**545 E. John Carpenter Freeway Suite 700**
**Irving, TX 75062**

**Kirsten Schneider**
**LAW OFFICE OF KIRSTEN SCHNEIDER LLC**
**P. O. Box 339**
**Fairfield, CT 06824**

EXHIBIT B

# STATE OF CONNECTICUT
## COMMISSION ON HUMAN RIGHTS AND OPPORTUNITIES

Micah Bailey
**COMPLAINANT**

CHRO No. 1930331

vs.

EEOC No. 523201900465

Nexstar Broadcasting Group Inc. and Nexstar Broadcasting Inc.
**RESPONDENT**

## RELEASE OF JURISDICTION

The Commission on Human Rights and Opportunities hereby releases its jurisdiction over the above-identified complaint. The Complainant is authorized to commence a civil action in accordance with CONN. GEN. STAT. § 46a-100 against the Respondent in the Superior Court for the judicial district in which the discriminatory practice is alleged to have occurred, in which the Respondent transacts business or in which the Complainant resides. If this action involves a state agency or official, it may be brought in the Superior Court for the judicial district of Hartford.

A copy of any civil action brought pursuant to this release must be served on the Commission at ROJ@ct.gov or at 450 Columbus Blvd., Suite 2, Hartford, CT 06103 at the same time all other parties are served. Electronic service is preferred. **THE COMMISSION MUST BE SERVED BECAUSE IT HAS A RIGHT TO INTERVENE IN ANY ACTION BASED ON A RELEASE OF JURISDICTION PURSUANT TO CONN. GEN. STAT. § 46a-103.**

The Complainant must bring an action in Superior Court within 90 days of receipt of this release and within two years of the date of filing the complaint with the Commission unless circumstances tolling the statute of limitations are present.

DATE: 4/3/2019

_Tanya A. Hughes_
Tanya A. Hughes, Executive Director

Service:
Complainant's attorney: kschneider@kschneiderlaw.com
Respondent's attorneys: victoria.chavey@jacksonlewis.com; alexa.farmer@jacksonlewis.com