# EXHIBIT 3

AGREEMENT BETWEEN

NEXSTAR BROADCASTING, INC.
and
NABET-CWA, AFL-CIO


PRODUCERS


June 21, 2017 to June 20, 2020

Agreement between (1) Nexstar Broadcasting, Inc. (WTNH-TV), and (2) National Association of Broadcast Employees and Technicians Communications Workers of America (AFL-CIO).

1. **Definition.** When initially capitalized in this Agreement, and except as its context may otherwise require:

    1.1. **"Company"** means Nexstar Broadcasting, Inc. or the same corporation designated by any other name, only as owner and operator of television Station WTNH-TV, New Haven, Connecticut;

    1.2. **"Station"** means television Station WTNH-TV or the same Station designated by any other call letters;

    1.3. **"International Union"** means National Association of Broadcast Employees and Technicians-Communications Workers of America (AFL-CIO) or the same labor organization designated by any other name;

    1.4. **"Local Union"** means Local 14, National Association of Broadcast Employees and Technicians-Communications Workers of America (AFL-CIO) or the same labor organization designated by any other name;

    1.5. **"Unions"** means both Local Union and International Union;

    1.6. **"Employee"** means an individual covered by paragraph 2.1;

    1.7. **"Unit" or "Bargaining Unit"** means the Employees, collectively, covered by Paragraph 2.1;

    1.8. **"Day"** means a twenty-four (24) hour period beginning at 12:01 AM;

    1.9. **"Workday"** means a twenty-four (24) hour period beginning with the start of the Employee's shift (including any contiguous pre-shift work) on any day;

    1.10. **"Week"** means a seven-day period beginning with the first day scheduled after scheduled consecutive days off;

    1.11. **"Workweek"** means a seven consecutive workday period beginning either (i) with the start of the Employee's shift on the first (1st) day following his scheduled weekly rest or (ii) on schedule change or schedule rotation, with the start of the Employee's shift on the day the schedule identifies as the first workday of such new workweek;

1.12. **"Edit" or "Editing"** means to manually, or by equipment operation, project, screen, view, audition, monitor, time, dub, cut, correct, delete or erase matter from, insert, arrange, mix, revise or store matter on, transfer matter to or from, retrieve matter from, assemble, splice or clean any film-tape intended to broadcast any matter over Station or to record any matter for broadcast by Station;

1.13. "Email notice" means an email with delivery confirmation as rendered in Microsoft Outlook, Registered Gmail, or other software email system.

1.14. "Progressive Discipline" ordinarily involves a verbal/written warning, suspension and then discharge, except immediate discharge may occur whenever "just cause" is established.

1.15. The masculine, feminine and neuter import one another.

## 2. **Agreement Scope.**

2.1. **Employees Covered.** Except as otherwise stated in it, this Agreement applies to: every producer and associate producer employed by Company at Station.

2.2. **Persons Not Covered.** This Agreement does not apply to any performer or reporter, office or clerical employee, staff artists, switchboard operator, announcer, maintenance employee, sales person, promotion employee, guard, professional employee, traffic employee, any employee covered by another collective bargaining agreement, or supervisor as defined in the National Labor Relations Act, as amended or any other person not within paragraph 2.1.

## 3. **Union Status.**

3.1. **Recognition.** Company recognizes Union as exclusive Collective Bargaining Representative of the Unit described in paragraph 2.1.

3.2. **Union Business: International Representative.** By permission of Company, which will not unreasonably be withheld, a duly authorized International Representative of International Union may visit Company's premises. Such Representative will not do anything the reasonable effect of which might interfere with or interrupt Company's business.

3.3. **Union Membership.** Each Employee will, thirty (30) days after his employment or the effective date of this paragraph, whichever is later, become and remain a member of Unions to the extent of tendering to Unions the initiation fee and periodic dues uniformly required for acquisition and retention of membership in

Unions. Local Union will, within thirty (30) days after any default in tendering such fee or dues, notify Company in writing of each Employee who fails to tender such fee or dues. Company will, within ten (10) days after receiving such notice, in turn notify in writing each Employee listed in it. If an affected Employee does not, within ten (10) days after Company mails such notice to him, make the required tender or established to Company's satisfaction that he is not required to make it, Company will discharge him. Unions will indemnify Company against all liability Company may incur by reason of any discharge pursuant to notice from Local Union under this paragraph. Failure by Local Union to notify Company of a default within the time required by this paragraph will bar discharge for that default but will not bar discharge for a properly-noticed subsequent default.

3.4.     **Union Membership: Unit List.** Company will give the Local Treasurer on execution of this Agreement, a duplicate list stating the name, department, hire date, and pay rate of each Employee then in the Bargaining Unit, and by the 10thday of the month following any change in such list, will give the Local Treasurer a duplicate list of each such change. The Local Secretary/Treasurer will be provided in writing the name, date of hire, classification, shift, and pay rate for newly-hired employees.

3.5.     **Union Membership: Dues Check Off.** Within thirty (30) days after sending the initial list required by paragraph 3.4 and each pay period thereafter during the term of this Agreement (subject to the requirements of any subsequent change list), Company will, for each Employee named who (a) has in any pay period of the month involved sufficient wages due him from Company and (b) has, on a form as shown in Schedule E to this Agreement, duly authorized it to do so, deduct from each Employee's compensation and remit to Local Union an amount equal to the periodic dues so listed as payable to Unions for his account. Company will have no obligation to deduct or remit the dues payable for the account of any Employee for any pay period for which the Employee does not have sufficient wages due him to pay his account with Unions. Unions will indemnify Company against all liability Company may incur by reason of any dues deduction or remittance pursuant to this paragraph.

3.6.     **Union Membership: Dues Check Off Authorization.** The periodic dues• deduction authorization required by paragraph 3.5 must (a) be personally signed by the Employee affected, (b) comply with all applicable laws and regulations and (c) be revocable on Company's receipt of written notice as provided in Schedule E, signed by the Employee affected and mail to Company by Certified Mail.

Company will promptly send Local Union a copy of such authorization or revocation.

4

4.    **Employee Status.**

4.1.    **Probationary Period.** An Employee will be on probation for the first one hundred and eighty (180) calendar days. During this probationary period, he will be subject to discharge at Company's sole discretion and will have no rights under paragraph 10 with respect to such discharge.

4.2.    **Discipline and Discharge: Basis.** The Employer shall have the right to discharge any Employee for just cause. The reason for such discharge shall be given to the Union and the Employee. If the Union believes any such discharge to be unjustified, the matter shall then be considered as a grievance, and shall be handled as stated in Article 10 of this Agreement.

