## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| **MICAH BAILEY** | : | |
| **Plaintiff** | : | |
| | : | **No. 3:19-cv-00671(VLB)** |
| **v.** | : | |
| | : | |
| **NEXSTAR BROADCASTING, Inc.** | : | **March 6, 2020** |
| **Defendant.** | : | |
| | : | |
| | : | |
| | : | |
| | : | |

**Before the Court is Defendant Nexstar Broadcasting, Inc.'s Motion to Dismiss Counts 5-12 of the Complaint [Dkt. 1] pursuant to Fed. R. Civ. P. 12(b)(6) for failure to state a claim upon which relief may be granted. [Dkt. 20 (Def. Mot. to Dismiss)]. In the Complaint, Plaintiff Micah Bailey, Defendant's former employee, alleges causes of action for: (1) gender discrimination in violation of Title VII of the Civil Rights Act of 1964; (2) gender discrimination in violation of the Connecticut Fair Employment Practices Act ("CFEPA"); (3) retaliation; (4) hostile work environment; (5) defamation-slander per se; (6) defamation-libel per se; (7) invasion of privacy – false light; (8) breach of contract; (9) breach of the implied covenant of good faith and fair dealing; (10) wrongful discharge in violation of public policy; (11) negligent infliction of emotional distress; and (12) intentional infliction of emotional distress. For reasons set forth below, the Court GRANTS in part and DENIES in part, Defendant's motion to dismiss.**

## Background

As a preliminary matter, it bears observation that Plaintiff's 238 paragraph complaint strains Fed. R. Civ. P. 8(a)(2)'s command that a complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." The statement should be short because "[u]nnecessary prolixity in a pleading places an unjustified burden on the court and the party who must respond to it because they are forced to select the relevant material from a mass of verbiage." *Salahuddin v. Cuomo*, 861 F.2d 40, 42 (2d Cir. 1988) (citing 5 C. Wright & A. Miller, Federal Practice and Procedure § 1281, at 365 (1969)). Since much of the superfluity arises from conclusory statements not entitled to the assumption of truth, the Court need not engage in the time-intensive exercise of striking them *sua sponte* pursuant to Fed. R. Civ. P. 12(f).[1] *See Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009). It nevertheless placed an unjustified burden on the Court and the opposing party. If this case proceeds to trial, the Complaint will not be shared with the jury.

For the purpose of deciding Defendant's Motion to Dismiss, the Court "draw[s] all reasonable inferences in Plaintiff['s] favor, assume[s] all well-pleaded factual allegations to be true, and determine[s] whether they plausibly give rise to

---

[1] *See e.g.* Compl. ¶¶ 73, 82, 87-88, 94, 96-101, 107 (conclusory statements). The Complaint also includes extraneous information, including claims against Plaintiff's union (Compl. ¶¶ 94-100, 113), a non-party. *See also, e.g.* Compl. ¶ 39, asserting that Ms. Hudak broke up with her boyfriend and began dating other people months after the incident, which fails to advance any element of any of Plaintiff's twelve claims. Other portions reflect redundancy. *See, e.g.* Compl. ¶ 67, 82.

an entitlement to relief." *Faber v. Metro Life Ins. Co.*, 648 F.3d 98, 104 (2d. Cir. 2011) (citations omitted).

According to the Complaint [Dkt. 1], Defendant, a television news station, employed Plaintiff as an assignment editor, then as a news producer. (Compl. ¶ 10). Amy Hudak, a reporter, was flirtatious with Plaintiff. (*Id.* ¶ 13). In February 2018, Plaintiff accepted Ms. Hudak's invitation to go out together for a drink. (*Id.* ¶ 15). After drinks, Ms. Hudak agreed to see Plaintiff's apartment. (*Id.* ¶¶ 17-20). After walking Ms. Hudak back to her vehicle, they mutually engaged in a brief kiss, after which Ms. Hudak verbally expressed hesitancy. (*Id.* ¶¶ 21-23). Plaintiff refrained from proceeding further. (*Id.* ¶ 22).

Four days later, Ms. Hudak complained to Human Resource ("HR") that Plaintiff kissed her on the cheek after walking her to her car a month earlier and made an unwelcomed advance by kissing her again after they met for drinks that weekend. (*Id.* ¶¶ 25-26). Ms. Hudak's complaint indicated that the date was supposed to include a group of co-workers and Plaintiff kissed her again after she said "no." (*Id.* ¶ 26). Plaintiff learned of the complaint two days later when news director Keith Connors called him into a meeting with HR manager Lisa Newell and union representative Ricky Santiago. (*Id.* ¶ 27). Plaintiff was not told the identity of the complainant or the details of the complaint but denied all wrongdoing. (*Id.* ¶¶ 28-30).

Plaintiff alleges that Ms. Newell cut him off while he told his explanation of the events and stated that "it sounds like you took advantage of a woman who is

going through a lot, who was just looking for a friend in a time of need." (*Id.* ¶ 30). Ms. Newell and Mr. Connors suggested that Plaintiff take full responsibility and apologize. (*Ibid.).* Mr. Connors and Ms. Newell ignored Plaintiff's offer to show them the text messages that led up to the February 2018 date. (*Id.* ¶ 31). Plaintiff's reputation was damaged by the complaint and the false accusations. (*Id.* ¶ 40).

Two days later, Plaintiff attended a meeting with Ms. Newell, Mr. Connors, and Ms. Hudak whereby he was coerced or enticed to apologize to Ms. Hudak with the promise that it would not be shared with corporate. (*Id.* ¶ 33). In March 2018, Mr. Connors promoted Ms. Hudak to a reporter on the show that Plaintiff produced. (*Id.* ¶ 35). Ms. Hudak's promotion was intended to cause Plaintiff stress, given that it occurred three weeks after her sexual harassment complaint against Plaintiff. (*Id.* ¶ 36). Ms. Hudak acted flirtatiously towards other co-workers and was not disciplined. (*Id.* ¶ 37).

In April 2018, Plaintiff and three co-workers went out for drinks, including Ms. Alex Conroy. (*Id.* ¶¶ 41-44). While out, Plaintiff perceived signs of attraction from Ms. Conroy and they had previously "matched" on Tinder, a mobile dating application. (*Ibid.*). Plaintiff and Ms. Conroy engaged in a consensual kiss and other fully-clothed amorous contact inside of Ms. Conroy's automobile. (*Id.* ¶¶ 44-47). After departing, Plaintiff sent a text message to Ms. Conroy, inquiring if she arrived home safely and if everything was okay, given that they were co-workers. (*Id.* ¶ 49). Ms. Conroy did not respond, prompting Plaintiff to text her again. (*Ibid.*).

