# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| **MICAH BAILEY** | : | |
| **Plaintiff** | : | |
| | : | **No. 3:19-cv-00671(VLB)** |
| **v.** | : | |
| | : | |
| **NEXSTAR BROADCASTING, Inc.** | : | **MARCH 6, 2021** |
| **Defendant.** | : | |
| | : | |
| | : | |
| | : | |
| | : | |

## MEMORANDUM OF DECISION
## <u>GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT</u>

Plaintiff Micah Bailey alleges sex discrimination, retaliation, breach of contract, defamation, and negligent infliction of emotional distress against his former employer, Defendant Nexstar Broadcasting, Inc. ("Nexstar"), arising from his termination. Defendant terminated Plaintiff from his position as a news producer after it found that he violated its anti-discrimination and harassment policy.

Defendant previously moved to dismiss Plaintiff's workplace torts and breach of contract claims, which the Court granted in part and denied in part. [ECF No. 33 (Mem. of Decision on Def. Mot. to Dismiss)]. Now, after completing discovery, Defendant moves for summary judgment on the remaining claims. For reasons set forth herein, the Court GRANTS Defendant's motion for summary judgment on all claims.

1

<u>Background</u>

The following facts are taken from the Local Rule 56 statements of material facts and evidence cited by the parties. The facts are read in the light most favorable to the non-movant, Mr. Bailey. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). This is prefaced with the materiality rule. "…[T]he substantive law will identify which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute of an issue of material fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Id.*

Before considering the relevant background facts, the Court will briefly frame the issues because the factual disputes are narrower than suggested by Plaintiff's opposition brief. Although the parties disagree widely on the interpretation of the material facts and the details of the encounters that resulted in Plaintiff's co-workers' complaints, the parties agree that he was not terminated until his employer received a third sexual harassment complaint after he was given remedial sexual harassment training. [ECF No. 50-45 (Pl. Local Rule 56(a)(2) Statement ¶¶ 9, 24, 26, 38, 42, 48](undisputed).[1]

---

[1] Plaintiff's Local Rule 56(a)(2) statement raises three generalized objections to Defendant's Local Rule 56(a)(1) statement: (1) that the statement violates the materiality requirement, (2) that the statement is vague, ambiguous, or asserts multiple facts, and (3) the fact is not supported by admissible evidence pursuant to Fed. R. Civ. P. 56(a)(2). Plaintiff asserts the first two objections in a conclusory

Plaintiff adamantly denies that he sexually harassed his former co-workers and argues that he went on two separate consensual dates with his co-workers, off hours, and that his conduct did not violate Nexstar's anti-harassment policy. [ECF No. 50 (Pl. Mem in Opp'n) at 1]. He argues that Nexstar rushed to judgment and terminated him without investigating his side of the story or allowing him to ask questions about the accusations because he is male. [*Id.* at 1-2]. Plaintiff argues that he complained about gender discrimination to his union representative and then again to his supervisor after he was suspended, less than a day before his termination. [*Id.* at 3]. He claims he was defamed by the announcement to the news staff that he was terminated for sexual harassment, which then spread throughout the regional news market. [*Id.* at 3]. Additionally, Plaintiff claims he "was teased daily about his good looks, especially his hair, unwantedly touched and inappropriately sexualized by his coworkers and by his supervisor," including on their Facebook Live feeds [*Id.* at 1-2].

These issues do not present a genuine issue of material fact because a reasonable jury could not return a verdict for Plaintiff applying the relevant law. As to Plaintiff's discrimination and retaliation complaints, the issue is whether Nexstar acted with a discriminatory or retaliatory motive when it suspended and terminated

---

and overly broad manner. The Court will address Plaintiff's evidentiary objections in a corresponding footnote.

As to Defendant's Local Rule 56(a)1Statement ¶ 38, Ms. Newell's testimony about what Ms. Conroy told Ms. Newell about her encounter with Mr. Bailey is not hearsay because it is not being offered for the truth of the matter asserted. Instead, it is being offered to show whether Ms. Newell believed the encounter between Mr. Bailey and Ms. Conroy was consensual. The precise details of their encounter are not material for reasons explained further herein.

Plaintiff, not whether they correctly concluded that he engaged in the alleged misconduct that served as the basis for his termination. *Henry v. Daytop Vill., Inc.*, 42 F.3d 89, 96 (2d Cir. 1994).

<u>Facts</u>

Plaintiff worked as a news producer at a local television station, acquired by Nexstar in 2017. [Def. Local Rule 56(a)(2) Statement ¶¶ 3, 6]. Plaintiff received a copy of Nexstar's anti-discrimination policy, which provides that:

> Nexstar has a Zero Tolerance Policy prohibiting discrimination or harassment of any employee by a supervisor, employee, job applicant, customer, visitor of the representatives of other businesses with whom we interact as part of our jobs. Nexstar does not discriminate against any employee or applicant for employment because of race, color, religion, disability, age, sex, national origin, citizenship, veteran's status, sexual orientation, military status or any other protected personal characteristic. All employees must refrain from any conduct that could be considered harassing or discriminatory. Nexstar will take reasonable steps to ensure that all employees, contractors, vendors, and customers comply with this policy.

[ECF 39-6, Def. Ex. D (2017 Nexstar Employee Handbook) at 9] [Pl. Local Rule 56(a)(2) Statement ¶ 4](admitted).

Plaintiff was also a member of a bargaining unit represented by the NABET and subject to a collective bargaining agreement ("CBA") between the union and Nexstar. [Def. Local Rule 56(a)(2) Statement ¶ 6]; [ECF No. 39-7, Def. Ex. E (CBA)].

On Saturday, February 17, 2018, Amy Hudak, a reporter, and Plaintiff met for drinks and there was a kiss on the mouth at the conclusion of the evening. [Def. Local Rule 56(a)(2) Statement ¶¶ 12-13]. The following Tuesday, Ms. Hudak reported to Lisa Newell, the local human resources manager, that Plaintiff made two unwanted advances towards her. [Def. Local Rule 56(a)(2) Statement ¶ 9]. Ms.

Hudak told Ms. Newell that, a month earlier, Plaintiff walked her to her car in the company's parking lot and then kissed her on the cheek. [*Id.* ¶ 10]; [ECF 39-4, Def. Ex. B. (Newell Depo.) at 36:20-36:08]. Ms. Hudak reported that on February 17th, she went out for drinks with Mr. Bailey as co-workers and then Ms. Hudak toured his apartment. [Def. Ex. B. (Newell Depo.) 36:15-36:20; 41:01-41:25]. She reported to Ms. Newell that when they walked back to her car, Plaintiff kissed her on the mouth and she pushed him away, but he then kissed her a second time. [Def. Local Rule 56(a)(2) Statement ¶¶ 14-16]. Ms. Newell testified that she asked Ms. Hudak open ended questions about the occasion. [Def. Ex. B. (Newell Depo.) at 39:13-39:14]. Ms. Newell testified that "The information she provided was credible that this was an encounter that two coworkers had, not a date. That she did not welcome Mr. Bailey's kiss." [*Id.* at 39:17-39:18]. Ms. Newell testified that she found Ms. Hudak's account credible because "Ms. Hudak is normally very professional in her speech and the manner in which she had said that "He stuck his tongue down my throat" was so uncharacteristic, that it rang very true that this was something she was very uncomfortable with, and that she did not want to have happen." [*Id.* at 44:10-44:14].

Ms. Newell and the news director, Keith Connors, then met with Mr. Bailey and his union representative, Ricky Santiago, concerning Ms. Hudak's complaint. [Def. Local Rule 56(a)(2) Statement ¶ 17]. Without disclosing Ms. Hudak's identity, Mr. Bailey was asked broadly for his account of the events and he confirmed that two kisses occurred on Saturday night, but said or implied that it was mutual, after a date. [Def. Ex. B. (Newell Depo.) at 41:01-41:07; 42:10-16; 43:01-43:14; 44:15-44:21]; [Def. Ex. A (Bailey Depo.) at 139:08-140:06]. Plaintiff denied that the January

incident occurred. [ECF 50-3, Pl. Ex. 1 (Bailey EEOC Aff. ¶ 25)]; [ECF 50-4, Pl. Ex. 2 (Bailey Depo.) at 278:14-278:16];  [Def. Ex. B. (Newell Depo.) 42:07-42:09]. The parties dispute whether Plaintiff offered to show Ms. Newell copies of text messages he exchanged with Ms. Hudak to support his version that they went out on a date. [Def. Ex. B (Newell Depo.) at 115:03-115:08];  [Pl. Ex. 2 (Bailey Depo.) at 363:08-363:15].  Plaintiff testified that Ms. Newell said to him, "it sounds like you took advantage of a friend in need." [Pl. Ex. 2 (Bailey Depo) at 146:04-146:05].

A day after the meetings, Mr. Connors issued a verbal warning to Plaintiff. [Def. Local Rule 56(a)(2) Statement ¶ 24]; [ECF Ex. F (Draft Employee Displ.)]. Plaintiff was required to undergo sexual harassment prevention training and "refrain from making unwanted advances towards co-workers," but the terms and conditions of his job were not changed. [Def. Local Rule 56(a)(2) Statement ¶¶ 26-27, 30].[2] Although not stated in the disciplinary action form, Plaintiff was made to apologize to Ms. Hudak and was then scolded by Ms. Newell. [Def. Ex. B. (Newell Depo.) at 55:01-56:06].  Additionally, Plaintiff was counseled by his immediate supervisor, Chuck Carter, the assistant news director with whom he had a good relationship, to avoid situations with co-workers that could be misconstrued as sexual in nature. [Def. Ex. A. (Bailey Depo.) at 141:01-143:07].

---

[2] Plaintiff objects to the Defendant's statement that "Plaintiff continued his role with the same duties, rate of pay, and benefits," after the verbal warning was issued pursuant to Fed. R. Civ. P. 56(c)(1)(B). However, the Defendant cites Plaintiff's deposition testimony which establishes this fact clearly. [Def. Ex. A (Bailey Depo) at 151:01-151:09].  The citation does not violate Fed. R. Civ. P. 56(c)(1)(B).

6

Two months later, Alexandra Conroy, a video editor, reported to Ms. Newell that after an evening of drinks with their co-workers, Plaintiff kissed her on the mouth and groped her, which she reported as unwelcome. [Def. Local Rule 56(a)(2) Statement ¶¶ 31-33]; *see also* [Pl. Local Rule 56(a)(2) Statement of Addl. Facts ¶ 76]. Ms. Conroy testified that she told Ms. Newell that "[Mr. Bailey] got in my car and started forcefully making out with me and making me touch him and he was touching me in an unwanted way." [ECF. 39-10, Def. Ex. H (Conroy Depo.) at 66:24-67:03]; [Def. Ex. B (Newell Depo.) at 63:24-64:21].