4.3.    **Seniority: Types and Definitions.** There will be two (2) types of seniority: (a) Station; (b) Classification. Station seniority means length of continuous employment with Station in the Unit, from the Employee's initial employment by Station in the Unit or his employment in the Unit after loss of his seniority, as the case may be. Classification seniority means seniority accrued as a producer, or associate producer. An associate producer will not be credited with classification seniority earned if promoted to a producer

4.4.    **Seniority: Acquisition.** An Employee will acquire Station seniority after completing his probationary period, and his Station seniority will then date from the start of his probationary period. Employees starting work on the same day will have equal Station seniority. An Employee will acquire classification seniority in the classification to which he is assigned on a non-temporary basis, when he acquires Station seniority.

4.5.    **Seniority: Accrual.** An Employee whose employment has not been terminated by resignation, discharge or death, and whose seniority has not been lost under paragraph 4.8 will accrue seniority in these cases: (a) while actively at work; (b) while on holiday or vacation; (c) for that part of any leave for military service preceding any voluntary extension of such service, so long as he complies with the conditions of such leave and has a statutory right to reemployment; (d) for the duration of any absence for illness or disability so long as he complies with the conditions of such leave. An Employee will accrue classification seniority in only one (1) classification at a time. An Employee assigned to a classification on a temporary basis will continue to accrue seniority in the classification to which he is assigned on a non-temporary basis.

4.6.    **Seniority: Retention.** An Employee whose employment has not been terminated by resignation, discharge or death, and whose seniority has not been lost under paragraph 4.7 will retain, but not accrue, seniority in these cases: (a) on leave of absence other than one (1) specified in paragraph 4.5 so long as he complies with the conditions of such leave; (b) for ninety (90) days on promotion or assignment to a position not covered by this Agreement; (c) up to one (1) year on layoff.

4.7. **Seniority: Loss.** Except as otherwise stated in this paragraph, an Employee will lose seniority and all reemployment rights by (a) resignation, (b) discharge, unless voluntarily remitted by Company or vacated by a valid arbitration award either accepted by Company or judicially confirmed, (c) one year continuous layoff, (d) absence for three (3) consecutive scheduled workdays without notifying Company in advance or without providing a timely, reasonable and valid excuse, (e) failure to report for work on schedule from a vacation, leave of absence or disciplinary suspension without notifying Company in advance or without providing a timely, reasonable and valid excuse, (f) failure to comply with the recall-from-layoff procedure established by paragraph 4.10, (g) one (1) year absence for illness or disability, or determination under paragraph 4.9 that he cannot reasonably be expected to return to work before the end of one (1) year, and (h) subject to Federal Law, voluntary extension of military service.

4.8. **Seniority: Application.** Seniority will apply separately in each classification to (a) layoff, (b) recall and (c) vacation-time preference as limited by the express provisions of this agreement. Station seniority shall be used to determine benefits, vacation and sick leave accrual.

4.9. **Seniority: Limitation.** If an Employee absent for illness or disability is unable to return to work after four (4) consecutive months of such absence, he will, at Company's request and expense, submit to examination by Company's physician up to three (3) times during the continuation of such absence. If Company's physician determines he may reasonably be expected to return to work before the end of one (1) year from the start of his absence, his seniority and reemployment rights will continue. If, on the other hand, Company's physician determines he cannot reasonably be expected to return to work in such time, and the Employee's physician concurs in this determination, Company may terminate the Employee's seniority and reemployment rights by paying him a severance allowance under paragraph 8.4. If the Employee's physician does not concur with Company's physician, their disagreement will be resolved by a third physician, to be appointed by them or, if they fail to agree on such appointment within ten (10) days, by a physician appointed by New Haven County Medical Society or such person as it may direct, and such third physician's determination will be final and binding. If this third (3rd) physician concurs in Company physician's determination, Company may terminate the Employee's seniority and reemployment rights by paying him a severance allowance under paragraph 8.9 An Employee who fails or refuses to comply with these requirements promptly will forfeit all benefits under this paragraph and will be deemed to have resigned. An Employee absent for illness or disability for one (1) year will lose his seniority and reemployment rights and will be deemed to have resigned.

4.10. **Seniority: Layoff and Recall.** Company will lay off Employees in inverse classification seniority order provided the skill and ability levels are equal. An Employee so laid off may, subject to his ability to satisfactorily perform the work available in another classification, exercise any seniority he may have in such other classification to displace any junior Employee in that classification. Company will recall laid-off Employees in classification seniority order, subject to the ability of such Employees to satisfactorily perform the work available in such classification. Associate Producers will be laid off prior to laying off any producers.

4.11. **Seniority: Layoff and Recall: Procedure.** Company will recall an Employee from layoff via a nationally recognized overnight courier service or by Certified Mail to the Employee's address as shown on the last federal income-tax withholding exemption certificate (Form W-4) he filed with Company or as shown on any notice he may have filed with Company by Certified Mail, whichever is most recent. This notice will specify a date and time not earlier than twelve (12) days from its confirmed delivery date or certification date, as the case may be, for the Employee to return to work. The Employee will, via a nationally recognized overnight courier service or by certified letter within seven (7) days from such confirmed delivery date or certification date, notify Company that he accepts such recall. If he fails to so notify Company, his seniority and re-employment rights will terminate and he will be deemed to have resigned. If he so accepts such recall, he must report for work at the date and time specified in the recall notice. If he does not so report, his seniority and reemployment rights will terminate and he will be deemed to have resigned. In computing any time limit specified in this paragraph, Saturdays, Sundays and holidays will be excluded.

## 5. **Work Time.**

5.1. **Normal Workday: General.** A normal workday for an Employee will be eight and one half (8 1/2) consecutive work hours including a one- half (1/2) hour meal period, nine (9) consecutive work hours including a one (1) hour meal period or, by mutual consent of the Employee and the Employer, ten and on half (10 1/2) consecutive work hours, including a half 1/2 hour meal period.

5.2. **Normal Workweek: General.** A normal workweek for an Employee will be five (5) consecutive normal workdays, or for Employees on a four (4) day week, four (4) consecutive workdays.

5.3. **Work Obligation: Employee: General.** Unless he has a reasonable and valid excuse, an Employee will work (a) the time assigned to him as a normal workday and workweek and (b) such additional time as Company may reasonably require. An Employee will report for work on time, ready, willing and able to work, and will perform willingly and faithfully whatever work he does.

7

5.4.   **Work Obligation: Employee: Other Employment, Etc...** An Employee will not, without Company's express permission, engage in any other employment or any contract work actually or potentially adverse to Company's interests.

5.5.   **Work Obligation: Employee: Respect for Law, Etc.** Employee will respect all public laws, rules and regulations affecting Company's business and Employee's employment with Company, and will also respect Company's policy on payola, plugola and interest conflict. To these ends, he will not accept or agree to accept from any person, directly or indirectly, any money, service or other valuable consideration for including any matter in or excluding and matter from a Station broadcast or preparation or promotion of any matter intended for a Station broadcast, and will immediately disclose to Company complete information concerning any offer of money, service or other valuable consideration for any such conduct which may come to his attention, subject to the provisions of Article 11, 11.2 Company Rules.