About a week later, Plaintiff was informed that another woman had made complaints against him. (*Id.* ¶ 52). He attended a meeting with two union representatives, Chuck Carter, and Ms. Newell concerning these new allegations. (*Id.* ¶¶ 52-53). Ms. Newell identified Ms. Conroy as the complaining party but did not provide Plaintiff with details of the allegations. (*Id.* ¶ 54). Plaintiff denied the allegation of "unwanted physical contact" and explained that the contact was consensual and based upon mutual attraction. (*Id.* ¶ 55). Plaintiff explained that the incident occurred in Defendant's parking lot and that he possessed messages on Tinder and Instagram that supported his position, but Ms. Newell declined to review the messages. (*Id.* ¶ 56). Ms. Newell did not follow up with any questions. (*Id.* ¶ 58).

During the meeting, Mr. Carter spoke well of Plaintiff's actions in moving forward with Ms. Hudak. (*Id.* ¶ 59). Ms. Newell indicated that she would be sharing the information with corporate and corporate's HR department would be making the final decision regarding his continued employment. (*Id.* ¶ 60). In response, Plaintiff asked Ms. Newell if he could resign instead of being potentially terminated, to which she indicated that it would be an option. (*Id.* ¶ 61). After the meeting, Plaintiff conferred in confidence with union representatives, Mr. Santiago and JP Coleman, and stated his belief that all of the complaints were false and that he was being treated unfairly, which they shared with Ms. Newell and Mr. Connors. (*Id.* ¶ 62). Mr. Carter sent him home for the day and told him not to return on Friday. (*Id.* ¶ 62).

Then, on Monday, April 16, 2018, Plaintiff was suspended for two-weeks after a meeting with Ms. Newell and Mr. Connors. (*Id.* ¶¶ 64-65). At the meeting, Mr.

Connors expressed his "extreme disappointment" over Plaintiff's "unwanted sexual advance" upon Ms. Conroy, but others "came to bat" for him. (*Id*. ¶ 65). He was provided with information about the Employee Assistance Program and the "Anti-Harassment Policy." (*Ibid*.). Mr. Santiago, the union representative, did not show up for the meeting. (*Ibid*.).

Within twenty four-hours of his suspension, Mr. Connors telephoned him to inform him that he was terminated on account of "new evidence," but would not specify the new information. (*Id*. ¶ 67). The termination eliminated the option to resign. (*Id*. ¶ 68).

The following day, Mr. Connors sent a mass email to employees stating: "Michal Bailey is no longer an employee at WTNH. His termination is effective immediately." (*Id*. ¶ 70). The email caused co-workers to discuss Plaintiff and the false accusations against him. (*Ibid*.). A former news anchor left him a voicemail message expressing support and that she believed that his firing was an overreaction prompted by the "#metoo" movement. (*Id*. ¶ 71). The following day, Mr. Connors used Plaintiff's name in connection with the company's "no tolerance policy" on sexual harassment. (*Id*. ¶ 72). Mr. Connors's follow up email also referenced Plaintiff and implied that he was fired for sexual harassment. (*Ibid*.). A female employee expressed concern with Mr. Connors's handling of the termination announcement, as did Ms. Newell and Mr. Carter. (*Id*. ¶¶ 70, 74).

Plaintiff then met with union president, Joe D'addesse and they reviewed his personnel file, which was incomplete and did not contain full written accounts of

the accusations. (*Id.* ¶ 75). Mr. D'addesse explained that a "current union member" shared allegations about a former producer, Marissa Nobile, and Plaintiff. (*Id.* ¶ 78). Plaintiff's only message to Ms. Nobile was one of personal support for Ms. Nobile. (*Id.* ¶ 79). Plaintiff does not know the basis for Ms. Nobile's allegations, although she was close with Ms. Conroy, even after Ms. Nobile's employment with Defendant ended. (*Id.* ¶ 79-81). There was no investigation into Ms. Nobile's allegations prior to Plaintiff's termination. (*Id.* ¶ 82).

Comments by Ms. Hudak, Ms. Conroy, Mr. Santiago, and Ms. Connors soured Plaintiff's reputation in the industry. (*Id.* ¶ 86). Plaintiff lost a second job with Full Sail Productions and the prospects of future projects after they learned of the false accusations. (*Id.* ¶ 89).

Defendant's mandatory online sexual harassment course states that "[i]f sexual contact is mutually desired it is not harassment," and that "[a] single isolated incident is unlikely to constitute a hostile work environment." (*Id.* ¶ 91). The employee handbook also includes an assurance of confidentiality. (*Id.* ¶ 93).

A few hours after his termination, Plaintiff sent a text message to a friend at another news outlet to inquire if there were producer openings. (*Id.* ¶ 103). In response, Plaintiff's friend, Jarryd, stated that he had heard what happened from "RJ," whom Plaintiff's friend assumed learned the information from "Ricky [Santiago] or Kels." (*Id.* ¶ 103). Plaintiff believes that Ricky Santiago, not "Kels," informed RJ. (*Id.* ¶ 104). Jarryd also informed Plaintiff that Allison, a producer with an NBC affiliate, inquired about Plaintiff's termination after hearing about it from

two other NBC-affiliate producers, whom Plaintiff believes learned it from Mr. Santiago. (*Id.* ¶ 105). Mr. Santiago encouraged other female employees to believe that Plaintiff sexually harassed Ms. Hudak and Ms. Conroy and others, although two other female employees expressed disbelief. (*Id.* ¶ 106). Mr. Santiago's statements went uncorrected by the Defendant. (*Ibid.*).

Plaintiff applied for a producer position at the local NBC affiliate, but was not hired based on the false information spread by Mr. Santiago. (*Id.* ¶ 108). Another employee of the Defendant told Plaintiff that Mr. Santiago said that Plaintiff would grab Ms. Nobile's buttocks while going out after work, which was fabricated. (*Id.* ¶ 109).