Ms. Newell interviewed Plaintiff on the same day and he confirmed that they went out for drinks with co-workers, that they returned to Nexstar's parking lot, that he texted Ms. Newell to come into her car to say goodnight, that there was kissing, and he confirmed that there was touching above the clothes. [Def. Ex. B. (Newell Depo.) at 64:24-65:03]. Plaintiff described the encounter as consensual and disclosed that he and Ms. Conroy "matched" with each other on Tinder, an online dating platform. [Def. Ex. A (Bailey Depo.) 191:01-197:04, 205:01-205:13]. Plaintiff was generally asked for his account of the events but was not provided the details of Ms. Conroy's allegations. [Def. Ex. A (Bailey Depo.) 278:04-278:09]; [Def. Ex. B (Newell Depo) at 68:15-68:24].

Here too, the parties dispute whether Plaintiff offered to show messages that he exchanged on social media with Ms. Conroy. [Pl. Local Rule 56(a)(2) Statement of Addl. Facts ¶ 85]; [Def. Ex. B (Newell Depo) at 68:10-68:14]. Plaintiff argues that he offered the social media messages to show mutual interest between himself and Ms. Conroy. [Pl. Local Rule 56(a)(2) Statement of Addl. Facts ¶ 85]. However,

7

Plaintiff testified that Ms. Newell allowed him to explain that he had "matched" with Ms. Conroy on Tinder. [Pl. Ex. 2 (Bailey Depo.) at 205:01-205:25]; ("You know, I mentioned it. I mentioned that we matched. Had to explain that to Lisa, because she's not part of our generation and she doesn't know what Tinder is. But yeah, I explained this. I wish I could have showed it-- shown it. … Q. So you explained with Lisa that you matched with Tinder. You shared that information. Correct? A. Correct . . ."). Plaintiff does not claim that any of Ms. Conroy's Tinder messages led him to believe she welcomed his intimate sexual advances;  therefore, the fact that Ms. Newell declined his offer to read the messages is immaterial.

Ms. Newell consulted the union president, who suggested suspending Plaintiff for two weeks. [Def. Ex. B (Newell Depo) at 70:20-70:24].  She then consulted in-house counsel and relayed the information first to Mr. Connors, and then the station's general manager, Richard Graziano, after which a disciplinary meeting was scheduled. [*Id.* at 70:24-71:05]; [ECF 39-5, Def. Ex. C (Graziano Aff.) ¶¶ 3, 8-9].

Plaintiff's union steward, Ricky Santiago, was expected to attend the disciplinary hearing. He was not present at the appointed time.  After waiting for him approximately twenty minutes, Mr. Bailey proceeded without Mr. Santiago. [Pl. Ex. B (Bailey Depo) 399:02-401:07].  Mr. Connors informed Mr. Bailey that he was being suspended without pay for two weeks as discipline for violating Nexstar's anti-harassment policy based on the incident with Ms. Conroy. [ECF. 39-9, Def. Ex. G. (Draft Employee Counseling Form)].  Mr. Connors then provided Mr. Bailey with another copy of Nexstar's policies, warned that any further instances of violation

of the policy could lead to further discipline or termination, and referred him to the employee assistance program to the extent alcohol was a factor in his behavior. [Pl. Ex. B (Bailey Depo) at 206:11-207:14].

After the meeting, Plaintiff complained to Mr. Santiago that he felt that he was not being believed because he was male and that he was being treated unfairly. [Pl. Ex. 1 (Bailey EEOC Aff.) ¶ 62]; [Pl. Ex. B (Bailey Depo) 382:20-384:14]. Plaintiff believed that Mr. Santiago was going to address Plaintiff's feelings about the situation with Ms. Newell as his union steward. [Pl. Ex. B (Bailey Depo) 384:01-384:05]. However, later that day, Ms. Newell exchanged emails with Mr. Santiago which suggest that they both personally disagreed with the leniency of the two-week suspension. [ECF 50-30 Pl. Ex. 28 (Newell-Santiago Emails), 04/16/2018]. Plaintiff does not establish that Mr. Santiago ever relayed his comments following the meeting to Ms. Newell or anyone else at Nexstar.

Plaintiff testified that, after the meeting, "[t]hey noticed that I was too upset to continue working. Chuck Carter was the one who told me to go home. Yeah. We even stepped outside for 15 minutes together, Chuck Carter and I, and I, again, reiterated that I wasn't being heard. I wasn't being treated fairly. They weren't investigating. And … obviously, I was upset. I was, you know, tearful. . . . I had a good relationship with Chuck Carter, but, you know, at that moment, it looked like it was the company's best interest in mind." [Pl. Ex. B (Bailey Depo.) 282:01-282:12].

The morning after Plaintiff was suspended, Ms. Newell received a third sexual harassment complaint from a female co-worker concerning Plaintiff.

Marissa Nobile, a former producer for Nexstar, emailed Ms. Newell to report that "[d]uring my almost two years at News 8, I was hit on countless times, made advances on when I was the only producer in the newsroom when he came back from the bars at 1 o'clock in the morning, kissed on the cheek because I turned my head to ward off [Mr. Bailey's] advances, etc." [ECF 39-11, Def. Ex. I (Nobile Email)]. In response, Ms. Newell wrote "I'm so sorry you had to endure this treatment as our employee" and that she would let her know if there was a need to discuss further. [ECF 50-23, Pl. Ex. 21 (Newell Repl. to Nobile, 04/17/2018)].

Ms. Newell testified that upon receipt of the email, she sought legal advice from in-house counsel, and then contacted Mr. Graziano and Doug Davis, senior vice president and regional manager, to report the latest complaint and ask if Mr. Bailey should be terminated. [Def. Ex. B (Newell Depo) at 118:20-121:25]; [Def. Ex. C (Graziano Aff.) ¶¶ 10-11].[3]

That afternoon, Ms. Newell wrote to the union president advising him that Nexstar decided to terminate Plaintiff's employment. [ECF 50-24, Pl. Ex. 22 (Newell Email to D'Addese, 04/17/2018)]. Ms. Newell did not interview Ms. Nobile or Plaintiff prior to his termination. [Pl. Local Rule 56(a)(2) Statement ¶ 102]. The parties dispute who made the termination decision. Nexstar argues that the termination decision was made by Mr. Connors, Mr. Graziano, and Mr. Davis. [Def. Local Rule

---

[3] Plaintiff's Local Rules 56(a)(2) statement denies the Defendant's statement to this effect. [Pl. Local Rule 56(a)(2) Statement ¶ 44]. However, Ms. Newell's deposition testimony and the emails cited by Plaintiff either pertain to the suspension decision or do not contradict Ms. Newell's testimony and Mr. Graziano's affidavit concerning the termination decision.

56(a)(1) Statement ¶ 45]. Plaintiff argues that the termination decision was made by Ms. Newell, in-house counsel Terri Bush, and Mr. Santiago. [Pl. Local Rule 56(a)(1) Statement of Addl. Facts ¶¶ 106-110]. Specifically, Plaintiff argues that Ms. Newell influenced Ms. Bush and Mr. Graziano to confirm the termination. [*Id.* ¶¶ 109-110]. Plaintiff also alleges that Mr. Santiago was a decision-maker because he influenced Ms. Newell. [*Id.* ¶ 108]; [Pl. Mem. in Opp'n at 9].

For purposes of vicarious liability, a supervisor must be empowered to take tangible employment action against the employee. *Vance v. Ball State Univ.*, 570 U.S. 421, 424 (2013). Plaintiff does not adduce any evidence to show that Ms. Bush, Ms. Newell, or Mr. Santiago were empowered to take tangible employment action against Plaintiff. As discussed *infra.*, Plaintiff's argument relies on a "cat's paw" theory of discrimination. To establish than an individual is a de facto decision maker under cat's paw theory, Plaintiff must show those empowered to take tangible employment action afforded Ms. Newell and Mr. Santiago an "outsized role" in the employment decision by negligently abdicating their responsibility. Mere influence is not enough to render an employee a de facto decision maker under this theory. *See Vasquez v. Empress Ambulance Serv.*, Inc., 835 F.3d 267, 275 (2d Cir. 2016)

Mr. Connors then called Plaintiff to inform him of his termination while Ms. Newell was also in the room. [Pl. Ex. B (Bailey Depo) 218:20-220:15]; [ECF 50-14, Pl. Ex. 12 (Newell Depo) 100:10-102:05]. Mr. Connors did not swear or raise his voice during the call. [Pl. Ex. B (Bailey Depo.) at 219:15-220:15]. Plaintiff testified

that he found the subject of the telephone call upsetting, not how it was carried out:

> Q. Describe everything that Keith Connors did during that termination discussion that you take issue with.
>
> A. The lack of information. The lack of investigation. The clear discrimination to believe one side. To believe whatever came through their desk and not get my story, not get my feedback. I wasn't asked about this Marissa situation. They cut me loose, done. No questions asked.
>
> Q. Anything else about that call with Keith Connors that you take issue with?
>
> A. Like I said, just not considering my side of the story, my -- I had no defense. That's all.

[*Id.* at 220:03-220:15].

Mr. Connors's phone call was followed by a letter from Mr. Graziano informing Plaintiff that he was terminated for violation of Nexstar's anti-harassment policy. [Def. Local Rule 56(a)(1) ¶ 48, undisputed]. The letter reads "[a]dditional information has come to our attention regarding your violation of Nexstar's Anti-Harassment policy. Your employment with Nexstar Broadcasting, Inc. WTNH / WCTX is terminated effective immediately; your last day of employment will be Friday, April 13, 2018." [Def. Ex. C (Graziano Aff, Ex. 1)]. Thereafter, Mr. Connors sent an email to a listserv named "News Staff-WTNH," which states: "Effective immediately, Micah Bailey is no longer employed at WTNH. We are posting a position and searching for a replacement. Chuck will be making schedule adjustments until the position is filled. Please see me with questions." [ECF 39-12, Def. Ex. J (Connors 04/17/2018 email)].

Plaintiff alleges that on April 20, 2018, Mr. Connors made false statements to news staff concerning Plaintiff by stating that he had been terminated for sexual harassment. [Pl. Local Rule 56(a)(2) Statement of Addl. Facts ¶¶ 115-16]. Defendant filed a copy of the relevant "Weekly News Update" that Mr. Connors sent which recaps the news station's planned coverage and business issues, stating: "Terminated 10pm producer following investigation into harassment claims" and "10pm producer Micah Bailey was terminated after harassment complaints. We're search (sic) for a replacement." [ECF 39-13, Def. Ex. K at 1, 7]. Plaintiff testified that "[o]n information and belief, I learned that he announced my termination to a newsroom full of employees that were just gossiping for days about my situation. And he used that moment to put his stance on Nexstar's sexual harassment (sic) and stapled my name to it." [Pl. Ex. B (Bailey Depo) at 255:03-255:08]. When asked how he knew what Mr. Connors said about his termination because he was not present, Plaintiff was unable to offer any evidence, testifying in response that he could not recall how he learned this information and that nothing could refresh his recollection. [*Id.* at 255:09-256:15]. Plaintiff was then asked: "So it's just your guess that this comment happened. Right?" to which he replied, "Pretty much, yeah." [*Id.* at 256:16-256:18].