5.6.   **Work Obligation: Company.** Company has no obligation to provide any particular number of workweeks for an Employee in any year; but, except in an emergency or circumstance beyond its control, will provide an Employee at least forty (40) work hours in a workweek.

5.7.   **Work Obligation: Company: Overtime Work.** Company has no obligation to assign overtime work to any Employee, but, to the extent it elects to assign overtime work to any Employee, will endeavor to distribute such work equitably, on an annual basis, among Employees in the same classification. Refused overtime will be considered overtime worked in determining equitable distribution.

5.8.   **Work Shifts.** Except as otherwise stated in paragraph 5.10 and except that a shift will not be split, there will be such work shifts, with such starting times, as Company may determine.

5.9.   **Work Shifts: Rest Periods.** Between the time an Employee goes off duty from his last shift and the time Company first requires him to report back on duty for his next shift, he will normally have these rest periods:

      (a) Twelve (12) hours between daily work assignments;

      (b) Thirty-six (36) hours between daily work assignments separated by one (1) intervening day off;

      (c) Sixty (60) hours between assignments separated by two (2) intervening days off.

      (d) Eighty (80) hours between assignments separated by three (3) intervening days off.

5.10 **Work Schedules.** Company will post (electronic or otherwise) a basic schedule of Employee's work assignment 14 days in advance of its start. Company may change an Employee's daily assignment and is required to give as much advance notice as possible. Employees may be assigned an on-call schedule for weekends and holidays. The Company may schedule a producer for on-call shifts and agrees to assign such shifts equitably using a rotation for all producers. The on-call rotation will be scheduled quarterly, and should the Company desire to discontinue the on-call rotation, it will notify the Union two weeks prior to the end of the quarter. An on-call employee shall respond within a reasonable time period to cover emergencies outside of regular hours or when a scheduled employee cannot meet the demands of news events. One (1) producer will be designated to be on-call each weekend.

It is understood and agreed that employees who are available to respond to overtime call backs are waiting to be engaged (as defined by the Fair Labor Standards Act) by the Company. Employees who are waiting to be engaged are free to participate in personal activities; are not required to wait at home, at the Company's premises or any specified location during the period they are "on-call". Employees who are "on-call" may leave the location they have indicated as the primary place of their primary contact. However, such employees will be available for callout by either leaving another phone number where they can be contacted or by carrying on their person a communication device such as a cell phone, or other such communication device which enables the Company to contact them.

It will be an Employee's duty to check his schedule before leaving each day; but after he has left, it will be Company's obligation to notify him of any change. It is expected that Employees will respond to email messages received by employees or messages left on voicemail or with responsible persons residing at the Employee's home or known address.

The Company will consider requests for shift changes based on seniority, but preserves the right to deny such changes when operational needs outweigh seniority.

6. **Monetary Benefits: Pay for Time Worked.**

   6.1. **Pay Basis.** Except as otherwise expressly stated in this Agreement, an Employee will be paid only for time actually worked.

   6.2. **Regular Compensation Rate.** An Employee's regular compensation rate is one-fortieth (1/40th) his regular weekly compensation rate, this rate will apply to all work time constituting his normal Workday or Workweek.

   6.3. **Premium Compensation Rate: Overtime Work (Not Applicable to Part-Time Employees).** Except as otherwise stated in this Agreement, an Employee's compensation rate for work required by Company will be:

   (a) one and one-half times (1-1/2X) his regular compensation rate for any hours of actual work in excess of forty (40) in a week.

9

6.4. **Premium    Compensation    Rate:    Holiday    Work.** An Employee's compensation rate for work required by Company on a holiday will be his regular compensation rate in addition to any pay he may be entitled to under paragraph 7.2.

6.5. **Premium Compensation Rate: Limitation.** Except as otherwise required by law, no premium compensation rate will apply to work an Employee does under a schedule arranged or rearranged to accommodate him.

6.6. **Compensation Computation: Pyramiding and Compounding.** Neither compensation nor compensation rates will be pyramided or compounded in computing compensation under this Agreement. If more than one (1) type of compensation or compensation rate would otherwise apply to the same work, only the higher rate will apply.

6.7. **Compensation Computation: Work Time.** For the purpose of computing an Employee's compensation, this will be deemed "time actually worked" within the contemplation of paragraph 6.1.:

| | |
|---|---|
| (a) when the Employee is sent out of the Station on an assignment requiring him to remain away overnight | (i) eight (8) hours for each Workday of such assignment regardless (unless Company assigns him work) whether actually worked, plus |
| | (ii) such time exceeding eight (8) hours as he may actually work |
| (b) when he is traveling on assignment out of the Station requiring him to remain away overnight | (i) all time spent driving an automobile and |
| | (ii) all other travel time up to eight hours in any one (1) day exclusive of the time between midnight and 8:00 a.m., prevailing local time |
| (c) when he is sent out of the Station on an assignment requiring him to return in the same Workday | All time spent on such assignment |

10

Time spent reporting for work will not be deemed to be time worked; but time spent thereafter during each workday's assignment (such as traveling between studios, remote broadcasts, or other assignments where travel is required) will be deemed to be time worked. An Employee's regular schedule will begin and end at the studio for an Employee assigned to work there, and at his assignment for an Employee hired to work a specific assignment, unless Company instructs him to start or end his Workday, as the case may be, at a point other than the studio or his specific assignment. Where Company assigns an Employee to start or end his Workday at an assignment which is further distant from his home than the studio or his specific assignment, as the case may be, Company may require him to use his own automobile in accordance with paragraph 8.8. If the Employee consents, he will be paid mileage in accordance with paragraph 8.8 for the use of his automobile on such workday less mileage for the distance from his home to and from the studio or his specific assignment, as the case may be.

6.8.  **Compensation Computation: Overtime Work.** Compensation for overtime work will be computed in one-tenth (10th) hour segments to the nearest one-tenth (10th) hour.

6.9.  **Compensation Computation: Records.** If a problem arises with respect to computation of an Employee's compensation under this Agreement, Company will, on request, make a copy of such Employee's compensation record available to Unions.

6.10. **Compensation Payment.** Compensation payable under this Agreement will be subject to payroll deduction required by law or authorized by the affected Employee.

7.  **Monetary Benefits: Pay For Time Not Worked.**

7.1.  **Holidays, Vacations, Sick Leave, Personal Leave.** Bargaining unit employees will be covered by Nexstar's holiday, vacation, sick leave and personal day policies on the same basis as non-represented employees of the Company. The Company reserves the right to modify or change the holiday, vacation, sick leave and personal day policies in any way as long as such modifications or changes apply equally to both bargaining unit and non-represented employees of the Company.

Any vacation, sick days and/or personal days used in 2017 prior to the effective date of this Agreement shall reduce the amount of vacation, sick days and/or personal days available for the employee to use under Nexstar's policies for the remainder of 2017.