Defendant maintains a sexually charged atmosphere and Plaintiff was the frequent target of teasing and innuendo because of his gender and looks, particularly, his hair. (*Id.* ¶ 110). Plaintiff lists the names of eleven former co-workers, both male and female, who made comments, such as, "Everybody talks about your hair... you have a ton of hair," "He's got the thickest, curliest, waviest hair ever! That's what makes you really handsome." (*Ibid.*). Although these comments made Plaintiff uncomfortable, he did not complain about them. (*Ibid.*)

A month after his termination, Richard Graziano, Defendant's vice president, contacted Plaintiff via text to discuss an opportunity to work on an outside project that Mr. Graziano had personally invested in. (*Id.* ¶ 111). During the meeting, Mr. Graziano stated that he tried to fight for Plaintiff and expressed disbelief as to Ms. Hudak's actions. *Ibid.*

Plaintiff filed a grievance related to his working conditions on April 27, 2018, but Mr. D'addesse failed to respond to Plaintiff in a timely manner, then the union declined to arbitrate his case. (*Id.* ¶¶ 112-14). Plaintiff challenged the decision not to arbitrate his termination. (*Id.* ¶ 115). Through the NABET sector president, Plaintiff learned that Ms. Nobile falsely complained that Plaintiff would return to the station after drinking and made comments that made her uncomfortable, as opposed to the allegation that he sent Ms. Nobile inappropriate text messages. (*Id.* ¶ 116).

Plaintiff has suffered extreme and severe emotional distress resulting in sleeplessness, depression, mood swings, aggression, anxiety, panic attacks, nervous breakdowns, post-traumatic stress and suicidal thoughts. (*Id.* ¶ 119). Plaintiff receives counseling and has been prescribed an antidepressant. (*Ibid.*).

### Legal Standard

### I.  Standard for Motion to Dismiss pursuant to Fed. R. Civ. P. 12(b)(6)

To survive a motion to dismiss, a plaintiff must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. In considering a motion to dismiss for failure to state a claim, the Court should follow a "two-pronged approach" to evaluate the sufficiency of the complaint. *Hayden v. Paterson*, 594 F.3d 150, 161 (2d Cir. 2010). "A court 'can choose to begin by identifying pleadings

that, because they are no more than conclusions, are not entitled to the assumption of truth.'" *Id.* (quoting *Iqbal*, 556 U.S. at 679). "At the second step, a court should determine whether the 'wellpleaded factual allegations,' assumed to be true, 'plausibly give rise to an entitlement to relief.'" *Id.* (quoting *Iqbal*, 556 U.S. at 679). "The plausibility standard is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678 (internal quotations omitted).

In general, the Court's review on a motion to dismiss pursuant to Rule 12(b)(6) "is limited to the facts as asserted within the four corners of the complaint, the documents attached to the complaint as exhibits, and any documents incorporated by reference." *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 191 (2d Cir. 2007). The Court may also consider "matters of which judicial notice may be taken" and "documents either in plaintiffs' possession or of which plaintiffs had knowledge and relied on in bringing suit." *Brass v. Am. Film Techs., Inc.*, 987 F.2d 142, 150 (2d Cir. 1993); *Patrowicz v. Transamerica HomeFirst, Inc.*, 359 F. Supp. 2d 140, 144 (D. Conn. 2005).

<u>Analysis</u>

I.     <u>Plaintiff's Defamation Claims</u>

Defendant moves to dismiss Counts 5 and 6 for defamation slander per se and libel per se, respectively. Defendant argues that: (1) the employer cannot be liable for alleged non-manager statements; (2) the sole identified statements are opinion; (3) there are no allegations of fact supporting the requisite element of

publication; and (4) alleged "statements" made during the investigation into the serious allegations against Plaintiff are privileged pursuant to the doctrine of intracorporate communication privilege. [Dkt. 26 (Def. Mem. in Supp. Mot. to Dismiss) at 9-14).

In opposition, Plaintiff argues that there are eight defamatory statements [Dkt. 25 (Pl. Mem. in Opp'n.) at 10-11] and argues that the Defendant omitted discussion of Mr. Connors's statement about Plaintiff to the entire news staff [*Id.* at 11]. Plaintiff argues that he pled sufficient facts to establish Defendant's vicarious liability based on ratification and adoption of its employees' comments. [*Id.* at 11-14]. Plaintiff argues that the alleged defamatory statements were not "communications between managers" and any privilege was waived by a plausible argument of malicious intent. [*Id.* at 18-20].

In reply, Defendant argues that three of the alleged defamatory statements consisted of Ms. Hudak's and Ms. Conroy's sexual harassment complaints in the context of an internal investigation and are not in themselves defamatory. [Dkt. 26 (Def. Reply Br.) at 3]. Defendant argues that Plaintiff has not provided legal support for the proposition that an employer's substantiated finding of sexual harassment in the workplace amounts to an adoption and ratification of the complaining party's statement. [*Id.* at 3-4.]. Defendant argues that Plaintiff has not rebutted Defendant's position that the employees' accusations were opinion. [*Id.* at 4-5]. Defendant also argues that neither Ms. Hudak nor Ms. Conroy published their statements beyond providing them to management and the union representative during Defendant's internal investigation and are subject to privilege on the same basis. [*Id.* at 5-6].

Defendant argues that Mr. Santiago's alleged defamatory statements were made in his capacity as a union representative and were not published. [*Id.* at 6-7]. Defendant argues that Mr. Connors's statements that implied that Plaintiff was terminated for sexual harassment were not false. [*Id.* at 8-10].

A. <u>Legal Standard for Defamation</u>

"A defamatory statement is defined as a communication that tends to harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him... To establish a prima facie case of defamation, the plaintiff must demonstrate that: (1) the defendant published a defamatory statement; (2) the defamatory statement identified the plaintiff to a third person; (3) the defamatory statement was published to a third person; and (4) the plaintiff's reputation suffered injury as a result of the statement." *Gambardella v. Apple Health Care, Inc.*, 291 Conn. 620, 627–28 (2009) (quotation marks omitted).

Even if a statement is defamatory, a "defendant may shield himself from liability for defamation by asserting the defense that the communication is protected by a qualified privilege." *Id.* at 628 (citing *Torosyan v. Boehringer Ingelheim Pharmaceuticals, Inc.*, 234 Conn. 1, 27 (1995)). Once the defendant has asserted privilege, courts must determine (1) whether or not the privilege applies, which is a question of law; and (2) if so, whether it has been abused, which is a question of fact. *Ibid.*

In *Torosyan*, 234 Conn. at 29, the Connecticut Supreme Court recognized a qualified privilege for "intracorporate communications in the context of employment decisions." Under this rule, "communications between managers regarding the review of an employee's job performance and the preparation of documents regarding an employee's termination are protected by a qualified privilege. Such communications and documents are necessary to effectuate the interests of the employer in efficiently managing its business." *Ibid*. At the pleading stage, when a defamation claim is based on statements that are, as pled, privileged, the plaintiff must also allege facts demonstrating malice in order to survive a motion to dismiss. *See Devone v. Finley*, No. 3:13-CV-00377 CSH, 2014 WL 1153773, at *7 (D. Conn. Mar. 20, 2014).