During Plaintiff's employment, his co-workers and two managers made comments about Plaintiff's appearance, especially his hair, that Plaintiff found unwelcomed. *See, e.g.* [Pl. Local Rule 56(a)(2) Statement of Addl. Facts ¶¶ 126-32]. The parties agree on the following alleged statements concerning Plaintiff:

- **Daren Kramer, a news anchor, said to Plaintiff "if I had that hair," to which Plaintiff responded with a compliment stating, "but you got nice hair, too Daren." Mr. Kramer allegedly referred to Plaintiff by the nicknames "GQ" and "Smooth";**
- **Amy Hudak said five or ten times to Plaintiff that "you could be a reporter with that hair.";**
- **Adam Darsky made one or two comments about Plaintiff's hair throughout his employment;**
- **Noelle Gardner also made comments about Plaintiff's nice hair and how he could be a reporter;**
- **Ms. Conroy told Plaintiff he was "having a good hair day" about five times;**
- **Anchors Anne Craig and Daren Kramer and editor Nancy Lynch complimented Plaintiff's outfits with comments such as "nice shirt."**

[Def. Local Rule 56(a)(1) ¶ 54, undisputed].

In addition to these undisputed claims raised by Plaintiff, Plaintiff was also the subject of Facebook Live video segments where he appeared with Ann Nyberg and was referenced as being single, although he did not complaint to management or Ms. Nyberg about the contents of the segment. [Pl. Ex. B (Bailey Depo.) 160:06-162:25]. Plaintiff also testified that Mr. Connors would say to him "Man, if I had that hair, " and "Oh, man, if I looked like that," monthly until February 2018. [*Id.* at 166:11-167:17]. Plaintiff also testified that Nancy Lynch, a managing editor, called him "delicious" five times. [*Id.* at 170:05-171:24]. Plaintiff testified that she also hugged him and touched his arm. [*Id.* at 176:07-177:18]. Plaintiff was asked: "A: And at no time did you report any of this conduct to anyone in Human Resources at Nexstar. Correct?" and he responded, "I did not report it. Correct." [*Id.* at 178:03-178:10].

## Legal Standard

Summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a

matter of law." Fed. R. Civ. P. 56(a). The moving party bears the burden of proving that no genuine factual disputes exist. *See Vivenzio v. City of Syracuse*, 611 F.3d 98, 106 (2d Cir. 2010). "In determining whether that burden has been met, the court is required to resolve all ambiguities and credit all factual inferences that could be drawn in favor of the party against whom summary judgment is sought." *Id.* (citing *Anderson*, 477 U.S. at 255; *Matsushita Electric Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)). This means that "although the court should review the record as a whole, it must disregard all evidence favorable to the moving party that the jury is not required to believe." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 151 (2000); *see Welch-Rubin v. Sandals Corp.*, No. 3:03-cv-00481, 2004 WL 2472280, at *4 (D. Conn. Oct. 20, 2004) ("At the summary judgment stage of the proceeding, [the moving party is] required to present admissible evidence in support of their allegations; allegations alone, without evidence to back them up, are not sufficient.") (citing *Gottlieb v. Cnty of Orange*, 84 F.3d 511, 518 (2d Cir. 1996); *Martinez v. Conn. State Library*, 817 F. Supp. 2d 28, 37 (D. Conn. 2011).

A party who opposes summary judgment "cannot defeat the motion by relying on the allegations in his pleading, or on conclusory statements, or on mere assertions that affidavits supporting the motion are not credible." *Gottlieb*, 84 F.3d at 518. "A party may not create an issue of fact by submitting an affidavit in opposition to a summary judgment motion that ... contradicts the affiant's previous deposition testimony." *Bickerstaff v. Vassar Coll.*, 196 F.3d 435, 455 (2d Cir. 1999), *as amended on denial of reh'g* (Dec. 22, 1999)(quotations and citations omitted). "The non-movant cannot escape summary judgment merely by vaguely asserting

the existence of some unspecified disputed material facts, or defeat the motion through 'mere speculation or conjecture." *World Ins. Co. v. Stack Oil, Inc.*, 922 F.2d 118, 121 (2d Cir. 1990) (internal citations of quotations omitted). Where there is no evidence upon which a jury could properly proceed to find a verdict for the party producing it and upon whom the onus of proof is imposed, such as where the evidence offered consists of conclusory assertions without further support in the record, summary judgment may lie. *Fincher v. Depository Trust & Clearing Corp.*, 604 F.3d 712, 726–27 (2d Cir. 2010).

## Discussion

After the Court's ruling on Defendant's motion to dismiss, the following counts remain: (1) gender discrimination in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"); (2) gender discrimination in violation of the Connecticut Fair Employment Practices Act ("CFEPA"); (3) retaliation; (4) hostile work environment; (5) defamation slander per se; (6) defamation libel per se; (8) breach of contract; and (11) negligent infliction of emotional distress. *See* [ECF. No. 33 (Mem. of Decision on Def. Mot. to Dismiss)]. The Court also limited the scope of Plaintiff's defamation claims. [*Id.* at 10-21]. The Court will address the parties' arguments and each of Plaintiff's claims sequentially.

## I.     Gender Discrimination in violation of Title VII and CFEPA

Defendant argues that Plaintiff cannot show the minimal inference of discrimination necessary to establish a prima facie case of discrimination because: 1) all three decision-makers were also male; 2) Plaintiff's evidence is based on

speculation; 3) Plaintiff concedes that the majority of the decisionmakers did not harbor discriminatory animus, and 4) there is no evidence of discriminatory remarks or that other similarly situated individuals were treated more favorably than Plaintiff. Additionally, Defendant argues that it has adequately articulated its legitimate, non-discriminatory basis for termination, and Plaintiff presents no factual evidence calling the termination decision into question. [ECF 39 (Def. Mem. of Supp.) at 2].

In opposition, Plaintiff argues that he can establish the minimal inference of discrimination to prove a prima facie case because the decision makers were not all male under "cat's paw theory," and he was treated less favorable than similarly-situated female comparators. [ECF 50 (Pl. Mem. in Opp'n) at 6-11]. Next, Plaintiff argues that Defendant cannot establish a legitimate non-discriminatory basis for his termination because Defendant cannot show that Plaintiff violated the company's anti-harassment policy because it does not apply to conduct that occurs outside of the workplace and the conduct was not unwelcomed. [*Id.* at 11-14]. Plaintiff argues that the proffered reason for his termination is a pretext for a discriminatory animus on account of his sex because Defendant failed to investigate Plaintiff's denial of the allegations. Plaintiff argues that Ms. Newell harbored a discriminatory animus based on her treatment of the accusers as compared to Plaintiff. [*Id.* at 14-21]. In addition to the arguments related to the investigation of complaints against him, Plaintiff also cites Defendant's decision to hire a woman as his replacement and to hire a woman again for a producer position that he applied for after he was terminated as further evidence of a gender

preference. [*Id.* at 19-20]. Plaintiff argues that Ms. Hudak previously made a false accusation against a female co-worker in the past, but the female employee's denial of the accusation was thoroughly investigated. [*Id.* at 19-20].

In order for the employee to first make a prima facie case of discrimination, the Plaintiff must show that: (1) he is a member of a protected class; (2) he was qualified for the position; (3) he suffered an adverse employment action; and (4) the adverse employment action occurred under circumstances that give rise to an inference of discrimination. *McDonnell Douglas Corp.* v. *Green*, 411 U.S. 792, 802 (1973). Plaintiff's burden to establish a prima facie case is "minimal" and "*de minimis.*" *Zimmermann v. Assocs. First Capital Corp.*, 251 F.3d 376, 381 (2d Cir. 2001).

Thereafter, there is a presumption of retaliation or discrimination that the defendant must rebut by articulating "a legitimate, non-retaliatory reason for the adverse employment action." *Jute v. Hamilton Sundstrand Corp.*, 420 F.3d 166, 173 (2d Cir. 2005). "[T]he plaintiff—once the employer produces sufficient evidence to support a nondiscriminatory explanation for its decision—must be afforded the "opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination." *Reeves v. Sanderson Plumbing Prod.*, Inc., 530 U.S. 133, 143 (2000). "Pretext may be demonstrated either by the presentation of additional evidence showing that the employer's proffered explanation is unworthy of credence, or by reliance on the evidence comprising the prima facie case, without more*." Percoco v. Lowe's Home Centers, LLC*, 208 F. Supp. 3d 437, 444 (D. Conn.

2016). "Although intermediate evidentiary burdens shift back and forth under this framework, '[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff.'" *Reeves*, Inc., 530 U.S. at 143 (quoting *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981)).

The analysis of Plaintiff's CFEPA claim is the same as under Title VII and the Court accordingly relies on the case law analyzing and interpreting both statutes. *Comm'n on Human Rights & Opportunities v. Echo Hose Ambulance*, 322 Conn. 154, 160 (2016); *Craine v. Trinity College*, 211 Conn. 425, 537, n.6 (2002).

A. <u>Whether Plaintiff can establish a prima facie case of discrimination.</u>

In this case, whether Plaintiff can establish a prima facie case of gender discrimination hinges on the fourth prong. Defendant's first argument is that since the decision makers were the same gender as the Plaintiff, there is an inference that they were not biased against him on account of his gender. [Def. Mem in Supp. at 12](citing *Drummond v. IPC International, Inc.*, 400 F. Supp. 2d 521 (E.D.N.Y. November 18, 2005) and *Marlow v. Office of Court Administration of New York*, 820 F. Supp. 753, 757 (S.D.N.Y. 1993), *aff'd*, 22 F.3d 1091 (2d Cir.), *cert. denied*, 513 U.S. 897, (1994)). In opposition, Plaintiff cites *Dickinson v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 431 F. Supp. 2d 247, 258 (D. Conn. 2006) for the proposition that the U.S. Supreme Court has cautioned against presuming that members of one identifiable group will not discriminate against members of the same group, quoting from *Oncale v. Sundowner*, 523 U.S. 75, 78 (1998). The Court agrees with

the Plaintiff as to the viability of the same-group inference for sex discrimination cases.

The U.S. Supreme Court in *Oncale* cited *Johnson v. Transportation Agency, Santa Clara Cty.*, 480 U.S. 616, 624-25 (1987), a sex discrimination case brought by a male employee claiming that his employer preferred a female employee, for the proposition that the court did not "consider it significant that the supervisor who made that decision was also a man." 523 U.S. at 79. Neither party cites controlling Second Circuit authority on the viability of the same-group inference after *Oncale*. In *Wexler v. White's Fine Furniture, Inc.*, 317 F.3d 564, 574 (6th Cir. 2003)(en banc), the Sixth Circuit held that the Supreme Court expressly rejected the same-group inference as to race and sex discrimination cases. At least one court in this District agreed with *Wexler*. *Hodges v. Rensselaer Hartfor[d] Graduate Ctr., Inc.*, No. 3:06-CV-850PCD, 2008 WL 793594, at *6 (D. Conn. Mar. 20, 2008); *see also Lizee v. Yale Univ.*, No. CV136038928S, 2014 WL 4099324, at *8, n. 6 (Conn. Super. Ct. July 15, 2014)(considering the district court's holding in *Drummond v. IPC International, Inc.*, 400 F.Sup.2d at 532 that the same-group inference against discrimination is well-recognized, "but research has not revealed Second Circuit or Connecticut appellate authority for this proposition."). The language of *Onacle* itself is persuasive in this regard: "[b]ecause of the many facets of human motivation, it would be unwise to presume as a matter of law that human beings of one definable group will not discriminate against other members of their group" 523 U.S. at 78 (citation omitted).