7.2. **Jury Service.** Company will, on an Employee's submitting valid proof of such service, pay him for required jury service the difference between his regular compensation rate and whatever compensation he may be entitled to for such service to a maximum per day equal to his normal Workday at the time and to an aggregate annual maximum of one hundred-sixty (160) hours. If such service exceeds this maximum, Company will, provided the Employee and his fellow Employees cooperate in any necessary schedule adjustment and any such adjustment will not require Company to pay any premium compensation rate or otherwise increase its payroll expense for the work involved, endeavor to provide work for the Employee at such times as he may be free from actual jury service.

7.3. **Funeral Leave.** An Employee will be entitled to up to three (3) consecutive scheduled Workdays' leave, with pay, when there is a death in the immediate family, if he attends the funeral. For this paragraph's purposes, "immediate family" includes only the Employee's father, mother, father-in- law (spouse's father), mother-in-law (spouse's mother) grandparents (parents of Employee's mother or father), brother, sister, spouse and child. Reasonable evidence supporting the claim of death may be required by the Company before paid funeral leave is granted. The benefits of this Section shall not apply to Employees absent from work on off-days, or for any other reason except vacation; they shall apply only to those days when the Employee is scheduled to work and would ordinarily have worked. The Company will consider requests for additional leave based on the Employee's particular circumstances. Additionally, the Company reserves the right to grant funeral leave beyond the "immediate family", as herein defined, on a case-by-case basis.

7.4. **Military Leave.** Employees will be granted a leave of absence to fulfill military reserve training requirements -- generally two (2) weeks in nature. An Employee who has completed at least one (1) year of service to the Station will receive his regular salary for the period of active duty less the amount of his military pay.

8.  **Monetary Benefits:   Miscellany.**

   8.1.   **Insurance/Benefits:**

   All employees covered by this Agreement shall be treated the same as all other Station Employees with respect to benefit plans and contributions to those plans. Such plans include health, dental and vision coverage, short and long-term disability insurance, life insurance, 401(k) and other similar plans and benefits.  The Company reserves the right to change, modify, or replace in whole or in part, the Company's insurance and benefit plans covered by this paragraph in any way as long as such changes apply equally to both bargaining unit and non- represented employees of the Company. Should any changes occur during the term of this Agreement, the Company shall notify the Union.

   8.2.   **Meal Money: Overtime Work.** An Employee will have a one-half (1/2) hour or one (1) hour meal period, as set forth in Section 5.1, in each shift. This period will begin not sooner than two (2) hours after his normal shift starts and end not later than six (6) hours after his normal shift starts. If Company requires an Employee to work more than four (4) hours overtime, whether before or after his normal shift, he will have an additional one-half (1/2) hour unpaid period within the hour immediately preceding or following his normal shift. When an Employee works twelve (12) or more hours in any Workday, Company will pay him eight dollars ($8.00) meal allowance in addition to whatever compensation he may be entitled to for time worked.

   8.3.   **Transportation and Travel Expense.** Company will arrange for or provide reasonable accommodations for any Employee it requires to travel and will reimburse him for all reasonable and necessary travel expense he actually incurs. Company has the right to determine the method of transportation, except (a) it will not specify that an Employee use his own automobile unless he consents and (b) it will not specify that an Employee use an intra-city motorbus where transportation of bulky or heavy equipment is necessary. If an Employee, with Company approval, uses his own automobile for travel required by the Company, Company will reimburse him for such use at the IRS applicable rate, except where Company expressly conditions its approval of such vehicle use on the Employee's being reimbursed on the basis of the lowest-cost available transportation permissible under this paragraph.

8.4.   **Terminal Benefits**. Company will pay, on employment termination, benefits only as stated in this paragraph.

| **Termination Cause** | | **Benefit Payable** | |
|---|---|---|---|
| (a) | Resignation | (i) | Compensation earned to termination and |
| | | (ii) | If the Employee gives two (2) weeks' notice of intent to resign, accrued vacation pay |
| (b) | Death | (i) | Compensation earned to termination and |
| | | (ii) | Accrued vacation pay |
| (c) | Illness or disability termination under paragraph 4.4 | (i) | Compensation earned to termination date, |
| | | (ii) | Accrued vacation pay, and |
| | | (iii) | This severance allowance: for each full twelve (12) months' continuous employment: (a) one (1) week's pay (at his regular compensation rate at termination) for each of his first five (5) such twelve (12) months' employment units and (b) two (2) weeks' pay (at his regular compensation rate at termination) for each of any subsequent such twelve (12) months employment units, to an aggregate "a" and "b" of eighteen (18) weeks maximum |
| (d) | Misconduct discharge or discharge under paragraph 3.3 | (i) | Compensation earned to termination and |
| | | (ii) | Accrued vacation pay |
| (e) | Call to military service | (i) | Compensation earned to separation date and |
| | | (ii) | Accrued vacation pay |
| (f) | Layoff | (i) | Compensation earned to termination date, |
| | | (ii) | Accrued vacation pay, and |

14

(iii) This severance allowance: for each full twelve (12) months' continuous employment: (a) one (1) week's pay (at his regular compensation rate at termination) for each of his first five (5) such twelve (12) months' employment units and (b) two (2) weeks' pay (at his regular compensation rate at termination) for each of any subsequent such twelve (12) months employment units, to an aggregate "a" and "b" of eighteen (18) weeks maximum

Any payment of severance allowance to an Employee will be debited, week for week, against whatever severance allowance he may thereafter be entitled to.

## 9. Work or Business Interruption.

9.1. **Strike Etc...** Neither Local Union, International Union nor any Employee will instigate, encourage or engage in any strike, sympathy strike, work stoppage, work interruption, work interference, slowdown, picketing, bannering or boycott, nor will Company engage in any lockout, during the life of this Agreement.

9.2. **Union Obligation and Liability.** In the event of any violation of paragraph 9.1, Local Union and International Union will immediately, on Company request:

(a) publicly declare by whatever means Company may reasonably request that such action is unauthorized and is in violation of this Agreement;

(b) order each Employee to return to work or otherwise cease such violation;

(c) take such steps as are available to them under their respective constitutions and by-laws to enforce compliance with paragraph 9.1.

If Unions comply with these obligations, they will not be liable for any violation of paragraph 9.1 which they did not authorize.

15

9.3.   **Employee Liability.** Company will have the absolute right to suspend or otherwise discipline, or to discharge, as in its sole discretion it may decide, any Employee who violates paragraph 9.1; and neither Local Union, International Union nor any Employee will question this right. However, the issue of fact whether a particular Employee violated such paragraph will be subject to arbitration   under paragraphs 10.1 through 10.12.

9.4.   **Other Labor Disputes: Union and Different Employer.** If Local Union, International Union, or any of International Union's other Local Unions, is engaged in a lawful strike against an employer not owned or controlled by or affiliated with Company on behalf of persons of whom it is the certified or recognized Collective Bargaining Representative, Company will not, without Local Union's consent, require an Employee, in circumstances which, under National Labor Relations Act, make Company an "ally" of such other employer, to work either (a) on any program it may prepare and transmit to such employer or (b) at the studio or transmitter of such employer. However, no Employee shall assert this paragraph as justification for failure or refusal to perform any work Company may assign to him unless (a) Company acknowledges or (b) it has been established by a valid arbitration award under paragraph 10.12 either accepted by Company or judicially confirmed that the circumstances are such as, under National Labor Relations Act, "make Company an 'ally' of such other employer."