In *Gambardella v. Apple Health Care, Inc.*, 291 Conn. at 622-23, the Connecticut Supreme Court held that qualified privilege is "lost upon showing either actual malice, i.e., publication of a false statement with actual knowledge of its falsity or reckless disregard for its truth, or malice in fact, i.e., publication of a false statement with bad faith or improper motive." *Id.* at 630.

Actual malice requires Plaintiff to show that the Defendant's "knowledge of the falsity or by reckless disregard of whether or not it was false." *New York Times Co. v. Sullivan*, 376 U.S. 245, 279-80 (1964). Reckless disregard for the truth may be tested by whether "defendant in fact entertained serious doubts as to the truth of his publication," *St. Amant v. Thompson*, 390 U.S. 727, 731, (1968), or by whether defendant was aware to a high degree "of probable falsity." *Id.* at 731; *Garrison v. Louisiana*, 379 U.S. 64, 74 (1964).

13

In addition to the requirement of good faith, the statement must also be limited in its scope and purpose and published in a proper manner to proper parties only. *Miles v. Perry*, 11 Conn. App. 584, 595 (1987)

### a. Internal complaints by Ms. Hudak and Ms. Conroy

The first issue is whether Ms. Hudak and Ms. Conroy's statements that Plaintiff made unwanted sexual advances towards them constitutes a plausible claim for defamation. Plaintiff admits that he kissed both women at least once (Compl. ¶¶ 21, 23, 45-48), including one instance in the Defendant's parking lot (*Id.* ¶ 56), but contends their respective statements to Defendant's HR manager were false because the encounters were entirely consensual. In his opposition brief, Plaintiff argues that Defendant ratified and adopted Ms. Hudak and Ms. Conroy's statements. [Dkt. 25 (Pl. Mem. in Opp'n.) at 10].

An allegation of unwanted sexual contact is a statement of an objective fact, rather than an opinion. *Matthew v. Kensington Square Apartments*, No. CV020470739S, 2004 WL 1098830, at *3-4 (Conn. Super. Ct. Apr. 28, 2004). Plaintiff has sufficiently alleged that Ms. Hudak and Ms. Conroy's statements were published by Defendant by virtue of their internal distribution to management. *See* [Compl. ¶ 60]; *Kleftogiannis v. Inline Plastics Corp.*, 411 F. Supp. 3d 216, 226 (D. Conn. 2019) (citing *Torosyan* 234 Conn. at 27-28). Additionally, Plaintiff alleged that management shared the circumstances of his termination with his former co-workers by referencing sexual harassment in employee announcements, both orally and in writing. [Compl. ¶ 72]. Thus, Plaintiff has satisfied the pleading

standard of a prima facie claim for defamation per se. The issue, therefore, turns on whether the statements are privileged.

The Court finds that the alleged defamatory statements made by Ms. Hudak and Ms. Conroy that were distributed by management are (1) subject to the intracorporate communications privilege but (2) Plaintiff has pled enough facts to show malice under *Gambardella v. Apple Health Care, Inc.*, 291 Conn. at 630. The issue is not whether Ms. Hudak or Ms. Conroy personally harbored malice, but whether the Defendant was reckless in publishing their statements.

An employer has an affirmative obligation under federal law to investigate claims of sexual harassment. *See Malik v. Carrier Corp.*, 202 F.3d 97, 105 (2d Cir. 2000)(citing *Faragher v. City of Boca Raton*, 524 U.S. 775 (1998)); ("Upper-level management has a good reason to press the investigation, however, even at the risk of misunderstandings that cause great emotional distress. This is so because, once higher management has notice of the problem, it may later face civil liability if it fails to look into the problem and act to prevent recurrence or expansion.") *Id.* at 107. This obligation is particularly strong when faced with multiple complaints. *See, e.g. Torres v. Pisano*, 165 F.2d 625, 639 (2d. Cir. 1997) ("Likewise, there may be cases in which a supervisor or co-worker is harassing a number of employees, and one harassed employee asks the company not to take action. In those cases, the employer's duty to other employees would take precedence....")

Several courts have found qualified privilege in the context of defamation claims brought by former employees who have been terminated on account of

internal investigations. *See Kleftogiannis,* 411 F. Supp. 3d at 226 ("As a matter of law, the intra-corporate communications privilege applies to the report produced from the internal investigation"); *see also Manning v. Cigna Corp.*, 807 F. Supp. 889, 898 (D. Conn. 1991) (discussing *Garziano v. E.I. Du Pont de Nemours & Co.*, 818 F.2d 380 (5th Cir.1987) and *Stockley v. AT&T Information Systems, Inc.*, 687 F.Supp. 764 (E.D.N.Y.1988)); *see also*, *Garziano,* 818 F.2d at 387, n.10 (surveying cases).[2]

As Judge Bolden recently noted in *Kleftogiannis*, the issue of whether qualified privilege was abused is typically addressed at the summary judgment stage based on a fuller factual record. 411 F. Supp. 3d at 227 (citing examples). This is particularly noteworthy because the malice standard requires clear and convincing evidence at trial, but only plausibility at the pleading stage. *Palin v. New York Times Co.*, 940 F.3d 804, 817 (2d Cir. 2019). Plaintiff must allege factual enhancements plausibly showing either malice in fact or actual malice by his employer; the unknown motives of his non-party former co-workers are not material as pled.

---

[2] The malice standard may be necessary to avoid a conflict between Connecticut's tort law and Title VII. Federal policies could not be effectuated if an investigation must cease once the accused denies the allegations or because of inherent danger of reputational harm to the accused. In order to constitute protected activity under Title VII (42 U.S.C § 2000e-3(a)), the alleged misconduct need not actually violate Title VII, but the complaint has to be made with a good faith and reasonable belief that it does. *See Manoharan v. Columbia Univ. Coll. of Physicians & Surgeons*, 842 F.2d 590, 593 (2d Cir. 1988). Conversely, a complaint made in bad faith is not protected activity. *See Sanders v. Madison Square Garden, L.P.,* 525 F. Supp. 2d 364, 366 (S.D.N.Y. 2007).

The Court need not address this hypothetical conflict because the intracorporate communication privilege clearly applies and Plaintiff has pled sufficient facts to show malice beyond a self-serving denial.