The fallacy of the same-group inference has been laid bare by credible social science research. This research, analyzing the results of implicit attitude and bias testing, demonstrates that members of a group discriminate against members of their own racial and ethnic group. See *Rich Morin, Exploring Racial Bias Among Biracial and Single-Race Adults: The IAT*, Pew Research Ctr. (Aug. 19, 2015), https://www.pewresearch.org/social-trends/2015/08/19/exploring-racial-bias-among-biracial-and-single-race-adults-the-iat/. While studies show that members of a group are less likely to be bias against members of their own group, they suffer, albeit to a lesser extent, from the same bias attitudes prevalent in the society at large. Indeed, it was based on similar studies presented by Thurgood Marshall showing same-group bias that the Supreme Court ruled as it did in *Brown v. Board of Education*, 347 U.S. 483, 494 (1954). *See* William J. Rich, *Betrayal of the Children with Dolls: The Broken Promise of Constitutional Protection for Victims of Race Discrimination*, 90 CORNELL L. REV. 419, 420-21 (2005)(explaining the Clark doll study relied on by Thurgood Marshall in the cases below and during oral arguments in *Brown*). Social norms are a powerful and pervasive force in American society. Therefore, the Court does not place any weight on the gender of the individuals who approved Mr. Bailey's termination

Next, Defendant argues that Plaintiff's reliance on the fact that Nexstar credited the accusers accounts of events over his amounts to sex discrimination would frustrate the public policy rationales behind Title VII and CFEPA. [Def. Mem. in Supp. at 12-13]. The argument generally addresses Defendant's proffered basis for the adverse action, not whether Plaintiff can establish the minimal inference of

discrimination necessary to establish the fourth prong of a prima facie case. As will be discussed later, the balance between frustrating the purposes of Title VII by impairing employers in the exercise of their duty to prevent, investigate, and remediate sexual harassment in the workplace and "deferring to invidious stereotypes and crediting malicious accusations" is a more nuance issue. *Compare Malik v. Carrier Corp.*, 202 F.3d 97 (2000) to *Menaker v. Hofstra University*, 935 F.3d 20 (2019).

In addition, the declination to read the text messages does not establish a minimal inference necessary to demonstrate a prima facia case of discrimination. Plaintiff admitted to Ms. Newell he initiated intimate contact with the complainants. He contends the intimacy was consensual. However, there is nothing in the text messages suggesting any complainant consented to having intimate contact with Plaintiff and Plaintiff did not offer them claiming they did. In both instances, Plaintiff offered to show that both co-workers consented to spending time with Plaintiff to explore their compatibility.

Nexstar's policy states: "All employees must refrain from *any conduct that could be considered harassing* [and warns] Nexstar will take reasonable steps to ensure that all employees, contractors, vendors, and customers comply with this policy."(emphasis added) [Def. Ex. D (2017 Nexstar Employee Handbook) at 9]; [Pl. Local Rule 56(a)(2) Statement ¶ 4](admitted). Plaintiff had an explicit duty imposed by this policy not to assume, but to assure that a co-worker who found him attractive and perhaps wanted to explore their compatibility wanted to advance to the physical stage. Having not sought or obtained their consent to intimate contact

his actions could foreseeably be considered harassment. Consequently, because Plaintiff did not claim he had any messages indicating his accuser welcomed intimate contact with him, Ms. Newell's failure to read them and include the content of the text messages did not suggest that she did not conduct a thorough investigation or that she was bias against Plaintiff because of his gender.

Finally, no adverse action was taken in response to Ms. Hudak's complaint. When Ms. Conroy complained of the same conduct a few months later, the situation was different. First, Plaintiff had recently been counseled on the anti-harassment policy. Second, based on the earlier complaint, he knew his conduct could be considered harassment. Third, the conduct occurred on Nexstar's premises. Thus, the escalation in the sanction following multiple complaints after counseling was not indicative of gender bias.

The Defendant's third argument on the prima facie causation prong is that the Plaintiff concedes that the majority of the decisionmakers did not harbor discriminatory animus. [Def. Mem. in Supp. at 13-15]. The Defendant argues that the decisionmakers were: Mr. Graziano, Mr. Davis, and Mr. Connors. [*Id.* at 13]. Plaintiff counters that the decision-makers were Ms. Newell, Ms. Bush, Mr. Carter, Mr. Connors, and Ricky Santiago. [Pl. Mem in Supp. at 6-9]. Plaintiff argues that "Mr. Graziano was a rubber-stamp decision maker and not involved in the termination process (he merely received updates and signed the termination letter), and Doug Davis just happened to be in the building when Plaintiff was terminated and other than his coincidental appearance, he was wholly uninvolved." [*Id.* at 6].

Defendant argues that Plaintiff testified that he believed that Mr. Connors discriminated against him because he is male, however, he does not point to any evidence supporting that belief. [Def. Mem. in Supp. at 14](citing Def. Ex. A (Bailey Depo. at 242:20-243:03].

Plaintiff did not reply to Defendant's argument as to Mr. Connors, but later argues that Mr. Connors acted in a discriminatory manner asserting, without evidentiary support, that he treated female comparator employees better. The Court agrees with the Defendant's contention that Plaintiff's allegations of discrimination against Mr. Connors rest on his claims that the investigation was flawed. Aside from Ms. Newell's failure to include the immaterial text messages, Plaintiff offers no evidence that the investigation was flawed. Mr. Connors's treatment of the female employees that Plaintiff identifies does not rise to an inference of discrimination because they were not similarly situated to Plaintiff as a matter of law, as explained later in this decision.

As to Ms. Newell, the portions of her deposition transcript cited by Plaintiff do not refute the Defendant's contention that the decision was made by Mr. Graziano, Mr. Davis, and Mr. Connors. [Pl. Ex. 12 (Newell Depo) at 86-87, 130-31]. Ms. Newell testified that "I conferred with Legal and with management that -- and they made the determination that Mr. Bailey's employment would be terminated" [*Id.* at 86:24-87:01]. She was then asked by Plaintiff's counsel: "So management, legal, and you, within that in 50-however-many-minutes, decided to terminate Micah Bailey's employment---." After Defendant's counsel objected to the form of the question, Ms. Newell testified that "[m]anagement and legal made the determination… to

24

terminate Mr. Bailey's employment." *Id.* at 87:08-87:18.  Later Ms. Newell was asked why Mr. Bailey was terminated, to which she testified: "It was the determination to terminate his employment based on the multiple violations of the anti – harassment policy.  It was determined by corporate, legal, and station and corporate management." [*Id.* at 131:10-131:14.].  In his affidavit, Mr. Graziano explains that Ms. Newell provided information, legal counsel provided legal advice, and the three decisionmakers (Mr. Connors, Mr. Davis, and himself) made the decision to terminate Mr. Bailey's employment. [Def. Ex. C (Graziano Aff.) ¶ 13].  Plaintiff offers no evidence challenging the veracity of Mr. Graziano's affidavit and the other evidence introduced by Defendants.

Plaintiff's argument that alleged bias by Ms. Newell during her investigation of the allegations infected the decision-making process relies on the "cat's paw" theory of discrimination.  This "refers to a situation in which an employee is fired or subjected to some other adverse employment action by a supervisor who himself has no discriminatory motive, but who has been manipulated by a subordinate who does have such a motive and intended to bring about the adverse employment action." *Vasquez*, 835 F.3d at 272 (quoting *Cook v. IPC Intern. Corp.*, 673 F.3d 625, 628 (7th Cir. 2012)).

In *Vasquez*, the Second Circuit explained that cat's paw does not apply where an employer in good faith, "relies on a false and malign report of an employee who acted out of unlawful animus" because the subordinate's discriminatory animus cannot be said to have motivated the adverse action.  835 F.3d at 275. Rather, cat's paw applies where the employer acts negligently with respect to the bias employee

and "thereby affords that biased employee an outsize role in its own employment decision." *Id.*

Ms. Newell's testimony establishes that, as the local human resources manager, she played a critical role in investigating the allegations, consulting in-house counsel and the union president, drafting the disciplinary forms and scripts, and relaying information to management. However, Plaintiff does not adduce evidence to show that Mr. Graziano, Mr. Connors, and Mr. Davis were negligent in their apparent reliance on facts gathered by Ms. Newell.

Even if Ms. Newell was a de facto decision maker, Plaintiff does not show how her investigation was tainted by a discriminatory animus against Plaintiff because he is male. An inadequate investigation, standing alone, is insufficient to establish discriminatory intent. *Sassaman v. Gamache*, 566 F.3d 307, 315 (2d Cir. 2009). Rather, only "where a plaintiff can point to evidence closely tied to the adverse employment action that could reasonably be interpreted as indicating that discrimination drove the decision, an arguably insufficient investigation may support an inference of discriminatory intent." *Id.*

Ms. Newell interviewed both Ms. Hudak and Ms. Conroy after they came forward with allegations against Plaintiff without prompting by Ms. Newell. In both instances, Ms. Newell listened to their account of events and then interviewed Plaintiff in an open-ended manner. Despite not being told the specifics of the allegations, in both instances, Plaintiff corroborated that there was physical contact between Plaintiff and the two women and, in the last instance, corroborated

that sexualized touching occurred on Defendant's property. Plaintiff does not dispute that these complaints were made and does not claim that Ms. Newell somehow altered or exaggerated their allegations. *See, e.g.* [Def. Ex. A (Bailey Depo.) at 150:16-150:21]( "Q -- but you're not claiming that Keith Connors or Lisa Newell made up that Amy reported this to them.· Right? A. No. Q.· Okay. I'm saying they fell for her lies."). As an initial matter, falling for lies is at best negligent but not evidence of bias.

Plaintiff argues that there are fourteen examples of where Ms. Newell harbored a discriminatory animus against him during her investigation of Ms. Hudak and Ms. Conroy's allegations, relating almost exclusively to how Ms. Newell carried out the investigation and the disciplinary sanctions imposed by Mr. Connors with input from her and others. Interpreting the facts in a light most favorable to Plaintiff, none of the deficiencies in the investigation potentially touch on a gender stereotype. For example, while investigating Ms. Hudak's complaint, Plaintiff alleges Ms. Newell said to him: "It sounds like you took advantage of someone looking for a friend in a time of need." [Def. Ex. A. (Bailey Depo.) at 239:04-239:05]. The statement does not suggest that Ms. Newell harbored and then applied any pre-conceived gender stereotypes broadly, but was rather addressing the specific circumstances of Plaintiff's alleged conduct and possibly expressing a negative view on his character. At best, the comment is a stray remark and temporally separated from Plaintiff's termination by two intervening events: Plaintiff's admitted physical contact with Ms. Conroy in Defendant's parking lot and Ms. Nobile's emailed complaint. Finally, Plaintiff alleges Ms. Newell was bias because she refused to

look at the text messages he proffered.  Her refusal is not evidence that she was bias because Plaintiff never told her the messages evinced his accusers' willingness to engage in intimate conduct with him.  Accordingly, even if Ms. Newell was a de facto decision maker, there is no genuine dispute of material fact regarding whether she exhibited a discriminatory motive in investigating the circumstances of the employee complaints.