9.5.   **Other Labor Disputes: Company and Different Labor Organizations.** If a labor organization not controlled by or affiliated with either Local Union or International Union or any other unit covered under a separate collective bargaining agreement by this Local or Union is engaged in a lawful strike against Company at the Station on behalf of persons of whom it is the recognized or Certified Collective Bargaining Representative, Company will not, except in an emergency or circumstance beyond its control, require an Employee to perform work done before the strike, as part of normal and required duties with Company, by any person in the Collective Bargaining Unit involved in the strike. However, no Employee shall assert this paragraph as justification for failure or refusal to perform any work Company may assign to him unless (a) Company acknowledges or (b) it has been established by a valid arbitration award under paragraph 10.5 either accepted by Company or judicially confirmed that such work is in fact "work done before the strike, as part of normal and required duties with Company, by any person in the Collective Bargaining Unit involved in the strike." For this paragraph's purposes, personnel shortage caused by the strike is not an "emergency or circumstance beyond Company control."

10. **Problem Adjustment.**

10.1. **Scope.** Except as stated in paragraph 10.8, problems Local Union, International Union or any Employee may have with Company (whether arising from a grievance, application or interpretation of this Agreement, or otherwise) will be adjusted as stated in paragraphs 10.2 through 10.12.

10.2. **Procedure & Time Limits: Initiation.** Either an Employee, a group of Employees, Local Union or International Union may initiate a problem by serving a written notice of it on Company within fourteen (14) days after occurrence of the facts on which it is based or, if it is based on fraud or active concealment, within fourteen (14) days after such facts are discovered or in the exercise of reasonable diligence could have been discovered. Such notice will state the facts on which the problem is based, specify each Agreement paragraph alleged to have been violated, and specify the relief and remedy sought. If no such notice is served in that time, the problem will be barred.

10.3. **Procedure & Time Limits: Initiation: Notice Amendment,** The Employee, group of Employees, or Union, as the case may be, which has served a timely problem• initiation notice on Company, may, at any time before completion of Step Two, amend such notice to (a) state additional or different facts, based on newly discovered evidence, and (b) specify additional or different Agreement para- graphs as the paragraphs allegedly violated. Any such amendment must be served on Company before Step Two's completion. If so served, it will extend the time for completion of the Step during which it is served by the number of days consumed in such Step before such service. No problem initiation notice may be amended after completion of Step Two.

10.4. **Procedure & Time Limits: Step One.** After a proper and timely notice is filed by an Employee or group of Employees, or Unions, Company's designated representative and Local Union's steward will discuss the problem. This discussion, unless extended by written agreement for a specified period, will be completed within ten (10) days after Company receives the required initiation notice. Company will, within seventy-two (72) hours after written and signed adjustment of a problem at this Step, dispatch to Local Union a written notice stating the text of such adjustment, and, if Local Union does not serve a written objection to it on Company within five (5) days after it receives such notice, the adjustment will be final and the problem will be barred except as the adjustment may otherwise provide. If Local Union or International Union files a proper and timely notice, the problem will be considered in Step Two, and Step One will be considered in Step Two, and Step One will be deemed completed as of the notice's filing date.

10.5. **Procedure & Time Limits: Step Two.** If the problem is not adjusted in the time specified in Step One, or if Local Union or International Union serves a timely objection to any adjustment under Step One, Company's designated representative and a representative of Local Union or International Union will discuss it. This discussion, unless extended by written agreement for a specified period, will be completed within ten (10) days after Step One's completion.

10.6. **Procedure & Time Limits: Arbitration.** If the problem is not adjusted in the time specified in Step Two, either Local Union, International Union or Company may ask the Federal Mediation and Conciliation Service to arbitrate it under its then-current voluntary labor arbitration rules, as modified by paragraph 10.7. Any such request will be written, with simultaneous written notice to the other party, and if it is not so filed and noticed within seven (7) days after Step Two's completion, the problem will be barred.

10.7. **Procedure & Time Limits: Arbitration: Arbitrator's Decision & Compensation.** The arbitrator will render his decision, in writing, within ten (10) days (or such additional time as the parties may by writing agree) after the problem has been submitted to him, and his decision, when so rendered as required by law, will be final and binding on the parties. The parties will bear their own expenses individually and share the arbitrator's fee and expenses equally.

10.8. **Exclusions & Limitations: Problem Adjustment Scope.** These problems are excluded from the adjustment procedure established by paragraphs 10.2 through 10.12: (a) violation or claimed violation of paragraph 9.1 or 9.2; (b) interpretation or application of paragraph 9.4 or 9.5; (c) negotiations for a new or amendatory agreement; (d) the issue whether a particular problem is arbitrable under this Agreement or any applicable law.

10.9. **Exclusions & Limitations: Arbitrator's Authority.** The arbitrator will have no authority to (a) add to, subtract from or in any way modify this Agreement; (b) substitute his discretion or judgment for Company's discretion or judgment with respect to any matter this Agreement consigns or reserves to Company's discretion or judgment; (c) interpret any policy, practice or rule, except as necessary in interpreting or applying this Agreement; (d) formulate or add any new policy or rule, or (e) establish or change any wage or classification.

10.10. **Exclusions & Limitations: Construction.** Nothing in paragraph 10.8 or 10.9 will prevent Company, Local Union or International Union from (a) applying to any court of competent jurisdiction for an order to compel arbitration of a problem the party so applying believes to be arbitrable under paragraphs 10.2

through 10.12 or (b) expressly submitting to arbitration, by written agreement signed by each party, any problem (which shall be specifically described in such agreement) this agreement would otherwise exclude from arbitration or (c) expressly conferring on an arbitrator, by such written agreement, any authority (which shall be specifically described in such agreement) this agreement would otherwise deny him.

10.11. **Construction.** Nothing in paragraphs 10.1 through 10.11 will prevent informal adjustment of any problem; and the parties intend that, so far as reasonably possible, every problem will be resolved between the Employee and supervisor immediately involved. Except as otherwise expressly stated in paragraph 10.8, the procedure established by this agreement for adjustment of problems will be Unions' exclusive remedy for claimed violation of this Agreement by Company. No Employee or group of Employees will have the right to initiate an arbitration proceeding. In computing any time limit specified in paragraphs 10.2 through 10.7, Saturdays, Sundays and holidays will be excluded.