Plaintiff cites *Smith v. Bridgeport Futures Initiative, Inc.*, No. 326697, 1996 WL 493229, at *3 (Conn. Super. Ct. Aug. 16, 1996) and *Paine Webber Jackson & Curtis, Inc. v. Winters*, 22 Conn. App. 640, 645 (1990) for the proposition that respondeat superior applies generally in defamation. But, the quotation to *Smith* cited by Plaintiff is applying New York law, not Connecticut law. [Dkt. 25 (Pl. Mem. in Opp'n.) at 11-12), as is *Paine Webber Jackson & Curtis, Inc.*, 22 Conn. App. at 645. *Smith* is elucidating on the contrast between New York and Connecticut law.

> In New York, "[t]he test for employer liability is whether the act was done while the servant was doing his master's work, no matter how irregularly or with what disregard of instruction ... If generally foreseeable, even intentional torts may fall within the scope of employment." [parenthetical omitted]
>
> *Connecticut law on this issue, at least in tone if not in substance, is more circumspect…* It may be doubted whether an employer ought to be held vicariously liable for a tort like libel as readily as New York law would have it where it is clear that the employee or agent is not speaking on behalf of the employer. *This is especially so where malice is alleged and is a necessary element. Malice is a uniquely personal emotio*n.

*Smith*, 1996 WL 493229, at *4 (emphasis added).

Here, Plaintiff admits that Ms. Hudak and Ms. Conroy were his co-workers (Compl. ¶¶ 38, 51), so their unstated motivations are immaterial. Given the procedural posture, requiring the Court to assume pled facts to be true and construing all ambiguities in Plaintiff's favor, Plaintiff states a claim for recklessness by the Defendant.

When Ms. Newell met with Plaintiff to discuss the instances of alleged sexual harassment, she twice refused Plaintiff's request that she view text messages and other electronic correspondence that would have supported his version of events.

(Compl. ¶¶ 31, 56). Ms. Newell cut off Plaintiff when he presented his recollection of the events. (*Id.* ¶ 31). Plaintiff was not provided with the details of or a chance to respond to the third sexual harassment allegation, which resulted in his termination. (*Id.* ¶ 82). A month after his termination, Mr. Graziano, Defendant's Vice President and General Manager, stated that he could not "believe Amy Hudak would do that" and "I tried to fight for you, but once it went up to corporate it was out of my hands." (*Id.* ¶ 111).

These facts, as pled, are open to competing interpretations. Construing all ambiguity in favor of the Plaintiff, the failure to consider the evidence that Plaintiff proffered on two occasions and disallowing him to respond to the third allegation states a plausible claim for recklessness.[3] Similarly, Mr. Graziano's statement

---

[3] The Complaint does not state precisely what the messages contain. It appears that Plaintiff would have used the messages to undermine Ms. Hudak and Ms. Conroy's credibility by showing that they had a romantic interest in Plaintiff. However, existence of flirtatious messages and the fact that Plaintiff and Ms. Conroy purportedly "matched" on Tinder does not necessarily mean that either woman consented to the kissing or touching in the manner described in the Complaint.

The procedural protections afforded criminal defendants that Plaintiff alludes to are inapplicable in the private workplace. *See, e.g.* (Compl. ¶¶ 82, 118). An employer need not reconcile every piece of conflicting evidence before reaching a conclusion on the truth or falsity of an allegation. To require employers to do so would disregard both the malice standard and a substantial body of Title VII jurisprudence. *See United States v. New York City Transit Auth.*, 97 F.3d 672, 677 (2d Cir.1996) ("An employer has latitude in deciding how to handle and respond to discrimination claims, notwithstanding the fact that different strategies and approaches in different cases and classes of cases will result in differences in treatment.")

The sole issue is whether the statement was published by the Defendant with reckless disregard for its truth.

tends to show that Defendant entertained serious doubts as to the truth of at least one of the allegations.

b. <u>Statements by Ricky Santiago</u>

Plaintiff alleges that Ricky Santiago made three defamatory statements to Plaintiff's former co-workers and other persons in the broadcasting industry regionally. [Dkt. 25 (Pl. Mem. in Opp'n.) 10]. Plaintiff alleges that Mr. Santiago told two co-workers "you should believe it, there were other accusers too," (Compl. ¶ 106) told two different co-workers that Plaintiff grabbed a coworker's buttocks, (Compl. ¶ 106) and that Plaintiff was terminated because he sexually harassed Ms. Conroy and Ms. Hudak (Compl. ¶¶ 103-105, 109). At least some of these statements constitute Mr. Santiago's opinions and are not actionable.

Moreover, Mr. Santiago is both an employee of the Defendant and Plaintiff's union representative. (Compl. ¶¶ 27, 33, 53, 62, 64, 65, 95, 106, 128, 140, 226). Plaintiff has not alleged any factual basis to plausibly show that Mr. Santiago's statements were made in his capacity as the Defendant's agent. *See Smith*, 1996 WL 493229, at *4. This is especially apparent given Plaintiff's assertion that Mr. Santiago owed Plaintiff a duty of fair representation under the collective bargaining agreement. (Compl. ¶ 96).

The Complaint alleges that Defendant knew of Mr. Santiago's false statements but failed to correct him (Compl. ¶ 109). However, this claim is devoid of any factual enhancements suggesting that the employer had knowledge of the publication of Mr. Santiago's statements, particularly to employees at competitor

19

firms. *See Stockley*, 687 F.Supp. at 771 (E.D.N.Y.1988) ("Proof of a "grapevine" is not proof of unprivileged communications…"). Thus, Plaintiff fails to state a claim of defamation as to Mr. Santiago's statements.

### c. Mr. Connors's statements

The Complaint alleges that at a weekly news staff meeting, Mr. Connors announced Plaintiff's firing, and then used his name as a launching pad for the Company's stance on sexual harassment. (Compl. ¶ 70). Plaintiff alleged sufficient facts to show that Mr. Connors was the Defendant's agent and the statements were made in the furtherance of Defendant's business objectives. (*Id.* ¶ 72).

His statement to employees is still privileged because employees and employers have a common interest in maintaining a harassment-free workplace. *Manning*, 807 F. Supp. at 898 (citing to and quoting *Garziano v. E.I. Du Pont De Nemours & Co.*, 818 F.2d 380, 387 (5th Cir. 1987)("Co-workers have a legitimate interest in the reasons a fellow employee was discharged."); *Stockley*, 687 F. Supp. at 771; *See also Sack on Defamation*, §9:2.2(A)("… in a broad sense the termination of a fellow employee may be considered a matter in which co-workers share a common interest"). Knowledge that an employer terminated an employee for violation of anti-harassment laws and policies advances their common aim because it shows that the employer takes their Title VII duties seriously. In this case, the employee announcements were also sufficiently confined in scope and distribution to preserve the privilege. However, this qualified privilege can be overcome by a showing of malice.