Plaintiff's argument that Mr. Santiago was a de facto decision-maker are conclusory.  Plaintiff argues that he confided in Mr. Santiago and that Plaintiff believed that Mr. Santiago would represent his best interests. [Pl. Mem. in Opp'n. at 9]. Plaintiff argues that Ms. Newell was in close contact with Mr. Santiago concerning the two-week suspension after it was imposed. [*Id.*]. However, there is no evidence of record suggesting that Mr. Santiago had any influence on the imposition of the disciplinary infraction, much less that Defendant's management officials were negligent in accepting information from Mr. Santiago or negligently deferred to his view on the disposition of Plaintiff's employment.  The fact that Plaintiff may have confided in Mr. Santiago as his agent for collective bargaining purposes has no bearing on whether Defendant acted with a discriminatory intent towards Mr. Bailey. Similarly, while Plaintiff argues that Attorney Bush was also a decision maker, Plaintiff does not argue that Attorney Bush harbored a discriminatory animus. [Pl. Mem. in Opp'n at 9]. Plaintiff also argues that Mr. Carter was a decision-maker because Mr. Carter sent Plaintiff home after he became upset upon learning of his suspension. [*Id.* at 9]. Mr. Carter also prepared Plaintiff's performance review, which offered a very favorable assessment just a few weeks

prior to his termination. [*Id.*](citing ECF 50-32, Pl. Ex. 30 (Performance Review)]. Plaintiff does not allege that Mr. Carter had a discriminatory animus, rather he had a good relationship with Plaintiff. *See* [Pl. Local Rule 56(a)(2) Statement ¶ 28].

Next, Mr. Bailey argues that he can establish an inference of discrimination by showing that he was treated less favorably than similarly situated female employees. [Pl. Mem. in Opp'n at 10-11]. To establish an inference of discrimination by these means, the comparator employee must be "similarly situated in all material respects," which means that plaintiff must show that his "co-employees were subject to the same performance evaluation and discipline standard," and that their undisciplined conduct is of "comparable seriousness." *Graham v. Long Island R.R.*, 230 F.3d 34, 40 (2d Cir. 2000). "Hence, the standard for comparing conduct requires a reasonably close resemblance of the facts and circumstances of plaintiff's and comparator's cases, rather than a showing that both cases are identical." *Id.*

Plaintiff argues that the following employees are comparators: Ms. Hudak, Ms. Conroy, Ms. Nobile, Michelle Lu, Alyssa Taglia, and Michelle DeVivo. The Court will address each of the employees in turn. First, for purposes of summary judgment, the Court will assume that news reporters and producers are held to the same workplace standards and reported up through Mr. Connors, Mr. Graziano, and then Mr. Davis. The Court notes that the CBA covers producers and associate producers and expressly excludes reporters, but the Defendant did not brief the issue. [Def. Ex. E (CBA) § 2].

In *Ruiz v. Cty. of Rockland*, 609 F.3d 486, 495 (2d Cir. 2010), the Second Circuit affirmed the grant of summary judgment where none of plaintiff's proposed comparators were accused of sexual misconduct and finding that although plaintiff "....may be innocent of these charges. ... the fact that Mr. Ruiz had been accused by multiple patients and co-workers of inappropriate and unlawful behavior clearly distinguishes Mr. Ruiz from other employees who were not the subject of such accusations. While Mr. Ruiz may be able to show that the real reason he was terminated was because Commissioner Walsh–Tozer believed these other allegations to be true, he has provided no evidence to suggest that she was motivated by Mr. Ruiz's race and national origin."

As is also the case here, Ms. Hudak, Ms. Conroy, and Ms. Nobile are not comparators because they are not "similarly situated" to Plaintiff. Plaintiff does not establish that Defendant was aware that any of these employees engaged in any misconduct for which they were not punished. Rather, his argument rests on his belief that their accusations were deemed credible because they are female, and he is male and that he was not given a sufficient opportunity to rebut the allegations. *See* [Pl. Mem. in Opp'n at 16-19]. Plaintiff does not present an example of an instance where a sexual harassment allegation was made against any other employee regardless of gender. [ECF 51-6 Def. Repl. Br., Ex. Q (Bailey Depo) 283:11-283:14 (Q. "Are you aware of anybody at Nexstar who had allegations against them that they had engaged in unwelcomed sexual conduct? A. No.").

As to Ms. Hudak, Plaintiff alleges that Mr. Connors discriminated against Plaintiff by promoting Ms. Hudak to a more desirable shift where she would work

closer with Plaintiff after Ms. Hudak made allegations against him. [Pl. Mem. in Opp'n at 17-18]. The argument fails because Plaintiff and Ms. Hudak worked in different roles and Plaintiff does not claim that Ms. Hudak was unqualified for the position. To the contrary he testified that he thought that Ms. Hudak was "one of the best reporters we had." [Def. Ex. Q. (Bailey Depo.) at 253:06-253:12]. Plaintiff testified that his belief that Ms. Hudak's promotion was an attempt to "smooth over" the situation was based on his speculation. [*Id.* at 253:16-256:25]. He offers no evidence to support this speculation.

Plaintiff is not similarly situated to Alyssa Taglia. Ms. Conroy testified that she and Ms. Hudak were suspended after Ms. Hudak reported that they believed they observed Ms. Taglia and Mr. Graziano pulling into his apartment building's parking garage while Ms. Hudak and Ms. Conroy were walking together. [Pl. Ex. 3 (Conroy Depo) at 25:20-29:13]. Ms. Newell testified that she was unfamiliar with the specifics of any complaint by Ms. Taglia regarding a false claim by Ms. Hudak and she did not speak with either woman regarding the incident. [Pl. Ex. 12 (Newell Depo.) 102:24-102:25;  103:04-103:07]. Ms. Newell then clarified that she asked Ms. Hudak whether she recalled seeing Ms. Taglia's vanity plate, which she did not, and later confirmed that Ms. Taglia was not in the area at the time. [*Id.* at 104:16-104:23].  An attorney for Ms. Taglia sent a letter to Ms. Hudak demanding that she retract her statement. [ECF 50-37, Pl. Ex. 35 (Ltr. from Atty. Ferguson to Hudak)]. Plaintiff does not have any personal knowledge of these events. [Pl. Ex. B (Bailey Depo) at 321:01-321:25].  Neither Ms. Taglia nor Ms. Hudak are similarly situated to Plaintiff because there is no allegation that they engaged in comparable misconduct that

went unpunished. Defendant's investigation into Ms. Taglia's complaint is also distinguishable because Plaintiff admitted that he had physical contact with other employees including on the Defendant's premises. Accordingly, the incident between Ms. Taglia and Ms. Hudak does not raise an inference of discrimination.

Plaintiff also advances the argument that Michelle Lu is a comparator because she replaced Plaintiff after he was terminated. Plaintiff notes, correctly, "that an inference of discrimination also arises when an employer replaces a terminated or demoted employee with an individual outside the employee's protected class." *Littlejohn v. City of New York*, 795 F.3d 297, 312–13 (2d Cir. 2015). Similarly, Plaintiff applied for a nighttime producer position with Defendant in October 2019, but a woman named Michelle DeVivo was hired instead. [Pl. Mem. in Supp. 19-20].

In reply, the Defendant argues that Plaintiff relies on Ms. Conroy's testimony that Ms. Lu and Ms. DeVivo work as nighttime producers, not that Ms. Lu replaced Plaintiff and Ms. DeVivo was hired instead of Mr. Bailey in 2019. [Def. Repl. Br. at 7](citing ECF 50-5, Pl. Ex. 3 (Conroy Depo.) at 8:01-9:25]. Plaintiff's supplemental affidavit in opposition to summary judgment states that he was replaced by Ms. Lu and that Ms. DeVivo was hired for the position that he applied for. [ECF 50-42 Pl. Ex. 40 (Bailey Suppl. Aff.) ¶¶ 6-7]. Mr. Bailey's affidavit does not state how he knows this information to be true.

Defendant's contention is correct. As a matter of proof, Plaintiff has not established that Ms. Lu replaced him or that Ms. DeVivo was hired for the position Plaintiff applied to in 2019. It appears that Plaintiff inferred that these women were

hired for those roles based on Ms. Conroy's testimony about the current composition of the nighttime production team. It is not necessarily the case, as Plaintiff could have been replaced by someone else, who was later replaced by Ms. Lu. However, Defendant did not submit any affidavits refuting Plaintiff's sworn statement and does not elaborate on the hiring process for those two positions. Therefore, considering Plaintiff's testimony and construing Ms. Conroy's testimony broadly in favor of the Plaintiff, the Court finds that there is a genuine issue of material fact as to whether Plaintiff was replaced by an individual outside of his protected class.

Having determined that Plaintiff narrowly presents enough evidence to satisfy the de minimis showing of an inference of discrimination based on his replacement by an individual outside of his protected class, the burden of production now shifts to Defendant.

**B. <u>Whether Nexstar has articulated a legitimate non-discriminatory basis for Mr. Bailey's termination.</u>**

Defendant proffers a legitimate, non-discriminatory basis for Plaintiff's termination: "Nexstar's good faith finding that Plaintiff violated its anti-harassment policy by engaging in unwanted sexual conduct toward three coworkers." [Def. Mem. in Supp. at 16-17].

Plaintiff argues that Defendant's proffer fails because his conduct does not violate the letter of Defendant's anti-discrimination policy. [Pl. Mem in Opp'n at 11-14]. Plaintiff's argument is misplaced. At this stage, Defendant must proffer a legitimate, non-discriminatory basis for the adverse action, but it is not required to

prove the validity of its decision. *Burdine*, 450 U.S. at 254 ("[t]he defendant need not persuade the court that it was actually motivated by the proffered reasons."). "This burden is one of production, not persuasion, it can involve no credibility assessment." *Reeves*, 530 U.S. at 142 (internal quotations omitted).

Defendant carries its burden of production by pointing to admissible evidence that it terminated Plaintiff for violating its Zero Tolerance anti-discrimination policy. *See* [Def. Ex. C (Graziano Aff, Ex. 1)(Termination Letter)]. An employer has a legal obligation under federal law to investigate allegations of sexual harassment. See *Malik*, 202 F.3d at 105. A belief that an employee violated an employer's sexual harassment policy is an adequate, legitimate grounds for termination. *See, e.g. Silverman v. City of New York*, 216 F. Supp. 2d 108, 119 (E.D.N.Y. 2002), *aff'd*, 64 F. App'x 799 (2d Cir. 2003); *DeCintio v. Lawrence Hosp.*, 797 F. Supp. 323, 324 (S.D.N.Y. 1992). It naturally follows that it is also a legitimate reason not to rehire. *See, e.g. Kellman v. Yale-New Haven Hosp.*, 99 F. Supp. 2d 222, 227 (D. Conn. 2000)(termination for fighting was sufficient basis to show legitimate basis not to rehire absent showing that the rehire decision was motivated by race).