10.12. **Expedited Arbitration: Violation of Paragraphs 9.1 or 9.2, Etc.** In the event of a claimed or actual violation of paragraph 9.1 or 9.2, or a problem involving interpretation or application of paragraph 9.4 or 9.5, either Company, Local Union or International Union may, in addition and without prejudice to whatever right it would otherwise have to relief in any court, request expedited arbitration of the issues involved. The party seeking such arbitration will (a) send the Federal Mediation and Conciliation Service (FMCS) an email notifying it of the violation and requesting immediate arbitration of the issues and (b) simultaneously send the other party an email quoting the text of the email to the FMCS. The FMCS will immediately appoint an arbitrator, who will be both an attorney and counselor-at-law and immediately available to immediately hear and determine the issues. The arbitrator will immediately hold a hearing, on email notice to Company and Union; will not adjourn or postpone the hearing unless the party requesting the arbitration consents; will have jurisdiction to issue against any culpable person or organization a cease-and- desist order to terminate any threatened or actual violation of paragraph 9.1 or 9.2 he may find; and will also have jurisdiction to grant against any such person or organization such other relief (except damages) as may be just. The arbitrator will issue any such order or grant any such other relief only by written award, emailed or delivered to the parties, but will not have any obligation to render any opinion; and any court of competent jurisdiction may, on motion of either party and without notice to the other party, immediately confirm such award and enforce any order in it. The parties intend that any such arbitration proceeding will, if possible, be completed and the arbitrator's award issued within twenty-four (24) hours from the time the party seeking it files its email request, and that any judicial confirmation of any such arbitration award will, if possible, be forthcoming with-in twenty-four (24) hours from the time the party seeking it files its motion therefor. The parties will bear their own expenses individually and share the arbitrator's fee and expenses equally.

Nothing in this paragraph will prevent either party from seeking similar or further relief against a claimed or actual violation of paragraph 9.1 or 9.2 from any court or divest any court of jurisdiction to grant any such relief. The term "days" shall exclude Saturdays, Sundays, and holidays.

11. **Business Management.**

11.1. **General.** Company has legal responsibility and, subject only to the express and specific terms of this Agreement, sole right to manage its business, including, among other things, as illustration and not as enumeration or limitation, the sole right to (a) hire, assign, transfer, promote, demote, schedule, layoff, recall, discipline and discharge its Employees and direct them in their work, (b) determine and schedule work and programming, acquisition, location, relocation, installation, operation, maintenance, alteration, modification, development, retirement and removal of equipment and facilities, (c) introduce any new or different process or procedure, and (d) control all Company property.

Company also has, as part of these rights, sole right to contract or subcontract any work which it deems may be more efficiently or better performed in such way. No such action will be subject to the problem adjustment procedure established by paragraph 10; if it causes or is concurrent with a consequential staff reduction, Company will bargain with Unions about the effects of any Employee laid off or terminated in such reduction. The Company agrees to give the Union advance notice of subcontracts.

11.2. **Company Rules.** As part of its general management rights, Company has the right to make, post and enforce rules affecting Employees. Such rules, however, will not be inconsistent with the express and specific terms of this Agreement and, in matters affecting compensation rates, compensation, employment time or other employment conditions, will be reasonable. Company will send Local Union and simultaneously post on its Employee bulletin boards or otherwise distribute to the Employees a copy of any personnel rule, affecting any Employee, it may make; and, unless otherwise stated in it, such rule will be effective on such sending and posting or distribution.

12. **Miscellany.**

12.1. **Meetings.** Company and Unions will confer at such reasonable times as either party may request to consider problems or consistent with the requirements and

limitations of paragraph 13 any proposal for this Agreement's amendment or supplement. So far as reasonably practicable, these meetings will be held outside any participating Employee's scheduled work time and the party requesting the meeting will notify the other party by advance writing of each subject to propose to discuss.

12.2. **Notices & Addresses: Company.** Any notice (except one pursuant to Agreement paragraph 10.2 [Problem Adjustment: Procedure & Time Limits: Initiation]) required to be served on Company under this Agreement will be sent by email, via a nationally recognized overnight courier service or mailed by Certified Mail to its General Manager and HR Manager at Company's office at 8 Elm Street, New Haven, Connecticut 06510, or such other address as Company may direct by written notice served on International Union or Local Union.

12.3. **Notices & Addresses: International Union.** Any notice required to be served on International Union under this Agreement will be sent by email, via a nationally recognized overnight courier service or mailed by Certified Mail to its office at 501 Third Street, N.W., 6th Floor, Washington, D.C. 20001-2797, or such other address as International Union may direct by written notice served on Company.

12.4. **Notices & Addresses: Local Union.** Any notice required to be served on Local Union under this Agreement will be sent by email, via a nationally recognized overnight courier service or mailed by Certified Mail to its President at such address as Local Union may direct by written notice served on Company.

12.5. **Notices & Addresses: Employee.** Any notice required to be served on an Employee under this Agreement will be sent by email, via a nationally recognized overnight courier service or mailed by Certified Mail to him at the address shown on the last Federal Income Tax Withholding Exemption Certificate (W-4) he filed with Company or on any notice he may have sent Company by Certified Mail, whichever is most recent. Every Employee must promptly notify Company of his telephone number and any change in it. Company will use only the last address or telephone number so noticed in contacting any Employee.

12.6. **Interest Succession.** This Agreement will bind and inure to the benefit of the parties and their respective legal successors and assigns.

12.7. **Agreement Construction.** Paragraph titles throughout this Agreement are merely editorial identification of their related text and do not limit or control that text.

12.8. **Separability.** If any decision of any Federal or Connecticut Court affects any provision of this Agreement, each such provision will be deemed amended to the extent necessary to comply with such decision, but otherwise this Agreement will not be affected.

12.9. **Tools & Equipment.** Company will furnish all tools necessary for employees to do their jobs.

12.10. **Waiver: Employee.** An Employee may temporarily waive his rights under paragraphs 5.1, 5.2, 5.8, 5.9, 5.10 and 8.2.

12.11. **Waiver: Union.** Company, Union and any affected Employee may, by mutual agreement, waive any provision of this Agreement as to such Employee.

## 13.  **Amendment.**

In reaching this Agreement, Company and Unions have considered all matters lawfully subject to Collective Bargaining.

This Agreement may be amended or supplemented only by further written Agreement between the parties. A party desiring amendment or supplement will notify the other party in writing, stating the substance of the amendment or supplement desired; but the other party will not be obliged to discuss or agree to such proposed amendment or supplement.

## 14.  **Effective Date & Duration.**

This Agreement will be effective from June 21, 2017 to June 20, 2020 and from year to year thereafter unless terminated as provided in paragraph 15.

## 15.  **Termination.**

This Agreement may be terminated, effective June 20, 2020 by written notice from either party, delivered to the other not earlier than March 21, 2020 nor later than April 21, 2020 of intent to modify or terminate it; and it may be terminated, effective any subsequent anniversary of June 20, 2020, by similar written notice from either party, delivered to the other not earlier than the preceding March 21, 2020 nor later than the preceding April 21, 2020. Notice of intent to modify will be equivalent to notice of intent to terminate.