As discussed *supra*, Mr. Connors was aware of the circumstances of Defendant's investigation at the time he made the statement to employees. (Compl. ¶¶ 27-31, 62-65, 67). Other executives also expressed concern about Mr. Connors's announcement, suggesting possible uncertainty about its truth. (*Id.* ¶ 70). Thus, Plaintiff has plausibly alleged reckless disregard for the truth, which is necessary to overcome a facially apparent claim of privilege at the pleading stage.

The Court therefore DENIES Defendant's Motion to Dismiss Counts 5 and 6 but limits the scope of Plaintiff's claims as set forth above.

## II. <u>False Light</u>

A false light invasion of privacy occurs if "(a) the false light in which the other was placed would be highly offensive to a reasonable person, and (b) the actor had knowledge of or acted in reckless disregard as to the falsity of the publicized matter and the false light in which the other would be placed." *Goodrich v. Waterbury Republican-America*n, 188 Conn. 107, 131 (1982)(internal quotation marks omitted). "An essential element of a false light invasion of privacy claim is that the defendant gives publicity to false information." *Pace v. Bristol Hosp.*, 964 F. Supp. 628, 630–31 (D. Conn. 1997) (citing *Handler v. Arends*, No. 527732 S, 1995 WL 107328, at *11 (Conn. Super. Ct. March 1, 1995)). To establish "publicity[,]" the plaintiff must produce "proof not merely of limited, private communication to one or more other persons, but of widespread communication to the general public or a significant segment thereof." *Id.* (quoting *Handler*, 1995 WL 107328, at *11).

Defendant argues, *inter alia*, that Plaintiff fails to state a claim for false light because he fails to satisfy the publicity requirement. [Dkt. 20 (Def. Mem. in Supp. Mot. to Dismiss) 14-16]. The Court agrees.

Defendant's agent's communications were limited to employees. "In the employment context, courts have determined that when information is conveyed only to employees ... with a duty, responsibility and a need for such information there is not sufficient publicity to support an action for invasion of privacy." *Grossman v. Computer Curriculum Corp.*, 131 F. Supp. 2d 299, 311–12 (D. Conn. 2000)(internal quotation omitted). For reasons previously stated, Mr. Santiago's statements consisting of workplace gossip or unauthorized statements to third parties cannot serve as the basis to impute liability on Defendant.

"Publicity" is distinct from "publication"; the former requires that the matter is made public by communicating it to a large audience. Restatement (Second) of Torts § 652D, cmt. (a). Plaintiff argues that Mr. Connors's email was then forwarded and "realistically reached thousands of people." [Dkt. 25 (Pl. Mem. in Opp'n.) at 22]. This factual assertion is absent from the Complaint. The fact that workplace gossip spread to other persons in the industry via Plaintiff's union representative's statements does not plausibly establish that the Defendant disseminated false information broadly. *See Pace*, 964 F. Supp. at 631. Like *Pace*, the employer's dissemination about the contested misconduct did not exceed its employees or agents, and therefore did not extend to the general public or a significant portion thereof.

The Court GRANTS Defendant's motion to dismiss as to Plaintiff's claim for invasion of privacy based on false light.

## III. Plaintiff's contract claims

Counts 8 and 9 of the Complaint are for breach of contract and breach of the implied covenant of good faith and fair dealing, respectively. Defendant moves to dismiss these counts on the basis that they are preempted by § 301 of the Labor Management Relations Act, 29 U.S.C. § 185(a). [Dkt. 20 (Def. Mem. in Supp. Mot. to Dismiss) at 17-21]. Defendant argues that Plaintiff's contract claims necessarily require the Court to interpret the terms of the collective bargaining agreement ("CBA"), which Defendant allegedly breached. Therefore, Defendant argues, Plaintiff's contract claims are preempted because they are inexplicably intertwined with the CBA.

In opposition, Plaintiff argues that the state law claims are independent of the CBA because Plaintiff is asserting rights that arise from independent legal obligations; namely an employer's good faith obligation to inform an employee about the reasons for his termination and not be terminated because of his gender. [Dkt. 25 (Pl. Mem. in Opp'n.) at 23-26]. These claims, Plaintiff argues, do not require interpretation of the CBA. [*Id.*].

In reply, Defendant argues the cases cited by Plaintiff were not for breach of contract, but rather tort actions. [Dkt. 26 (Def. Reply Br.) 10-14]. Defendant further argues that Plaintiff cannot claim a breach of the covenant of good faith and fair dealing because he is not an at-will employee and Plaintiff failed to plead bad faith.

**The Court agrees with Defendant, in part**

   a. <u>Preemption under the § 301 of the Labor Management Relations Act, 29
   U.S.C. § 185(a)</u>

The Supreme Court has instructed that, "[w]here the resolution of a state-law claim depends on an interpretation of the collective-bargaining agreement, the claim is pre-empted." *Hawaiian Airlines, Inc. v. Norris*, 512 U.S. 246, 260–62 (1994) (citing *Lingle v. Norge Div. of Magic Chef, Inc.*, 486 U.S. 399, 405–06 (1988)). This "pre-emption merely ensures that federal law will be the basis for interpreting collective-bargaining agreements and says nothing about the substantive rights a State may provide to workers when adjudication of those rights does not depend upon the interpretation of such agreements." *Lingle*, 486 U.S. at 409. The Supreme Court has made clear that the preemptive effect of § 301 has expanded in order to give the policies that animate the provision their proper range, and has cautioned that "the bare fact that a collective-bargaining agreement will be consulted in the course of state-law litigation plainly does not require the claim to be extinguished." *Livadas v. Bradshaw*, 512 U.S. 107, 124 (1994) (citing *Allis-Chalmers Corp v. Lueck*, 471 U.S. 202, 210 (1985)). As such, the Supreme Court has stressed that "it is the legal character of a claim, as 'independent' of rights under the CBA (and not whether a grievance arising from 'precisely the same set of facts' could be pursued) that decides whether a state cause of action may go forward." *Lividas*, 512 U.S. at 123–24 (internal citations omitted).