C. <u>Whether Mr. Bailey can establish that Nexstar's articulated reasons for his termination were pretextual for gender discrimination.</u>

Since Defendant has proffered a legitimate, non-discriminatory basis for Plaintiff's termination, the presumption of discrimination formed by the establishment of a prima facie case dissipates and Plaintiff must show that the reasons articulated by Defendant are a pretext for discrimination. *Reeves*, 530 U.S. at 143. The issue of pretext does not concern whether the reasons for Plaintiff's

termination were flawed or even false; the issue is whether they were false to conceal intentional discrimination. *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502 (1993)(the trier of fact's rejection of the reasons for the termination does not entitle judgment for the plaintiff as a matter of law).

First, Plaintiff argues that his conduct does not violate Defendant's Zero Tolerance anti-discrimination policy because the alleged harassment did not occur in his capacity as an employee and because it was not "unwelcomed." [Pl. Mem in Opp'n at 11-14]. The argument fails for two independent reasons. The language challenged by Plaintiff means that employees are prohibited from discriminating against Defendant's business invitees, rather than delineating the temporal scope of the policy: "Nexstar has a Zero Tolerance Policy prohibiting discrimination or harassment of any employee by a supervisor, employee, job applicant, customer, *visitor or the representatives of other businesses with whom we interact as part of our jobs.*" *See* [Pl. Local Rule 56(a)(2) Statement ¶ 4](emphasis added).  No where does the policy limit is application to the location of the conduct or the capacity in which the conduct was committed. The policy focuses entirely on the relationship of the actor to Nexstar. Second, Mr. Bailey offered no evidence to demonstrate that he showed Nexstar or attempted to show Nexstar that any of his accusers consented to having intimate contact with him.

More importantly, it is not for the Court to determine whether Plaintiff's conduct actually violated this policy or violated federal and state laws prohibiting sexual harassment. Whether Mr. Bailey is "…actually guilty of any misconduct has no bearing on the resolution of this disparate treatment claim: the court must consider

only whether [plaintiff] has sufficiently established a pattern of disparate treatment based on race or gender, from which a rational factfinder could infer unlawful discriminatory animus on the part of [the employer]." *Henry*, 42 F.3d at 96.

Similarly, it is not for the Court to determine whether the sanction imposed was the appropriate decision, so long as the decision was not motivated by discriminatory animus*. See Scaria v. Rubin*, 117 F.3d 652, 655 (2d Cir. 1997)("This Court does not sit as a super-personnel department that reexamines an entity's business decisions."). Thus, "[e]vidence that an employer made a poor business judgment generally is insufficient to establish a question of fact as to the credibility of the employer's reasons." *Dister v. Continental Group, Inc.*, 859 F.2d 1108, 1116 (2d Cir.1988). "An employer has latitude in deciding how to handle and respond to discrimination claims, notwithstanding the fact that different strategies and approaches in different cases and classes of cases will result in differences in treatment." *United States v. New York City Transit Auth.*, 97 F.3d 672, 677 (2d Cir. 1996).

Here, Plaintiff points primarily to the evidence cited to establish a prima facie case of discrimination, relying primarily on allegations that the Defendant's investigation into Plaintiff's account of the events was insufficient. *See* [Pl. Mem. in Opp'n at 15-16]. The fact that the employer found female employees' accounts of events more credible than Plaintiff's does not demonstrate that the decision to terminate him was motivated by gender bias, as "[e]mployers must frequently resolve credibility disputes between employees." *Saenger v. Montefiore Med. Ctr.*, 706 F. Supp. 2d 494, 514 (S.D.N.Y. 2010).

36

As the Second Circuit observed in *Malik v. Carrier Corp.*, "investigations of this nature inevitably entail risks of misunderstandings or statements that a trier might *ex post* find to be careless. An employer simply cannot be diligent in carrying out an investigation if it must weigh every sentence or question with an eye to whether a jury might later conclude that it unreasonably injured an alleged harasser's psyche." 202 F.3d at 108.

On the other hand, substantial irregularities in an investigation, coupled with prior criticisms for inadequately handling sexual misconduct allegations raised by female students, has been held to plausibly allege that a university acted with a discriminatory animus towards males. *Doe v. Columbia Univ.*, 831 F.3d 46 (2d Cir. 2016) (applied to Title VII cases in *Menaker v. Hofstra Univ.*, 935 F.3d 20, 31 (2d Cir. 2019). In *Menaker*, a male athletic coach alleged that the university's vice president knew that at least one of the student's allegations against him was false, the university knew that the student and parent who complained may have had a nefarious intention, the university abandoned its formal harassment investigation protocol, and was subject to at least some targeted external pressure to aggressively address sexual misconduct complaints brought by female students. 935 F.3d at 31-37. These significant procedural irregularities and external pressures are not present in this case.

Here, there is no genuine dispute of material fact that three female co-workers reported to Defendant that Plaintiff made unwanted physical advances towards them, that he was given multiple opportunities to remediate his behavior and was on notice that further incidents would not be tolerated, and he conceded that he

groped an employee in the parking lot less than two months after receiving admonitions about similar conduct.

There is a factual dispute concerning whether Plaintiff offered to show Ms. Newell copies of text messages to corroborate his account that he went on a date with Ms. Hudak and his encounter with Ms. Conroy arose from mutual attraction. There is no dispute that Defendant did not investigate the truth of the allegations raised by Ms. Nobile. But neither the sufficiency of Defendant's investigation nor its outcome are material as Plaintiff has not produced evidence tending to show that the shortcuts taken or the conclusions reached during the investigative process were because of any pre-conceived gender bias, beyond Plaintiff's own speculation about what motivated the decision. *See Saenger,* 706 F. Supp. 2d at 515 (the "[d]efendant's investigatory procedures are only relevant if they give rise to an inference that the investigation was a sham designed to mask [d]efendant's discriminatory agenda."); *see also Ruiz,* 609 F.3d at 495.

Plaintiff has not established that similarly situated female employees were treated more favorably and cannot identify comments by decision makers suggesting that they were disinclined to believe Plaintiff because he is male. In so failing, he has not raised a genuine issue of material fact as to these essential elements of his claim.

Although there is a genuine issue of material fact regarding whether Plaintiff was replaced by a woman, he has not shown that the woman who replaced him or the woman that was hired when he re-applied to Nexstar were unqualified for the

positions. *Goonewardena v. New York Workers Comp. Bd.*, 258 F. Supp. 3d 326, 341 (S.D.N.Y. 2017), *aff'd sub nom. Goonewardena v. New York State Workers' Comp. Bd.*, 788 F. App'x 779 (2d Cir. 2019). The gender of Plaintiff's replacement may be enough to establish a prima facie case of discrimination, but it is insufficient to show pretext. *Stern v. Trustees of Columbia Univ. in City of New York*, 131 F.3d 305, 312 (2d Cir. 1997) ("If the plaintiff's evidence was barely sufficient to make out a prima facie case, it may not be sufficient to establish discrimination after the defendant has proffered a neutral rationale.").

For the above reasons, the Court concludes that Plaintiff demonstrates a prima facie case for discriminatory treatment based on his sex. Defendant articulated a legitimate, non-discriminatory reason for Plaintiff's termination. Because Plaintiff is unable to show that a genuine issue of material fact exists as to whether Defendant's proffered reasons for his termination and rejection were pretextual for discrimination, summary judgment is therefore GRANTED on Plaintiff's sex discrimination claim under Title VII.

CFEPA prohibits employers from, *inter alia*, discriminating against an employee "because of the individual's ... sex" or "because such person has opposed any discriminatory employment practice," and prohibits aiding and abetting "the doing of any act declared to be a discriminatory employment practice," or "harass[ing] any employee, person seeking employment or member on the basis of sex." Conn. Gen. Stat. § 46a-60(b)(1), (b)(4), (b)(5), (b)(8).

Summary judgment is also GRANTED on count two of the complaint for sex discrimination in violation of CFEPA because the same standards apply and the parties do not cite any relevant differences between Title VII and CFEPA. *See Comm'n on Human Rights & Opportunities v. Echo Hose Ambulance*, 322 Conn. at 160; *Craine*, 211 Conn. at 537; *Brittell v. Dep't of Corr.*, 247 Conn. 148, 164, 717 A.2d 1254 (1998); *Williams v. Quebecor World Infiniti Graphics,* 456 F. Supp. 2d 372, 383 (D. Conn. 2006) ("The Connecticut Supreme Court looks to federal precedent when interpreting and enforcing the CFEPA.") (*citing Levy v. Comm'n of Human Rights and Opportunities*, 236 Conn. 96, 103 (1996)).

## II.     Retaliation under Title VII and CFEPA

Defendant moves for summary judgment on Plaintiff's retaliation claims on the basis that Plaintiff has not adduced evidence showing that he engaged in protected activity within the meaning of Title VII and CFEPA and cannot establish that the decision to terminate him was because of any protected activity. [Def. Mem. in Supp. at 19-25].

In opposition, Mr. Bailey argues that he engaged in protected activity when he complained to his union representative, Mr. Santiago, and his supervisor, Mr. Carter, that he was being treated differently because he is male. [Pl. Mem. in Opp'n at 22-24]. The Court disagrees.

Title VII prohibits employers from retaliating against employees who oppose discriminatory practices, file complaints of discriminatory treatment, or participate in an investigation. 42 U.S.C. § 2000e-3(a). When analyzing retaliation claims,

courts apply the *McDonnell Douglas* burden-shifting framework. *Hicks v. Baines*, 593 F.3d 159, 164 (2d Cir. 2010); *see also McDonnell Douglas Corp.*, 411 U.S. at 802–05. Initially, the plaintiff must establish a prima facie case by demonstrating: "(1) participation in a protected activity; (2) that the defendant knew of the protected activity; (3) an adverse employment action; and (4) a causal connection between the protected activity and the adverse employment action." *Hicks*, 593 F.3d at 164 (quoting *Jute*, 420 F.3d at 173). It is well established that, "to prove that [s]he engaged in protected activity, the plaintiff need not establish that the conduct [s]he opposed was in fact a violation of Title VII." *Manoharan v. Columbia Univ. Coll. of Physicians & Surgeons*, 842 F.2d 590, 593 (2d Cir. 1988). Rather, the employer must have been able to reasonably understand that Plaintiff's opposition or testimony was directed at conduct prohibited by Title VII. *Rajaravivarma v. Bd. of Trustees for Connecticut State Univ. Sys.*, 862 F. Supp. 2d 127, 164-65 (D. Conn. 2012).

Thereafter, there is a presumption of retaliation that the defendant must rebut by articulating "a legitimate, non-retaliatory reason for the adverse employment action." *Jute*, 420 F.3d at 173. Finally, if the defendant proffers such a reason, "the presumption of retaliation dissipates and the employee must show that retaliation was a substantial reason for the adverse employment action." *Ibid.*

Plaintiff must prove that the employer took adverse retaliatory action "because" a plaintiff engaged in protected activity under Title VII. *Univ. of Texas Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 362 (2013). "'[B]ut-for' causation does not, [however,] require proof that retaliation was the only cause of the employer's action, but only that the adverse action would not have occurred in the absence of

the retaliatory motive." *Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 90–91 (2d Cir. 2015).