In the event that either party has given notice of proposed changes and negotiations thereon have not resulted in an agreement by the anniversary date to renew, modify or extend this Agreement, either party may serve upon the other a ten (10) day written notice to terminate this Agreement. The terms and provision of this Agreement shall continue in full force and effect until the expiration of said ten (10) day period.

**16.** **Non-Discrimination.**

Company and Unions will continue their policy and practice of not discriminating against any Employee or applicant for employment because of race, color, creed, religion, national origin, sex, age, or sexual orientation, in accordance with applicable Federal and Connecticut law.

Neither the Company nor the Union shall engage in any restraint, coercion or discrimination against any Employee because of his or her membership or non-membership in the Union, except as permitted under the National Labor Relations Act as amended.

NATIONAL ASSOCIATION OF BROADCAST
EMPLOYEES AND TECHNICIANS-
COMMUNICATIONS WORKERS OF
AMERICA AFL-CIO

NEXSTAR BROADCASTING, INC.

_____
NABET-CWA Local No. 14 President

Timothy C. Busch
President

Dated:_____

Dated: ___8 - 17-17___

_____
Staff Representative

Dated: _____

APPROVED:

_____
NABET-CWA Sector President

Dated: _____

23

## Schedule A - Duties & Compensation

**A.**  **Duties, Etc.**

A-1  **Duties.** An Employee's duties, for the purpose of this Agreement, are:

    (a)  principally responsible for timing and content decisions during the newscast, other live shows, taped programming, and pre-production elements;

    (b)  coordinating, researching, writing, and/or preparation of script materials, gathering information, graphic selection, and video element selection;

    (c)  attendance at editorial meetings to discuss assignment of stories to talent;

    (d)  communicating with talent during live shows and newscasts;

    (e)  Associate producers may not be regularly scheduled to produce a show but may be assigned to produce a show for training purposes, vacation relief, absences, or other temporary necessity;

    (f)  Any other responsibilities as assigned by management. An Employee will also perform, as Company may assign, any other duties. These duties are intended to be a general description of the position, however, anyone other than producers and associate producers may also be assigned to perform these duties. No bargaining unit employee will be laid off as a direct result of the assignment of bargaining unit work to non-bargaining unit employees.

A-2  **Hazardous Work.** Company will not assign an Employee to hazardous work without his consent. If an Employee declines work on the ground it is hazardous, Company may assign it to any willing Employee or, on whatever terms Company may arrange, to any other person. Company will provide reasonable safety clothing for an Employee, who, by Company assignment, performs hazardous work. For this paragraph's purposes, "hazardous work" means work where there is a clear and present danger of serious bodily injury or serious health impairment.

A-3  **Interchangeability.** Nothing in paragraph A-1 will be construed as imposing any limitation on the interchange-ability of work assignments among Employees in the producer and associated producer classification.

A-4    **Concurrent Multiple Duties.** The Company reserves the right to assign an Employee to more than one (1) job function.  In situations where an Employee who performs more than one (1) job function at any one time, the Company agrees to follow progressive discipline, which may include immediate discharge when just cause is established, in cases where multiple duties result in performance errors.

A-5    **Other Personnel.** Prior to the layoff of any full-time producer, all part time hours shall be reduced or eliminated until only part time work remains. Any full time employee may displace any remaining part time employee. Any such full-time employee shall still eligible for recall to full-time position, if one becomes available during recall period.

A-6    **Compensation**

**Compensation Rate: Regular.** These minimum regular annual compensation rates will be:

| | |
|---|---|
| Producers: | $40,500.00 |
| Associate Producers: | $30,000.00 |

Beginning the first pay period following the effective date of this Agreement, bargaining unit employees will receive a one percent (1%) wage increase in their weekly wage rate. Beginning the first pay period following the first anniversary date of this Agreement, bargaining unit employees will receive three quarters of one percent (0.75%) increase in their weekly wage rate. Beginning the first pay period following the second anniversary date of this Agreement, bargaining unit employees will receive three quarters of one percent (0.75%) increase in their weekly wage rate. Each bargaining unit member will also receive a one-time lump-sum payment of two hundred and fifty dollars ($250.00) at the time the agreement is ratified. This one-time payment will not be computed into the "regular rate" for that employee.  The minimum salary as set forth above in Section A-6 shall remain unchanged during the term of this Agreement.

Bargaining unit employees covered by a personal services contract shall not be eligible for the one percent (1%) increase on the effective date of this Agreement.

The Company may increase an individual employee's regular wage rate above the minimum rates set forth above.

Employees may be offered personal service agreements provided the minimum terms and conditions of the collective bargaining agreement are met. Employees may not be required to sign personal service agreements. Personal service agreements may not contain a provision by which an employee waives his/her right to the grievance and arbitration procedure in connection with a termination

## Schedule B -Temporary Employees

B-1.   **Definition.**

A temporary Employee is an Employee employed to work either (a) a specified time period, or (b) a specific assignment of limited duration. The business office will notify a Union Official of temporary Employees. Such notice shall include the future start date and the end date, if known, as well as the reason for such use.

B-2.   **Agreement Application.**

Except as otherwise stated in this Schedule B, this Agreement applies to each temporary Employee.

B-3.   **Agreement Paragraphs Not Applicable.**

These Agreement paragraphs do not apply to a temporary Employee:  4.1, 4.2, 4.4, 4.5, 4.6, 4.7, 4.8, 4.9, 4.10, 4.11, 7.3, 7.4, 8.1, 8.2, 8.3 and 8.4.

B-4.   **Limitations or Variations on Applicable Agreement Paragraphs.**

These Agreement paragraphs apply to a temporary Employee with the limitations or variations state in this paragraph.

(a)   **Paragraph 4.1 (Probationary Period).**

Notwithstanding non-application of paragraph 4.1, a temporary Employee is always terminable at Company's will.

(b)   **Paragraph A-2 (Compensation Rate: Regular).** A temporary Employee's regular compensation rate will not be less than the minimum wage.

(c)   **Schedule C (Part-Time Employees).** Schedule C applies to any temporary Employee who is also a part-time Employee.

**Schedule C - Part-Time Employees**

C-1.   **Definition.**

A part-time Employee is an Employee employed to work, generally less than a normal workweek.

C-2.   **Agreement Application.**

Except as otherwise stated in this Schedule C, this Agreement applies to each part-time Employee.

C-3.   **Agreement Paragraphs Not Applicable.**

These Agreement paragraphs do not apply to a part-time Employee: 4.9, 4.10, 4.11, 5.1, 5.2, 5.9(b), 5.9(c), and 8.1.

C-4    **Limitations or Variations on Applicable Agreement Paragraphs.**

These Agreement paragraphs apply to a part-time Employee with the limitations or variations stated in this paragraph.

(a) **Paragraph 4.1 (Probationary Period).** In applying this paragraph, a part-time Employee will be credited with one (1) day for each eight (8) hours of part-time work, and, if he becomes a full-time Employee without intervening occurrence of any event which, under paragraph 4.7, would cause a full-time Employee to lose seniority, will be credited with his part-time employment at the rate of one (1) day for each eight (8) hours he worked.