In this case, Plaintiff argues that Defendant breached Sections 4.2 and 16 of the CBA. (Compl. ¶¶ 204-205). A copy of the CBA is included with Defendant's Motion to Dismiss [Dkt. 30 (Def. Mot. to Dismiss) Ex. 3].

Section 4.2 states:

> The Employer shall have the right to discharge any Employee for just cause. The reason for such discharge shall be given to the Union and the Employee. If the Union believes any such discharge to be unjustified, the matter shall then be considered as a grievance, and shall be handled as stated in Article 10 of this Agreement.

Section 16 states, in relevant part:

> Company and Unions (sic) will continue their policy and practice of not discriminating against any Employee or applicant for employment because of race, color, creed, religion, national origin, sex, age, or sexual orientation, in accordance with applicable Federal and Connecticut law.

Section 16 is axiomatic; Section 4.2 is not. While the Connecticut Supreme Court has recognized the importance of open and honest communication in the workplace, there is no preexisting legal duty for an employer to provide an at will employee with the reasons for their termination. *See Thibodeau v. Design Grp. One Architects, LLC*, 260 Conn. 691, 697 (2002) (at-will employment can be terminated for "any reason, or no reason, at any time without fear of legal liability" except for recognized statutory or public policy exceptions).

Plaintiff's breach of contract claim as to Section 4.2 is preempted because it turns on the meaning of the CBA and is wholly dependent on the contractual right asserted. *Lingle*, 486 U.S. at 407 (1988).

The Court GRANTS Defendant's motion to dismiss as to Count 8 to the extent it relies upon Section 4.2.

The Court makes no findings as to Section 16. The parties did not brief whether the CBA's antidiscrimination provision arguably has a broader scope than available statutory protections, whether different standards of proof apply, or what remedies are available. The Court expresses no opinion on this issue at this juncture.

b. <u>Breach of the Covenant of Good Faith and Fair Dealing</u>

In *Magnan v. Anaconda Industries, Inc.*, 193 Conn. 558 (1984), the Connecticut Supreme Court held that the implied covenant of good faith and fair dealing applies in "every contract without limitation," including employment contracts. 193 Conn. at 566-570. The contractual doctrine attempts to protect employees who are "without bargaining power to obtain employment for a definite term…" *Id.* at 569 (citing *Sheets v. Teddy's Frost Foods*, Inc. 179 Conn. 471, 480 (1980). The narrow exception to the employment at will doctrine applies when the termination involves "impropriety…derived from some violation of public policy." *Id.* at 572 (applying the tort standard from *Sheets*, 179 Conn. at 475). In the employment context, this Court previously recognized that *Mangan* restricted the breach of the covenant of good faith and fair dealing to the at will employment arrangement. *Datto, Inc. v. Braband*, 856 F. Supp. 2d 354, 373-74 (D. Conn. 2012) (citing *Mangan*, 193 Conn. at 572).

Courts in this District have held that § 301 preempts this cause of action because unionized employees enjoy job security under their collective bargaining agreement. *See, e.g.*, *Billue v. Praxair, Inc.*, No. 3:05-cv-00170 (JCH), 2005 U.S. Dist. LEXIS 25815, at *6 (D. Conn. Oct. 26, 2006); *Williams v. Comcast Cablevision of New Haven, Inc.*, 322 F. Supp. 2d 177, 185 (D. Conn. 2004); *Jenkins v. Area Co-op. Educ. Servs.*, No. CIV.A. 3:99CV2371CFD, 2004 WL 413267, at *3 (D. Conn. Feb. 25, 2004); *Carvalho v. Int'l Bridge & Iron Co.*, No. 3:99CV605 (CFD), 2000 WL 306456, at *7-8 (D. Conn. Feb. 25, 2000); *Anderson v. Coca Cola Bottling Co. of New York*, 772 F. Supp. 77, 81-82 (D. Conn. 1991).

The Court GRANTS Defendant's motion to dismiss as to Count 9.

## IV.     Wrongful discharge in violation of public policy

Defendant moves to dismiss the tenth count, wrongful discharge in violation of public policy, for three reasons: (1) Plaintiff was not an at-will employee, (2) Plaintiff fails to identify the public policy that supports his claim, and (3) Plaintiff has a remedy under CFEPA and Title VII. [Dkt. 20 (Def. Mem. in Supp. Mot. to Dismiss) at 21-25]. The Court agrees with the Defendant's third argument, which is dispositive of Plaintiff's claim.

Again, although Connecticut follows the "at-will" employment doctrine, a common law cause of action in tort for wrongful discharge of an at-will employee exists in limited circumstances. *Sheets*, 179 Conn. at 475. Such remedy is available in tort subject to two limitations: (1) the former employee must establish "a demonstrably improper reason for dismissal, a reason whose impropriety is

27

derived from some important violation of public policy," *Ibid.*; and (2) the employee must establish that he or she was "*otherwise without remedy* and that permitting the discharge to go unredressed would leave a valuable social policy to go unvindicated." *Burnham v. Karl & Gelb, P.C.*, 252 Conn. 153, 159 (2000) (quoting *Atkins v. Bridgeport Hydraulic Co.*, 5 Conn.App. 643, 648 (1985)) (emphasis in original). A statutory remedy need not be an equivalent remedy to the common law for purposes of precluding a wrongful termination tort claim. *Burnham*, 252 Conn. at 164-65. "The question is whether the allegations, taken in a light most favorable to the plaintiff, may be reasonably construed to assert a distinct and alternative theory of liability rooted in a public policy that is not protected by statute." *Medero v. Murphy Sec. Serv.*, LLC, No. 3:16-CV-00047 (VLB), 2016 WL 3172727, at *2 (D. Conn. June 6, 2016).

Plaintiff's opposition brief does not attempt to distinguish Plaintiff's wrongful termination claim from his statutory claims for discrimination and retaliation. [Dkt. 25 (Pl. Mem. in Opp'n.) at 28-29]. Instead, Plaintiff argues that he was the victim of gender bias. *Ibid*; *see also* (Compl. ¶¶ 218)("Defendant terminated Plaintiff's employment without a fair investigation because he is male"). This conduct falls squarely within the purview of Title VII, which provides the private right of action that has been asserted in this case. *See Sassaman v. Gamache*, 566 F.3d 307, 314 (2d Cir. 2009).

Accordingly, the Court GRANTS Defendant's motion to dismiss as to Count 10 because Plaintiff is not without a remedy.