Plaintiff fails to demonstrate a prima facie case of retaliation. As Plaintiff notes, "[w]hen an employee communicates to her *employer* a belief that the employer has engaged in a form of employment discrimination, that communication virtually always constitutes the employee's opposition to the activity." [Pl. Mem in Opp'n at 22](emphasis added)(quoting *Brauer v. MXD Group, Inc.*, 2019 WL 4192181 at *3 (D.Conn. September 4, 2019)(citing *Crawford v. MetroGov't of Nashville & Davidson Cnty.*, 555 U.S. 271, 277 (2009).

After the April 12th meeting with Ms. Newell concerning Ms. Conroy's allegations, Plaintiff was emotional and said to Mr. Santiago: "Look, I'm telling the truth." And I told them I wasn't -- I wasn't being heard, wasn't being treated the same, and that they were believing their stories, whatever they were saying, and they weren't believing mine. And I was -- I couldn't control my emotions." [Pl. Ex. 2 (Bailey Depo.) at 383:10-383:16].  However, Plaintiff's complaints to Mr. Santiago and Plaintiff's belief that Mr. Santiago would advocate on his behalf were misdirected and too generalized to place Nexstar on notice that Plaintiff was actively opposing a discriminatory practice. *See Kelly v. Howard I. Shapiro & Assocs. Consulting Engineers, P.C.*, 716 F.3d 10, 17 (2d Cir. 2013).

Plaintiff's complaints to Mr. Carter after Plaintiff was informed of his suspension were more generalized than his earlier complaint to Mr. Santiago. Plaintiff testified that he was upset after learning of his suspension and stepped

outside with Mr. Carter: "I, and I, again, reiterated that I wasn't being heard. I wasn't being treated fairly. They weren't investigating. And -- and, obviously, I was upset. I was, you know, tearful. And -- and I had a -- I had a good relationship with Chuck Carter, but, you know, at that moment, it looked like it was the company's best interest in mind." [Pl. Ex. 2 (Bailey Depo.) at 382:04-382:12]. These statements do not rationally convey to Defendant that Plaintiff was opposing discriminatory treatment on account of his gender. Rather, they amount to a generalized complaint about the disposition of the allegations against him. "The onus is on the speaker to clarify to the employer that he is complaining of unfair treatment due to his membership in a protected class and that he is not complaining merely of unfair treatment generally." *Sharpe v. MCI Commc'ns Servs., Inc.*, 684 F. Supp. 2d 394, 406 (S.D.N.Y. 2010).

Because Plaintiff cannot show that he engaged in protected activity, the Court need not consider the remaining contested elements under the *McDonnell Douglas* burden shifting evidentiary framework. The Court notes that the evidence raised by Plaintiff on his retaliation claim is duplicative of his discrimination claim. He similarly fails to establish that the proffered basis for his termination was pretextual for a retaliatory motive. It bears mention that, even if Plaintiff's comments to Mr. Santiago and Mr. Carter constitute protected activity, Plaintiff does not adduce any evidence to show that the decision makers for his termination, including potentially Ms. Newell, were aware of his comments to Mr. Santiago and Mr. Carter.

Therefore, the Court GRANTS Defendant's motion for summary judgment as to Plaintiff's retaliation claim.

### III.    Hostile work environment

Plaintiff alleges that he was subjected to a sexually charged work environment where women flirted with him, he was teased by coworkers and his supervisor, ridiculed about his looks, especially his hair, inappropriately sexualized and unwantedly touched. [Pl. Mem in Opp'n at 28-30].

In support of summary judgment, Defendant argues that none of the comments alleged were "because of" his gender, he fails to show that the conduct was "severe" and "pervasive," and that liability for the comments cannot be imputed to Defendant based under the *Faragher/Ellerth* affirmative defense. [Def. Mem. in Supp. at 25-30]. The Court agrees with the Defendant.

In order to establish a hostile work environment claim under Title VII, a plaintiff must produce enough evidence to show that "the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Demoret v. Zegarelli*, 451 F.3d 140, 149 (2d Cir. 2006) (internal quotation marks omitted). A plaintiff must show not only that he subjectively perceived the environment to be abusive, but also that the environment was objectively hostile and abusive. *Hayut v. State Univ. of N.Y.*, 352 F.3d 733, 745 (2d Cir. 2003). Generally, unless an incident of harassment is sufficiently severe, "incidents must be more than episodic; they must be

sufficiently continuous and concerted in order to be deemed pervasive*." Alfano v. Costello*, 294 F.3d 365, 374 (2d Cir. 2002) (internal quotation marks omitted). Accordingly, to analyze a hostile work environment claim, the Court considers the record as a whole and assesses the totality of the circumstances, *see Raniola v. Bratton*, 243 F.3d 610, 617 (2d Cir. 2001), considering a variety of factors including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance," *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993). The Court must also consider the extent to which the conduct occurred because of the plaintiff's sex. *See Alfano*, 294 F.3d at 374.

Construing the evidence in a light most favorable to Plaintiff, he adduces enough evidence to show that comments about his appearance occurred on a routine basis, but the comments themselves are primarily gender neutral and are not objectively offensive. "Facially neutral incidents may be included, of course, among the "totality of the circumstances" that courts consider in any hostile work environment claim, so long as a reasonable fact-finder could conclude that they were, in fact, based on sex. But this requires some circumstantial or other basis for inferring that incidents sex-neutral on their face were in fact discriminatory." *Alfano*, 294 F.3d at 378. Here, the challenged comments were complimentary, innocuous, and never referred to sexual activity, never referred to sexual characteristics, and never used derogatory sexualized language; of note, Plaintiff never seriously told his co-workers to desist comments about his appearance, hair, or relationship status. [Def. Ex. A (Bailey Depo.) at 161:21-161:25; 163:17-164:15].

Accordingly, the totality of the circumstances regarding his co-worker's comments and occasional hugs does not rationally establish conduct severe enough to constitute a hostile work environment on account of Plaintiff's sex. The only sex-based comments alleged to have been made by a management official were Mr. Connors's generalized comments about Plaintiff's hair and looks monthly, which are far too innocuous and sporadic to constitute a hostile work environment which could have altered the terms and conditions of employment. [Pl. Ex. B (Bailey Depo) at 166:11-167:17]. *See Vance*, 570 U.S. at 428-32 ("If the harassing employee is the victim's co-worker, the employer is liable only if it was negligent in controlling working conditions. In cases in which the harasser is a "supervisor," however, different rules apply.").

Even if Plaintiff's co-workers' conduct was "severe and pervasive" and on account of his gender, Plaintiff fails to show that liability can be imputed to Defendant. To establish the *Faragher-Ellerth* affirmative defense as to co-worker harassment, the employer must show that it "exercised reasonable care to prevent and correct promptly any [discriminatory] harassing behavior," and (2) "the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise." *See Faragher v. City of Boca Raton*, 524 U.S. 775, 807 (1998); *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 765 (1998).

Plaintiff testified that he did not report the conduct to Nexstar's corporate office, to Mr. Graziano, or to Mr. Carter. [Def. Ex. A (Bailey Depo.) at 172:09-172:25]. Plaintiff's opposition brief argues that "Plaintiff then complained to his supervisor,

Carter, about the hostile work environment and he was ignored." [Pl. Mem. in Opp'n at 30](citing Pl. Ex. B (Bailey Depo. )371-372 and Pl. Ex. A (Bailey EEOC Aff.) ¶ 35). The cited evidence does not support Plaintiff's contention that he reported sexual harassment to management.

Plaintiff testified that working with Ms. Hudak after she was promoted to the evening news team a few weeks after her sexual harassment complaint bothered him. Pl. Ex. B (Bailey Depo.) at 372:03-372:09]. When asked about the details of Ms. Hudak's behavior that bothered him, Plaintiff testified that:

A. She came in with this fresh energy knowing she just won the battle with the support of management on her side. And yes, she was seen flirting around the newsroom stopping at other male employees' desks, like I mentioned. I think Chuck Carter even witnessed that alongside me. And we discussed that.

Q. What did you say to Chuck about it, if you recall?

A. It was a short conversation. I just remember it saying, like, "Are you seeing this?" And he said "Yep."

Pl. Ex. B (Bailey Depo.) at 372:15-373:01.

Plaintiff's vague comment to Mr. Carter about his perception of Ms. Hudak's behavior is not rationally related to any unwanted compliments about his hair or appearance. Consequently, Plaintiff failed to avail himself to avenues available to address his complaints about unwanted compliments and attention from his male and female co-workers.

Therefore, the Court GRANTS Defendant's motion for summary judgment as to count three of the Complaint for sex discrimination based on a hostile work environment.

IV.   **Defamation**

Defendant argues that it is entitled to summary judgment on Mr. Bailey's defamation claims, counts five and six, because: (1) Defendant did not make any defamatory statements as any statements made were objectively true; (2) even if Defendant's statements can be construed as defamatory, they are protected by qualified privilege, and (3) there is no evidence of malice and Plaintiff cannot overcome Defendant's qualified privilege. [Def. Mem. in Supp. at 30-36].

In opposition, Plaintiff argues that Defendant recklessly adopted false statements of fact concerning Plaintiff by failing to conduct an adequate investigation and disregarding supportive comments from management.  Plaintiff then argues that Mr. Connors made false statements to news staff concerning Plaintiff's termination for violating Nexstar's sexual harassment policy. [Pl. Mem. in Supp. at 31-40].

In reply, Defendant argues that, based on the Court's ruling on Defendant's motion to dismiss, the issue is narrowly whether Plaintiff can show abuse of the intra-corporate communication privilege. [Def. Repl. Br. at 12]. Defendant also argues that Plaintiff cannot establish that he was defamed by Mr. Connors because he relies on speculation as to what Mr. Connors said to news staff and the fact that Plaintiff was terminated for sexual harassment is objectively true. [Def. Repl. Br. at 13]. The Court agrees with Defendant.

As the Court explained it its ruling on Defendant's motion to dismiss, [ECF 33 at 12], even if a statement is defamatory, a "defendant may shield himself from

liability for defamation by asserting the defense that the communication is protected by a qualified privilege." *Gambardella v. Apple Health Care*, Inc., 291 Conn. 291 Conn. 620, 628 (2009) (citing *Torosyan v. Boehringer Ingelheim Pharmaceuticals, Inc*., 234 Conn. 1, 27 (1995)). Once the defendant has asserted privilege, courts must determine (1) whether or not the privilege applies, which is a question of law; and (2) if so, whether it has been abused, which is a question of fact. *Ibid*.

In *Gambardella v. Apple Health Care, Inc*., the Connecticut Supreme Court held that qualified privilege is "lost upon showing either actual malice, i.e., publication of a false statement with actual knowledge of its falsity or reckless disregard for its truth, *or* malice in fact, i.e., publication of a false statement with bad faith or improper motive." *Id*. at 630 (emphasis in original).