(b) **Paragraphs 4.3 (Seniority: Types & Definition), 4.4 (Seniority: Acquisition), and 4.7 (Seniority: Application).** In applying these paragraphs, all part-time Employees will have seniority only in relation to another part-time Employee; he will not have seniority in relation to a full-time Employee. If he becomes a full-time Employee, his seniority as a full-time Employee will date from that date, regardless whether he completes his probationary period before or after that date.

(c) **Paragraph 5.3 (Work Obligation: Employee: General).** In applying this paragraph, a part-time Employee's "normal Workday" will be his scheduled Workday.

(d) **Paragraphs 7.6 (Vacations: Accrual), 7.7 (Vacation: Consumption).** In applying these paragraphs, a part-time Employee will be credited only for time worked.

(e) **Paragraph 7.10 (Sick Leave).** In applying this paragraph, every twenty- four (24) hours of work will equal one (1) hour of accumulated sick time.

27

(f) **Paragraph 8.7 (Meal Money: Overtime Work).** This paragraph applies only to a part-time Employee whom Company requires to work at least eight (8) hours in one Shift.

(g) **Paragraph 8.9 (Terminal Benefits).** In computing any pay a part-time Employee may be entitled to under this paragraph, one (1) week's pay will equal (i) his regular compensation rate at his employment termination date multiplied by (ii) the average hours he worked weekly in the fifty-two (52) weeks preceding such date. The average hours he worked weekly in such period will be determined by dividing the total hours he worked in such period by fifty-two (52).

(h) **Paragraph 12.10 (Waiver: Employee).** A part-time Employee may also waive his rights under paragraph 7.1 .

(i) **Paragraph A-3 (Compensation Rate: Regular).** A part-time Employee's regular compensation rate will be determined by dividing the minimum regular weekly compensation rate by forty (40) to determine the minimum hourly rate.

C-5. **Limitations on Part-Time Employment.**

(a) Part time Employees at the Station will not exceed two (2) at any one time.

(b) Except **to** meet operational requirements, no part-time Employee will work more than thirty (30) hours in any one (1) workweek.

(c) No non-temporary full time Employee will be laid off so long as any part time employee is employed.

## Schedule D - Associate Employees

D-1.  Definition.

An associate Employee is an Employee employed with minimum qualifications and experience to assist Employees and Company supervisors in performing duties under Schedule A.

D-2.  Agreement Application.

Except as otherwise stated in this Schedule D, this Agreement applies to each associate Employee.

D-3.  Agreement Paragraphs Not Applicable.

These Agreement paragraphs do not apply to an associate Employee: 4.1, 4.2, 4.4, 4.5, 4.6, 4.7, 4.8, 4.9, 4.10, 4.11, 4.12, 4.13 and 7.9.

D-4.  **Limitations or Variations on Applicable Agreement Paragraphs.**

These Agreement paragraphs apply to an associate Employee with the limitations or variations stated in this paragraph.

(a)  **Paragraph 4.1 (Probationary Period).** Notwithstanding non-application of paragraph 4.1, an associate Employee is always terminable at Company's will.

(b)  **Paragraph 8.4 (Terminal Benefits) In** applying this paragraph, an associate Employee's terminal benefits shall be: (i) compensation earned to termination date; (ii) accrued vacation pay; (iii) this severance allowance: two (2) weeks' pay (at his regular compensation rate at termination).

(c)  **Paragraph A-5 (Compensation Rate: Regular).** An associate Employee's regular compensation rate will be not less than two hundred ten dollars ($210.00) per week.

D-5.  **Limitations On Associate Employee Employment**

(a)  No regular Employee who is an Employee as of January 27, 1979 will be laid off so long as any associate Employee is employed within such regular Employee's department.

(b)  Company will not schedule overtime for an associate Employee on his regularly scheduled day off or before the start of his regular shift unless he is assigned to work such pre-shift overtime with a regular overtime Employee and the assignment is outside the station.

(c)  Company will not employ more than one associate employee at a time.

29

## SCHEDULE E

## <u>DUES AND INITIATION FEE CHECK OFF AUTHORIZATION</u>

The Company and the Union agree that the Check-Off authorization shall be in the following form:

Name:_____
                 (Please print)

Position:       _____

Social Security Number:    _____

I hereby authorize WTNH-TV to deduct bi-weekly from my gross earnings a sum equal to one and two-thirds percent (1 2/3%) from the previous bi-weekly period including all overtime and penalty payments, on account of membership dues in NABET-CWA. In addition, I further authorize WTNH-TV to deduct from my wages on account of union initiation fees the sum of_____dollars, which shall be paid_____(provide for period and number of payments). The sums thus to be deducted are hereby assigned by me to NABET-CWA, and are to be remitted by the Company to the National Association of Broadcast Employees and Technicians – Communications Workers of America, AFL-CIO, Local 14.

I submit this authorization and assignment with the understanding that it will be effective and irrevocable for a period of one (1) year from this date, or up to the termination date of the current Collective Bargaining Agreement between WTNH-TV and NABET-CWA, AFL-CIO, whichever occurs sooner.

This authorization and assignment shall continue in full force and effect for yearly periods beyond the irrevocable period set forth above, and each subsequent yearly period shall be similarly irrevocable unless revoked by me within ten (10) days prior to the expiration of any irrevocable period thereof. Such revocation shall be affected by written notice by Registered Mail to the Company and the Union within such ten (10) day period.

Date:_____    Signed:_____

Forward to:

NABET-CWA Local 14

This confirms our understanding on interpretation and application of the Collective Bargaining paragraphs listed below.

(1)   **Paragraphs 4.3 (Seniority: Types & Definition), 4.4 (Seniority: Acquisition) and 4.5 (Seniority: Accrual)**

The fact these paragraphs establish classification seniority and provide for an Employee to acquire and accrue it in no way affects Company's rights to assign an Employee to work in more than one (1) classification on a regular continuing basis.

(2)   **Paragraph 5.3 (Work Obligation: Employee: General)**

No Employee may refuse to work overtime merely because it is "scheduled" as distinct from unanticipated; the mere fact overtime is scheduled does not permit an Employee to refuse to work it.

(3)   **Paragraph 5.9 (Work Shifts: Rest Periods)**

Company will not ordinarily require an Employee to work more than eight (8) consecutive days without a rest day.

31

NATIONAL ASSOCIATION OF BROADCAST
EMPLOYEES AND TECHNICIANS-
COMMUNICATIONS WORKERS OF
AMERICA AFL-CIO

NEXSTAR BROADCASTING, INC.


NABET CWA Local No. 14

Timothy C. Busch
President

Dated: 7/24/17

Dated: 8-17-17


Staff Representative

Dated: 7/24/17

APPROVED:


NABET-CWA Sector President

Dated:

8/5/17