## V.   <u>Negligent infliction of emotional distress</u>

In order to state a claim for negligent infliction of emotional distress under Connecticut law in the employment context, it must arise from the conduct of the defendant during the termination process. *Perodeau v. City of Hartford*, 259 Conn. 729, 750 (2002) (citations and internal quotation marks omitted).[4] The issue is "whether the defendant's conduct during the termination process was sufficiently wrongful that the defendant should have realized that its conduct involved an unreasonable risk of causing emotional distress and that [that] distress, if it were caused, might result in illness or bodily harm." *Id*. at 748 (quoting *Montinieri v. Southern New England Telephone Co.*, 175 Conn. 337, 345 (1978)).

Defendant argues that Plaintiff's negligent infliction of emotional distress claim relies impermissibly on conduct that occurred during the investigation and not the termination process itself. [Dkt. 20 (Def. Mem. in Supp. Mot. to Dismiss) at 26-30]. The Court disagrees for reasons apparent in the Complaint but not advanced by Plaintiff in his briefing.

---

[4] Prior to *Perodeau*, the Second Circuit held in *Malik v. Carrier Corp.* 202 F.3d 97, 106-08 (2d. Cir. 2000) that a negligent infliction of emotional distress claim could not arise from the ordinary distress that an alleged harasser would generally experience in the course of an investigation given the employer's duty to investigate under Title VII. The Second Circuit determined that Connecticut law did not conflict with Title VII because a negligent infliction of emotional distress claim may be precluded by legal imperatives attendant to the workplace. *Id*. at 106, n. 2. Thereafter, in a certified question from the Second Circuit, the Connecticut Supreme Court in *Perodeau* further categorically limited negligent infliction of emotional distress claims in the employment context to the termination process itself. 259 Conn. at 758.

In the Complaint, Plaintiff alleged that he was offered the opportunity to resign instead of being terminated and was told that the Defendant would keep the terms of his separation confidential. (Compl. ¶ 61). Defendant then reversed course less than a day later when they terminated him telephonically without giving him the ability to respond to the allegations. (*Id.* ¶¶ 61, 67-68). Mr. Connors then informed the news staff that Plaintiff was terminated effective immediately, and shortly after implied that he was terminated for sexual harassment. (*Id.* ¶ 69-70). In effect, it denied him the opportunity to quietly resign, which also caused him to lose his second job. (*Id.* ¶ 68). Plaintiff alleged that the abrupt termination call itself caused him humiliation and shock. (*Id.* ¶ 69).

Consequently, the Court finds that Plaintiff plausibly states a claim that his termination was carried out in a manner posing an unreasonable risk of causing emotional distress.

The Court therefore DENIES Defendant's motion to dismiss as to Count 11 for negligent infliction of emotional distress.

## VI.     Intentional infliction of emotional distress

"It is well established that an employer is liable for the willful torts of his employee when they are committed within the scope of his employment and in furtherance of the employer's business." *Cardona v. Valentin*, 160 Conn. 18, 22 (1970); *see Robbins v. Physicians for Women's Health, LLC*, 311 Conn. 707, 722 (2014) ("Employers are likewise deemed connected because, to the extent the

tortious conduct occurred within the scope of the employment relationship, employees are viewed as having acted on behalf of their employers.").

To prevail on an intentional infliction of emotional distress claim, the Plaintiff must demonstrate: "(1) that the actor intended to inflict emotional distress or that he knew or should have known that emotional distress was the likely result of his conduct; (2) that the conduct was extreme and outrageous; (3) that the defendant's conduct was the cause of the plaintiff's distress; and (4) that the emotional distress sustained by the plaintiff was severe." *Appleton v. Bd. of Educ. of Town of Stonington*, 254 Conn. 205, 210 (2000) (quotations and citations omitted).

For conduct to be extreme and outrageous, it must go "beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Carrol v. Allstate Ins. Co.*, 262 Conn. 433, 443 (2003)(citing Restatement (Second), Torts § 46, comment (d), p. 73 (1965)). "Conduct on the part of the defendant that is merely insulting or displays bad manners or results in hurt feelings is insufficient ...." *Appleton*, 254 Conn. at 210.

In *Appleton v. Bd. of Educ. of Town of Stonington*, 254 Conn. at 205 the Connecticut Supreme Court held that condescending comments made to a teacher in front of colleagues, questioning her vision and ability to read, telling the plaintiff's daughter that she was acting differently, calling the police to escort her from school, causing her to undergo psychiatric examinations, and ultimately forcing her to take a suspension, leave of absence, then resign, was not extreme or outrageous conduct.

In addition to the allegations previously discussed, Plaintiff argues that male and female employees would make sexist comments about his appearance, especially his hair. [Dkt. 25 (Pl. Mem. in Opp'n.) at 35-36). The comments amount to unwanted compliments and attention, none of which was highly sexualized or demonstrates a plausible intent to ridicule or humiliate him. The Complaint also cites the fact that Ms. Hudak was promoted to the same team as Plaintiff after her harassment complaint, which was intended to cause him distress. (Compl. ¶ 36). However, there is no claim that Ms. Hudak harassed or intimidated Plaintiff; rather, they worked well together. (Compl. ¶ 37). Plaintiff alleges he apologized to Ms. Hudak and defendants took no further action. Nothing about the facts Plaintiff alleges suggest Defendants had any reason not to believe that the matter had been resolved to everyone's satisfaction and there would be no repercussions.

Construing all ambiguity in favor of Plaintiff, the allegations fall far short of the necessary showing of outrageous conduct exceeding the bounds of decency in a civilized society.

The Court GRANTS Defendant's motion to dismiss Count 12 for intentional infliction of emotional distress.

## Conclusion

For the aforementioned reasons, the Court GRANTS Defendant's motion to dismiss as to Counts (7) invasion of privacy-false light, (8) breach of contract as to Section 4.2, (9) breach of the implied covenant of good faith and fair dealing, (10)

wrongful termination in violation of public policy, and (12) intentional infliction of emotional distress.

The Court GRANTS in part and DENIES in part Defendant's motion to dismiss Counts (5) and (6) for slander and libel per se. The Court limits this claim to statements made by management level employees or officers and has determined that the statements are facially subject to a qualified privilege.

The Court makes no finding regarding Count 8 for breach of contract to the extent it relies on Section 16. The parties may renew their arguments as to Section 16 at a later time.

The Court DENIES Defendant's motion to dismiss Count (11) for negligent infliction of emotional distress.

IT IS SO ORDERED.

_____/s/_____
Hon. Vanessa L. Bryant
United States District Judge


Dated at Hartford, Connecticut: March 6, 2020