Actual malice requires Plaintiff to show that the Defendant's "knowledge of the falsity or by reckless disregard of whether or not it was false." *New York Times Co. v. Sullivan*, 376 U.S. 245, 279-80 (1964). Reckless disregard for the truth may be tested by whether "defendant in fact entertained serious doubts as to the truth of his publication," *St. Amant v. Thompson*, 390 U.S. 727, 731, (1968), or by whether defendant was aware to a high degree "of probable falsity." *Id*. at 731; *Garrison v. Louisiana*, 379 U.S. 64, 74 (1964). The malice standard requires clear and convincing evidence at trial, but only plausibility at the pleading stage. *Palin v. New York Times Co*., 940 F.3d 804, 817 (2d Cir. 2019).

The Court previously held that Ms. Hudak and Ms. Conroy's statements to Ms. Newell were subject to the intra-corporate communication privilege as a matter of law, but Plaintiff had plausibly alleged recklessness under *Gambardella*, 291 Conn. at 630. [ECF 33 at 15]. Specifically, the Court considered Plaintiff's allegations that Ms. Newell cut him off while interviewing him about the allegations, that she refused to view exculpatory text messages, refused to permit Plaintiff to respond to a third allegation, and that Mr. Graziano made a comment to Plaintiff over lunch months after Plaintiff's termination that suggested that he harbored serious doubts about the veracity of the allegations. [*Id.* at 17-19].

The Court cautioned that the issue of whether qualified privileged was abused is typically addressed on summary judgment, which would apply a clear and convincing evidence standard, instead of the plausibility standard which is applied at the pleading stage. [ECF 30 at 16](citing *Kleftogiannis v. Inline Plastics Corp.*, 411 F. Supp. 3d 216, 226 (D. Conn. 2019) and *Palin*, 940 F.3d at 817).

Here, construing the evidence in a light most favorable to Plaintiff, he has not shown that the statements alleging that Plaintiff made unwanted advances towards his female co-workers were disseminated by managers who knew or purposely avoided the truth. Negligence alone in the investigative process is not enough. *See Julian v. Securitas Sec. Servs. USA, Inc.*, No. 308CV1715MRK, 2010 WL 1553778, at *5 (D. Conn. Apr. 19, 2010); *Oski v. Fed. Exp. Co.*, No. 307CV1082 (WWE), 2009 WL 3257777, at *6 (D. Conn. Oct. 7, 2009)(same). As discussed, *supra.*, the resolution of the sexual harassment complaint hinged on a credibility determination and

Plaintiff admitted, twice, to engaging in physical contact with female co-workers that they later reported was unwelcome.

At the pleading stage, Plaintiff alleged plausible support for the inference that Mr. Graziano disbelieved Ms. Hudak's allegation against Mr. Bailey. [ECF 33 at 18-19]. However, after the close of discovery, the only evidence that could be mustered to show that any management officials disbelieved or seriously questioned whether Plaintiff had violated Nexstar's sexual harassment policy is Plaintiff's statement in his affidavit that Mr. Graziano said to him that he could not "believe Amy Hudak would do that" and "I tried to fight for you, but once it went up to corporate it was out of my hands." [Pl. Ex. A (Bailey Aff.) ¶ 111]. The language in Plaintiff's affidavit appears verbatim in the Complaint. [ECF 1 (Compl.) ¶ 111]. Plaintiff was deposed about his lunch meeting with Mr. Graziano and never referenced these statements. [Pl. Ex. B (Bailey Depo.) at 306:22-309:01]. Even so, the statement does not establish a genuine issue of material fact as to whether Mr. Graziano believed Plaintiff violated Nexstar's zero tolerance policy by engaging in unwanted physical contact: Mr. Bailey was not terminated until Ms. Conroy and Ms. Nobile lodged separate complaints.

Finally, there is no genuine issue of material fact that Plaintiff was terminated for violation of Nexstar's sexual harassment policy. Plaintiff does not establish that the details of the disputed allegations against him were disseminated beyond management. Plaintiff's claim that he was slandered by Mr. Connors at a briefing for news staff similarly fails because Plaintiff admitted that he was speculating about what Mr. Connors told staff. [Pl. Ex. B (Bailey Depo) at 255:03-256:18].

Therefore, Mr. Connors' statement to news staff announcing his termination cannot constitute defamation because it was objectively true. Vague claims about employee gossip following the termination announcement cannot establish a defamation claim as the information is not traceable to information disseminated by Nexstar's management. *See Manning v. Cigna Corp.*, 807 F. Supp. 889, 899 (D. Conn. 1991).

Accordingly, the Court GRANTS Defendant's motion for summary judgment on Plaintiff's defamation claims, counts five and six.

### V.      Breach of Contract

Defendant argues that Plaintiff cannot establish a breach of contract claim arising from the CBA because: (1) Plaintiff fails to establish the formation of any contractual right as to him; (2) his claim is preempted by the Labor Management Relations Act; (3) the Court lacks subject matter jurisdiction over the claim as Plaintiff failed to exhaust contractual grievance processes and (4) Plaintiff has not established any requisite breach. [Def. Mem in Supp. at 37-41].

In opposition, Plaintiff argues that he exhausted his administrative remedies because he appealed the union's decision declining to arbitrate the grievance regarding his termination. [Pl. Mem. in Supp. at 40]. Second, Plaintiff argues, without citation to applicable legal authority, that Section 16, the CBA's anti-discrimination provision, is not inextricably intertwined with the CBA because its language is simple and unambiguous. [*Id.* at 41]. Plaintiff does not address Defendant's arguments as to contract formation or breach of contract.

The relevant portions of the CBA provide:

Section 4.2:

The Employer shall have the right to discharge any Employee for just cause. The reason for such discharge shall be given to the Union and the Employee. If the Union believes any such discharge to be unjustified, the matter shall then be considered as a grievance, and shall be handled as stated in Article 10 of this Agreement.

Section 16, in relevant part:

Company and Unions (sic) will continue their policy and practice of not discriminating against any Employee or applicant for employment because of race, color, creed, religion, national origin, sex, age, or sexual orientation, in accordance with applicable Federal and Connecticut law.

[Def. Ex. E (CBA)]

The Court previously dismissed Plaintiff's complaint to the extent it relied on Section 4.2 because it turns on the meaning of the CBA and provided otherwise wholly independent legal rights. [ECF 33 at 25]. The Court declined to make any findings as to the applicability of Section 16 because "[t]he parties did not brief whether the CBA's antidiscrimination provision arguably has a broader scope than available statutory protections, whether different standards of proof apply, or what remedies are available." [*Id.* at 26].

As the Court previously explained: The Supreme Court has instructed that, "[w]here the resolution of a state-law claim depends on an interpretation of the collective-bargaining agreement, the claim is pre-empted." *Hawaiian Airlines, Inc. v. Norris*, 512 U.S. 246, 260–62 (1994) (citing *Lingle v. Norge Div. of Magic Chef, Inc.*, 486 U.S. 399, 405–06 (1988)). This "pre-emption merely ensures that federal law will

be the basis for interpreting collective-bargaining agreements and says nothing about the substantive rights a State may provide to workers when adjudication of those rights does not depend upon the interpretation of such agreements." *Lingle*, 486 U.S. at 409. The Supreme Court has made clear that the preemptive effect of § 301 has expanded in order to give the policies that animate the provision their proper range, and has cautioned that "the bare fact that a collective-bargaining agreement will be consulted in the course of state-law litigation plainly does not require the claim to be extinguished." *Livadas v. Bradshaw*, 512 U.S. 107, 124 (1994) (citing *Allis-Chalmers Corp v. Lueck*, 471 U.S. 202, 210 (1985)). As such, the Supreme Court has stressed that "it is the legal character of a claim, as 'independent' of rights under the CBA (and not whether a grievance arising from 'precisely the same set of facts' could be pursued) that decides whether a state cause of action may go forward." *Lividas*, 512 U.S. at 123–24 (internal citations omitted).

It is evident that Plaintiff's breach of contract claim arising from the CBA's anti-discrimination provision relies on a right conveyed by the CBA, otherwise it is simply duplicative of Plaintiff's statutory claims for discrimination. Thus, Plaintiff's breach of contract claim arises directly from the CBA itself and is preempted by § 301 of the LRMA. *See Civardi v. Gen. Dynamics Corp.*, 603 F. Supp. 2d 393, 398 (D. Conn. 2009) (holding breach of contract claim based on employee handbook preempted because it required interpretation of CBA).

Accordingly, the Court GRANTS Defendant's motion for summary judgment as to Plaintiff's claim for breach of contract, count eight of the Complaint.

### VI.   Negligent infliction of emotional distress

Under Connecticut law and "[i]n the employment context, a claim for negligent infliction of emotional distress is only recognized where it is based upon unreasonable conduct of the defendant in the termination process." *Oliver v. Waterbury Bd. of Educ.*, No. 3:12–cv–01285 (VLB), 2014 WL 1246711, at *21 (D.Conn. Mar. 24, 2014). The conduct must be "…*sufficiently wrongful* that the defendant should have realized that its conduct involved an unreasonable risk of causing emotional distress and that [that] distress, if it were caused, might result in illness or bodily harm." *Perodeau v. City of Hartford*, 259 Conn. 729, 751 (2002)(emphasis in original) (quotation omitted). "The mere termination of employment, even where it is wrongful, is therefore not, by itself, enough to sustain a claim for negligent infliction of emotional distress." *Parsons v. United Techs. Corp.*, 243 Conn. 66, 88–89, (1997).

Defendant argues, again, that Plaintiff failed to show sufficiently wrongful conduct during the termination process. [Def. Mem. in Supp. at 41-44]. In opposition, Plaintiff argues for an expansive interpretation of the termination process, arguing that it extends back to the investigation into Ms. Conroy's allegations. [Pl. Mem. in Supp. at 41]. The Court agrees with the Defendant.

At the motion to dismiss stage, the Court found that Plaintiff plausibly stated a claim for negligent infliction of emotional distress because Plaintiff alleged that he was promised the opportunity to resign, but was then abruptly and summarily terminated and the reason for his termination was announced shortly after to his former colleagues. [ECF 33 at 30]. Now, after the close of discovery, the only evidence that Plaintiff advances to show that he was offered the opportunity to resign is his EEOC affidavit which recites the allegations in the complaint verbatim. *Compare* [Compl. ¶ 61] to [Pl. Ex. A (Bailey EEOC Aff.) ¶ 61].

Statements that may be crass, insensitive, and even inappropriate are generally insufficient to constitute sufficiently wrongful conduct that employers should realize creates an unreasonable risk of emotional injury. *Pecoraro v. New Haven Register*, 344 F. Supp. 2d 840, 847 (D. Conn. 2004). Here, it is undisputed that the termination phone call was short and did not involve any objectionable language. Because no reasonable jury could find that Defendant engaged in sufficiently wrongful conduct such that it should have been aware of an unreasonable risk that it would inflict emotional harm on Plaintiff, beyond that which is ordinarily attendant to terminations, summary judgment for the Defendant must be GRANTED.

<u>Conclusion</u>

For the above stated reasons, the Court GRANTS Defendant's motion for summary judgment on all counts. The Clerk is directed to enter judgment for the Defendant and to close this case.

**IT IS SO ORDERED.**

                  /s/
_____
**Hon. Vanessa L. Bryant**
**United States District Judge**


**Dated at Hartford, Connecticut: March 6, 2021**